## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Connie Sellers and Sean Cooper, individually and as the representatives of a class of similarly situated persons, and on behalf of The Boston College 401(k) Retirement Plan I and The Boston College 401(k) Retirement Plan II, | Civil Action No.: |
| | COMPLAINT |
| Plaintiffs, | CLASS ACTION |
| V. | |
| TRUSTEES OF BOSTON COLLEGE; PLAN INVESTMENT COMMITTEE, and JOHN and JANE DOES 1-10, | |
| Defendants. | |

## **NATURE OF THE ACTION**

Plaintiffs Connie Sellers and Sean Cooper ("Plaintiffs") bring this class action lawsuit on behalf of their retirement plans, themselves, and other similarly situated individuals. Defendants Trustees of Boston College, the Plan Investment Committee ("the Committee"), and John and Jane Does 1-10 (collectively, "Defendants"), are fiduciaries of the retirement plans of which Plaintiffs are participants. As described herein, Defendants have breached their fiduciary duties to the Plans in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), to the detriment of the Plans, their participants, and their beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct, recover losses to the Plans, and obtain other appropriate relief as provided by ERISA.

## **PRELIMINARY STATEMENT**

1.      This is a class action complaint against the Trustees of Boston College ("Boston College") and all other Defendants to challenge their repeated failure to administer the Plans prudently, comply with the Plans' duly enacted Investment Policy Statement, or monitor fiduciaries and service providers to the Plans. Plaintiffs sue pursuant to ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132 and allege as follows.

2.      ERISA imposes a range of strict fiduciary duties in order to safeguard plan participants like the Plaintiffs. Fiduciaries—like the Defendants—are subject to strict duties of loyalty and prudence. They must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A) and with the "care, skill, prudence, and diligence" expected in managing a plan of similar scope. *Id.* § 1104(a)(1)(B). These fiduciary duties are among "the highest known to the law." *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d 296, 304-05 (D. Mass. 2013).

3.      Ensuring that ERISA fiduciaries prudently manage defined contribution ("DC") plans in particular is increasingly important. As of the fourth quarter of 2021, Americans had approximately $11 trillion in such plans.[1] While defined benefit plans ("DB"), or traditional pensions, were the predominant retirement vehicle for previous generations, less than a quarter of Generation X, Millennials, and Generation Z retirees are expected to receive any traditional pension income.[2] By contrast, two-thirds of workplaces that offer retirement plans offer DC plans.[3]

4.      At the same time, imprudent and disloyal mismanagement often harms DC plan participants much more than those in DB plans. Employers sponsoring DB plans must stand behind the promised benefit amount and are therefore ultimately responsible for remedying fiduciaries' breaches before participants experience harm: "In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole v. U.S. Bank N.A.*,

---

[1] *See* Investment Company Institute [ICI], Defined Contribution Plan Participants' Activities, 2021 at 7 (Apr. 2022), *available at* https://www.ici.org/system/files/2022-04/21_rpt_recsurveyq4.pdf.

[2] *See* Report on Secure Retirement Institute FactBook: https://401kspecialistmag.com/11-eyebrow-raising-facts-from-the-secure-retirement-institute-chapter-1/ (last visited June 9, 2022). When Congress enacted ERISA, there were more than twice as many DB participants as DC participants. Today, there are almost seven times as many *DC* participants. Cong. Research Serv., *A Visual Depiction of the Shift from Defined Benefit (DB) to Defined Contribution (DC) Pension Plans in the Private Sector* (Dec. 27, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF12007.

[3] Congressional Research Service, *supra* n.2 at 1.

140 S. Ct. 1615, 1618 (2020). Employers therefore have strong incentives to reduce fees and eliminate underperforming investments. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). In DC plans by contrast, employers do not guarantee any level of benefits, and participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015); *see also Hughes v. Nw. Univ.,* 142 S. Ct. 737, 740 (2022) ( "Each participant chooses how to invest her funds, subject to an important limitation: She may choose only from the menu of options selected by the plan administrators . . ."); 29 U.S.C. § 1002(34). Because employers and other fiduciaries bear no risk, they lack incentive to police costs and investment performance.

5.      The Department of Labor has emphasized that investment options' fees and underperformance can have a pronounced effect on workers' ability to retire securely. For example, a difference of 1% in annual fees can dramatically impact retirement. A worker paying 1.5% instead of 0.5% in fees and earning 7% on an initial $25,000 balance can expect her assets will be nearly *30% lower* after 35 years, adding up to $100,000 less to retire on.[4] That worker can expect a lower quality of life in retirement or may be forced to work extra years to make up for the lost opportunity. Such an outcome is even worse if she earns less than 7% in performance.

6.      Despite these high stakes, despite being subject to ERISA's strict fiduciary duties, and despite the serious potential for harm to Plaintiffs and other participants, Defendants utterly failed to employ a prudent process for managing the Plans.

7.      Boston College sponsors two retirement plans—The Boston College 401(k) Retirement Plan I ("Plan I") and The Boston College 401(k) Retirement Plan II ("Plan II").

---

[4] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

8.      Defendants' mismanagement of each Plan has cost participants millions of dollars, leading to their paying excess fees and losing out on retirement income. As detailed below, Defendants limited Plan I's participants to low-performing, high-cost investment options such as the consistently underperforming CREF Stock Account (representing over 20% of the Plan's assets invested) or the costly TIAA Real Estate Account. They also subjected Plan II's participants to dramatically high recordkeeping costs, over a third higher than similar plans. Moreover, many of these options were flagged as imprudent in prior ERISA litigation of which Defendants could and should have been aware.

9.      Courts have frequently concluded that such conduct is sufficient to state a claim for breach of fiduciary duty. *See Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d. 252, 259 (D. Mass. 2018) (plaintiff sufficiently pled claim for fiduciary breach by "plausibly alleg[ing] that the higher fees were unjustified or otherwise improper"); *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 1:20-CV-10397-GAO, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) ("[T]he long-term retention of a substantial number of underperforming funds at higher than comparable costs gives rise to a plausible inference of an objectively imprudent monitoring process.").

10.     At all times during the Class Period, the Plans had between them at least $730 million in assets under management. At the end of 2018, 2019, and 2020 the Plans had combined net assets of approximately $810 million, $958 million, and $1.1 billion, respectively.[5] These assets all were, and continue to be, entrusted to the care of the Plan's fiduciaries, including Defendants.

---

[5] For 2020, Plan I had approximately $659 million in assets and 3,631 participants with account balances at year-end, while Plan II had approximately $451 million in assets and 3,147 participants. *See* December 31, 2020 Form 5500 for Plan I, filed with the DOL ("2020 Form 5500—Plan I") at 2, 55; December 31, 2020 Form 5500 for Plan II, filed with the DOL ("2020 Form 5500—Plan II") at 2, 42. The 2020 Forms 5500 are the most recent on file.

11.     The Plans' assets under management rank each among the top 0.4% of all 401(k)

plans.[6] Plans this large have outsized bargaining power in the  marketplace for DC plan services

and greater control over the fees and expenses charged against participants' investments. *See*

*Pinnell v. Teva Pharms. USA, Inc.*, No. CV 19-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar.

31, 2020). Defendants, however, did not prudently use this power to reduce the Plans' expenses

and ensure participants had access to the best investment options.

12.     Based on this and other conduct detailed below, Plaintiffs assert claims against

Defendants for breaching their fiduciary duty of prudence (Count One). Plaintiffs also assert a

claim against Defendant Boston College for its failure to monitor other fiduciaries (Count Two).

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

U.S.C. § 1332(e)(1), because it is an action brought under Title I of ERISA, 29 U.S.C. § 1001, *et*

*seq.* Plaintiffs bring this action pursuant to ERISA Sections 502(a)(2) and (a)(3), 29 U.S.C.

§ 1132(a)(2) and (3), which authorize employee retirement plan participants to bring civil actions

on behalf of their plans to remedy breaches of fiduciary duties and other prohibited conduct, and

to obtain monetary and appropriate equitable relief as set forth in ERISA Sections 409 and 502,

29 U.S.C. §§ 1109 and 1132.

14.     This Court has personal jurisdiction over Defendants because they transact

business in this District, reside in this District, and/or have significant contacts with this District.

This Court also has personal jurisdiction over Defendants because ERISA provides for

nationwide service of process.

---

[6] ICI, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018*, at 8 (July 2021), *available at*  https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf (stating that, out of 586,622 401(k) plans on record with the DOL in 2018, 1,034 had between $250 and $500 million in assets—like the Plans did—while 1,262 had even more assets). Combined, of course, the Plans' assets are greater than even more plans. The ICI is a leading trade association for the mutual fund industry. *Id*. at 80.

15.     Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C.

§ 1132(e)(2), because some or all of the ERISA violations occurred in this District and

Defendants reside and may be found in this District. Venue is also proper in this District

pursuant to 28 U.S.C. § 1391, because Defendants do business in this District and a substantial

part of the events or omissions giving rise to the claims asserted herein occurred within this

District.

## PARTIES

### Plaintiffs

16.     Plaintiff Connie Sellers resides in Hyde Park, Massachusetts. During her

employment, Plaintiff Sellers participated in Plans I and II, investing in the options offered under

those Plans and which are the subject of this lawsuit. Plaintiff Sellers has been financially injured

by the unlawful conduct described herein. Plaintiff Sellers' account would be worth more today

had Defendants not violated ERISA as described herein.

17.     Plaintiff Sean Cooper resides in Bridgewater, MA. During his employment,

Plaintiff Cooper participated in Plan I, investing in the options offered under that Plan and which

are the subject of this lawsuit. Plaintiff Cooper has been financially injured by the unlawful

conduct described herein. Plaintiff Cooper's account would be worth more today had Defendants

not violated ERISA as described herein.

18.     Each Plaintiff has standing to bring this action on behalf of the Plans because each

of them participated in one or both of the Plans and were injured by Defendants' unlawful

conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the

value of their accounts currently, or as of the time their accounts were distributed, and what their

accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as

described herein.

19.     Plaintiffs lacked knowledge of all material facts necessary to understand that

Defendants breached their fiduciary duties and otherwise engaged in conduct violating ERISA

until shortly before they filed suit. These material facts consisted of information such as the

investment alternatives that Defendants could have made available within the Plans, the costs and investment performance of existing options compared to potential alternatives that Defendants could have made available, the plan costs they experienced and the costs for similarly sized plans, information regarding different share classes of investments that could have been made available, as well as information for costs and performance of different types of available investments.

**Defendants**

20.     Defendant Trustees of Boston College is the legal entity overseeing a private, Catholic educational institution in Middlesex and Suffolk Counties, Massachusetts. Boston College's principal place of business is 140 Commonwealth Avenue, Chestnut Hill, Massachusetts  02467. *See* 2020 Form 5500—Plan I at 1.

21.     Boston College is the "plan sponsor" of each Plan within the meaning of ERISA Section 3(16)(B), 29 U.S.C. § 1002(16)(B).[7] Boston College is also a "named fiduciary" pursuant to ERISA Section 402(A), 29 U.S.C. § 1102(a) because it has the ultimate authority to control and manage the operation and administration of the Plans. Moreover, because Boston College exercises discretionary authority or control with respect to management and administration of each of the Plans and disposition of the Plans' assets, Boston College is a functional fiduciary under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

22.     The school's website lists each individual member of the Board of Trustees as well as a number of individuals "Trustee Associates" and Regents, each of whom plays an unspecified role in the management of the school. Boston College, *Trustees & Leadership*, https://www.bc.edu/content/bc-web/about/trustees.html (last visited June 9, 2022).

23.     The Plan Investment Committee is charged with oversight of the Plans' investment policies, and the Investment Policy Statement acknowledges that "[m]embers of the Committee are 'fiduciaries' as defined by ERISA." It further states that "[t]he Committee will

---

[7] *See* 2020 Form 5500—Plan I at 31 (Audit Report, Note 1); 2020 Form 5500—Plan II at 31 (Audit Report, Note 1).

direct its duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries." Investment Policy Statement at 5.[8]

24.     Boston College appointed fiduciaries of the Plans. On information and belief, this included appointing members of the Plan Investment Committee. *See* Investment Policy Statement at 5; SPD at 9. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.     Boston College, acting through its Board of Trustees, had a fiduciary duty to monitor and supervise the Plans' fiduciaries, including the Plan Investment Committee and its members during the Class Period, but, as set forth in detail below, the Plans' fiduciaries failed to carry out their duties prudently.

26.     For the foregoing reasons, at all times during the Class Period, Defendant Trustees of Boston College was a fiduciary of each Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition of Plan assets and exercised discretionary authority to appoint and/or monitor the other fiduciaries, which in turn had control over Plan management and/or authority or control over management or disposition of Plan assets. While Plaintiffs have not named individual Trustees, Regents, or Trustee Associates as Defendants, Plaintiffs reserve the right to do so based on information obtained through discovery.

**John Doe Defendants**

27.     To the extent that there are additional officers, employees, board members, administrators, and/or contractors of Boston College who are/were fiduciaries of the Plans during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the

---

[8] The Investment Policy Statement, available to participants online, does not specify *which* Plan it applies to, providing only that it is intended to "summarize the underlying philosophy and processes for the selection, monitoring, and evaluation of investment options offered under the Boston College 401(k) Retirement Plan." Investment Policy Statement at 1, *available at* https://www.bc.edu/content/bc-web/offices/human-resources/sites/employee-handbook/benefits/investment-policy-statement.html  (last visited June 9, 2022).

right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include, but are not limited to, Boston College officers, employees, board members, administrators, and/or contractors who are/were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## THE PLANS AND THEIR ADMINISTRATION

28.     The Plans are each defined contribution or individual account plans that include a cash or deferred arrangement. Each is an "employee pension benefit plan" within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), covering eligible current and former Boston College employees, including each of the Plaintiffs. Each Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan." BC also has a separate, voluntary 403(b) plan to which participants can direct contributions. Summary Plan Description ("SPD"), Boston College 401(k) Retirement Plans I & II, dated January 1, 2015 at 14, 19, 21.

29.     Boston College established Plan I as the Boston College Qualified Retirement Plan effective April 1, 1985. Effective July 1, 1997, that Plan was renamed the Boston College 401(k) Retirement Plan I. Participants in the prior plan automatically continued in the newly renamed Plan I and also had the opportunity to transfer any portion of their accounts to Plan II. Participants in Plan I retain the opportunity to allocate their contributions between the Plans and to transfer portions of their account to Plan II. SPD at 3, 9-10.

30.     Effective July 1, 1997, Boston College created Plan II. As with Plan I, participants in the newer Plan may allocate their contributions to either and may transfer portions of their account to Plan I. SPD at 9-10.

31.     Boston College is the Plan Sponsor for both Plan I and Plan II. SPD at 18.

32.     Boston College is also the Plan Administrator for both Plan I and Plan II. *Id.*

33.     A participant's account consists of the sum of his or her contributions and the employer's matching contributions. SPD at 6.

34.     Retirement benefits provided by each Plan are based solely on the amounts contributed to a participant account, and any income or gains (or losses) on such contributions, less any expense that may be allocated to such participant's account. SPD at 6.

35.     Teachers Insurance and Annuity Association and College Retirement Equities Fund ("TIAA") is Plan I's trustee and the custodian for the majority of that Plan's investments. *See* Form 5500—Plan I at 31 (2020 Auditor's Report, n.1).

36.     TIAA is the recordkeeper for Plan I. *See* 2020 Form 5500—Plan I at 10.

37.     Fidelity Management Trust Company ("Fidelity Trust") is Plan II's trustee and the custodian for the majority of that Plan's investments. See Form 5500—Plan II At 31, (2020 Auditor's Report n.1).

38.     Fidelity Investments Institutional Operations Company LLC ("Fidelity") is the recordkeeper for Plan II. 2020 Form 5500—Plan II, at 10.

39.     Peter S. Lynch, Vice Chairman of Fidelity Management & Research Company, Boston College Alumnus, and legendary former manager of Fidelity's Magellan Fund is listed as a "Trustee Associate" on Boston College's Trustees & Leadership website. *Supra* ¶ 22. In 2000, after Mr. Lynch and his wife, Carolyn A. Lynch, announced a sizable donation, Boston College named its School of Education and Human Development after them, "[i]n honor of that gift, at the time the largest ever to the University." Boston College, *About Carolyn A. and Peter S. Lynch*, https://www.bc.edu/content/bc-web/schools/lynch-school/about/about-carolyn-and-peter-lynch.html (last visited June 9, 2022).

**Eligibility**

40.     An employee is eligible to participate in either or both Plans after having completed one year of service, as defined in the Plans, provided the employee is 21 years old and is not in an excluded classification (*i.e.,* a "casual employee, a teaching fellow, a temporary pool employee, an auxiliary policeman or policewoman, a bartender, a student, a graduate assistant, a 'leased employee,' a non-faculty employee who has an appointment of less than 6 months, a non-faculty employee who is in a benefits-eligible position but who is less than full-time with an

appointment of less than 36 weeks," or certain faculty employees such as those with reduced teaching loads). SPD at 5.

**Contributions and Vesting**

41.     Once an eligible employee enrolls, the school reduces their pay by 2% and contributes that amount to the relevant Plan. The school makes employer contributions, calculating the match based in part on the participants' years of service. SPD at 4. Participants can allocate contributions to investment options in either Plan and transfer assets between plans. *Id.* Both employee and employer contributions vest immediately. *Id.* at 8.

42.     According to the Plans' 2020 Forms 5500, employer contributions totaled $14,207,773 for Plan I and $14,175,069 for Plan II. Like other employers, Boston College enjoys significant benefits from sponsoring the Plans, including benefiting from increased employee recruitment and reduced turnover.

**The Plans' Investments**

43.     The Plans each allow participants to invest in several mutual funds, including Target Date Funds (funds that in turn invest in a mix of equity and fixed income investments ostensibly balanced based on the investor's time until retirement). Plan I includes 30 options, of which 11 are TIAA's "Lifecycle" Target Date Funds. 2020 Form 5500—Plan I, at 55. Plan II includes 27 options, of which 13 are Fidelity's "Freedom" Target Date Funds. 2020 Form 5500—Plan II, at 42. In each Plan, the vast majority of options are TIAA or Fidelity funds, respectively, with four or fewer options from outside fund families available in each Plan.

44.     The Plans' fiduciaries select, monitor, and evaluate investment options operating pursuant to an Investment Policy Statement adopted in 2006. *See* Investment Policy Statement, *supra* ¶ 23, n.8.

45.     The Investment Policy Statement provides that "[t]he Plan Administrator decides which investment options to offer" under the Plans. *Id.* at 9.

46.     The Investment Policy Statement also "[r]ecogniz[es] that a defined contribution program can provide a primary method for retirement savings," and states that investment

options have therefore been selected that among other things "charge fees that are reasonable for the asset class and investment style." *Id.* at 2-3.

47.     The Statement provides that changes to investment options will be made at the sole discretion of the Plan Investment Committee. *Id.* at 5.

48.     The Investment Policy Statement sets forth "general guidelines" for the Committee to follow in reviewing options, including the historical risk and return of options and their cost to participants. IPS at 4. It provides that the Committee will "specifically review the range of investment options provided and the performance of each investment option" on a periodic basis. *Id.* at 4.

49.     As the Investment Policy Statement notes, "[m]embers of the Committee are 'fiduciaries' as defined by ERISA." IPS at 5. The Statement recognizes that members must act "solely in the interest of the Plan[s'] participants and beneficiaries" and lists several Committee duties and responsibilities, including selecting the trustee, recordkeeper, and investment options and evaluating individual options. *Id.* at 5.

50.     As alleged below, Defendants failed to prudently manage the Plan's investment options and failed to comply with the Investment Policy Statement.

**Payment of Plan Expenses**

51.     During the Class Period, administrative and investment expenses paid using Plan assets were reported on each Plan's Form 5500.

**ERISA Fiduciary Duties**

52.     ERISA imposes strict fiduciary duties, including duties of loyalty and prudence, upon retirement plan fiduciaries like defendants here. ERISA Section 404, 29 U.S.C. § 1104(a)(1) provides:  "[A] fiduciary shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims; . . . and (D) in accordance with the documents and instruments governing the plan." *See also Hughes*, 142 S. Ct. at 739.

53.     "[T]he twin duties of loyalty and prudence,' . . . are among 'the highest known to the law.'" *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d 296, 304-05 (D. Mass. 2013) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009)); *see also Sweda v. Univ. of Pa.*, 923 F. 3d 320, 333 (3d Cir. 2019).

54.     ERISA's "prudent person" standard serves "to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). Recently, the Supreme Court emphasized that this standard imposes a "continuing duty of some kind to monitor investments and remove imprudent ones." *Hughes*, 142 S. Ct. at 741 (quoting *Tibble*, 575 U.S. at 530). Fiduciaries must exercise prudence in selecting investments and are also subject to a "continuing duty to monitor [plan] investments and remove imprudent ones," which exists "separate and apart" from the duty with respect to the initial selection. *Tibble*, 575 U.S. at 529. They must dispose of any imprudent investments within a reasonable time and may be held liable either for "assembling an imprudent menu of investment options" or "failing to monitor the plan's investment options to ensure that each option remains prudent." *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

55.     A fiduciary must ensure that *each* investment option is and remains prudent and cannot defend by arguing that it has offered some prudent investments along with imprudent investments. *Hughes*, 142 S. Ct. at 741-42.  "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 289 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009) (quoting *DiFelice*, 497 F.3d at 423).

56.     ERISA also requires Plan fiduciaries to act in accordance with Plan documents. Any violation of the terms of plan documents constitutes a fiduciary breach. *Dardaganis v.*

*Grace Capital, Inc.*, 664 F. Supp. 105, 108 (S.D.N.Y. 1987), *aff'd* 889 F.2d 1237 (2d Cir. 1989); *see also Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 765 F. 3d 59, 64 (1st Cir. 2014) ("[A] fiduciary 'must act in accordance with the documents and instruments governing the plan insofar as they accord with the statute.'") (Quoting *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1548 (2013)).

## DEFENDANTS' ERISA VIOLATIONS

### A.  Defendants Caused Participants to Incur Unreasonable Fees During the Class Period

57.     As described above, Defendants were each fiduciaries of the Plans.

58.     Plaintiffs lacked and continue to lack actual knowledge of Defendants' specific decision-making process for managing the Plans, including their process for selecting and monitoring Plan investments, as this information is in the sole possession of Defendants.

59.     Plaintiffs have drawn reasonable inferences regarding these processes from the facts set forth herein for purposes of this Complaint.

### (1)  Defendants Failed to Ensure the Plans' Recordkeeping Expenses Were Reasonable

60.     TIAA and Fidelity provide the Plans a set of administrative services, such as tracking participants' account balances and sending participants communications, that collectively are described as "recordkeeping." *See generally Hughes*, 142 S. Ct. at 740. The market for recordkeeping services is competitive, and numerous recordkeepers in the marketplace are able to provide the same services at very little cost. Several services (such as processing Qualified Domestic Relations Orders, *see* 29 U.S.C. § 1056 (d)(3)(B)(i)) may even be a profit center for recordkeepers. Recordkeepers will compete to win contracts with DC plans, particularly those with many assets and/or large participant populations.

61.     Plan fiduciaries can arrange for recordkeeping to be paid directly by the plan sponsor or from the plan's assets. For plans, like both Plan I and II, paying from plan assets, payments may be made directly or through revenue sharing, where investments within the plans make payments to the plans' recordkeeper or to the plans directly for recordkeeping costs.

62.     While courts have recognized that fiduciaries' use of revenue sharing is not per se imprudent, they have noted that revenue sharing may hide the true scope of fees from participants and even from fiduciaries themselves. *See, e.g.*, *Tussey v. ABB, Inc.*, 746 F. 3d 327, 336-37 (8th Cir. 2014).

63.     Here, revenue sharing harmed the Plans' participants because it resulted in their being forced to pay above-market recordkeeping and administrative fees, which was hidden from their view.

64.     In 2020, Plan I's Form 5500 filed with the DOL reported direct recordkeeping compensation to TIAA totaling $55,010. 2020 Form 5500—Plan I, at 10. It noted that TIAA also received indirect compensation (*i.e.,* revenue sharing). Plan II's Form 5500, however, reported direct compensation to Fidelity over seven times higher: $393,136, in addition to indirect compensation. 2020 Form 5500—Plan II, at 6. This despite the fact that Plan II has slightly *fewer* participants and is nearly a third smaller by asset size. *See id.* ¶ 10. Moreover, Plan II reported varying levels of direct compensation throughout the class period, with direct costs *increasing* each year, despite that Plan reporting fewer participants over time and despite the general trend in the marketplace toward lower costs. *See infra* ¶ 70.

65.     Defendants caused Plan II's participants to pay dramatically higher recordkeeping fees than participants in like plans and like circumstances.

66.     NEPC, a consulting group, recently published the results of a survey of defined contribution plans, reporting on factors such as the fees plans paid. *See* NEPC, LLC, *NEPC 2021 Defined Contribution Plan Trends and Fee Survey Results* (Feb. 2022).[9] The group sampled 137 DC plans, with 1.6 million participants and $230 billion in aggregate assets. The median plan had $728 million in assets and 5,400 participants, comparable to Plan I's and Plan II's asset and participant counts. *See* NEPC 2021 Report at 2; *see also supra* ¶ 10.

---

[9] *Available at* https://1o6eee2d0sv33mxg9d15cr4u-wpengine.netdna-ssl.com/institutional/wp-content/uploads/sites/4/2022/02/2021-NEPC-DC-Plan-Trends-and-Fee-Survey-Full-Results.pdf.

67.     NEPC's survey found that larger plans paid lower recordkeeping fees per participant, that half of surveyed plans with between 5,000 and 15,000 participants paid $40 to $55 per participant in recordkeeping fees, and that *no* such plans in the survey paid above $70. NEPC 2021 Report at 12. By contrast, Plan II paid well above $100 per participant—$124.92, well more than *double* the rate that many comparable plans paid, and three quarters *more* than the very highest fees paid by plan participants in the survey. Moreover, this figure only counts *direct* compensation—the disparity may be even higher once Fidelity's indirect compensation, not detailed in the Form 5500s, is counted.

68.     Plan I's recordkeeping costs likewise included both direct and indirect compensation. The Form 5500 does not report details, and plan participants' statements variously report a "Plan Servicing Credit" or a "Plan Servicing Fee." Plan I's Fee Disclosures further elaborate that these entries reflect adjustments to ensure TIAA receives a set percentage in revenue sharing for each investment as an "administrative fee," but none of these documents contain details about the total amount TIAA actually receives. Plaintiffs anticipate that Plan I's total recordkeeping costs, once revealed through discovery, will similarly reflect imprudence by the fiduciaries.

69.     To satisfy their duty of prudence, fiduciaries must evaluate all fees participants pay to a recordkeeper or other service provider on a continuing basis. *See* Dep't of Labor, *A Look at 401(k) Plan Fees* at 2. This requires an evaluation of every fee a service provider receives, whether through direct compensation or revenue sharing, and a prudent fiduciary should ensure any payments exceeding reasonable compensation are returned to the plans.

70.     Prudent fiduciaries also look externally, to the marketplace, to determine what comparable plans are paying their service providers and, consequently, what is reasonable compensation. Courts have held that this may require conducting a Request for Proposal process, issuing RFPs every three to five years as a matter of course or more often if benchmarking or other information shows the fees are unreasonable. *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479

(M.D.N.C. 2015). Industry participants, too, emphasize the importance of an RFP process. *See*
2020 NEPC Report at 12 NEPC, LLC, *NEPC 2020 Defined Contribution Progress Report at
12*.[10] ("While there is scale pricing, (i.e., larger plans can access lower fees), operational
complexity and service levels drive meaningful differentiation in price. Best practice is to
compare fees and services through a record-keeping vendor search Request for Proposal ("RFP")
process."). Obtaining market information is particularly important since fees in the retirement
plan marketplace regularly show a downward trend. *See* ICI Report, *supra* n.6 at 49.

71.     Both ERISA and DOL regulations "require[] plan fiduciaries, when selecting and
monitoring service providers and plan investments, to act prudently and solely in the interest of
the plan's participants and beneficiaries." DOL 408(b)(2) Regulation Fact Sheet[11] at 1. In
guidance to fiduciaries, the DOL has emphasized that staying informed about the marketplace is
a key component of prudent conduct:

> "Responsible plan fiduciaries also must ensure that arrangements with their service
> providers are 'reasonable' and that only 'reasonable' compensation is paid for services.
> Fundamental to the ability of fiduciaries to discharge these obligations is obtaining
> information sufficient to enable them to make informed decisions about an employee
> benefit plan's services, the costs of such services, and the service providers."
> *Id.* (emphasis added).

72.     The facts available to the Plaintiffs—including that the Plans each have retained
the same recordkeepers over the course of the Class Period and appear to have seen no
meaningful reduction in recordkeeping fees—support an inference that Defendants failed to
conduct RFPs at reasonable periods and otherwise failed adequately to explore whether the Plans

---

[10] *Available at*
https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Sur
vey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

[11] *Available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-
activities/resource-center/factsheets/final-regulation-service-provider-disclosures-under-
408b2.pdf.

could obtain more favorable rates in the recordkeeping marketplace, which is highly competitive and includes many firms capable of offering the same levels of service. Indeed, Defendants ignored multiple red flags specific to TIAA and Fidelity, as detailed herein, further indicating they failed to monitor these service providers.

73.     In light of the Plans' asset size and participant counts, coupled with the trend toward lower recordkeeping expenses and the competitive nature of the marketplace, each of the Plans could have obtained recordkeeping services of the same or better quality at a lower cost.

**(2) Defendants Failed to Act Meaningfully While Many of the Plans' Options Had Excessive Investment Management Fees.**

74.     Defendants also failed to prudently select and monitor the Plans' investment options during the Class Period. These failures wasted the Plans' assets and harmed each participant's ability to obtain a secure retirement through a combination of high fees and low performance.

75.     In comparison to options in similarly sized plans, many of the Plans' investments were significantly more expensive than comparable funds found in similarly sized plans.[12]

76.     As noted above, the Plan Investment Committee selects the various investment options made available to Plan participants. The following options were available to participants in Plan I as of December 31, 2020 (non-TIAA funds are bolded and italicized):

| Fund Name | Total Assets |
|---|---|
| TIAA Insurance Investment Account – Traditional Annuity | $185,214,338 |
| CREF Variable Annuity – Stock Account R3 | $137,965,163 |
| CREF Variable Annuity – Growth Account R3 | $37,894,786 |
| CREF Variable Annuity – Social Choice Account R3 | $32,172,849 |
| CREF Variable Annuity – Global Equities Account R3 | $27,627,014 |

---

[12] If anything, these comparisons understate Defendants' failure to act prudently. Combined, the Plans' assets total over $1 Billion while the combined participant count is nearly 7000 (though there is some double counting, as many participants are invested in both Plans). *See supra* ¶ 10.

| | |
|---|---|
| TIAA Pooled Separate Account – Real Estate Account | $25,429,515 |
| TIAA-CREF Mutual Funds – Equity Index Institutional | $24,598,361 |
| CREF Variable Annuity – Bond Market Account R3 | $20,127,696 |
| TIAA-CREF Mutual Funds – International Equity Index Institutional | $18,143,596 |
| TIAA-CREF Mutual Funds – Large-Cap Value Index Institutional | $15,928,147 |
| TIAA-CREF Mutual Funds – Small-Cap Blend Index Institutional | $13,656,957 |
| TIAA-CREF Mutual Funds – Lifecycle 2040 Institutional | $13,424,871 |
| TIAA-CREF Mutual Funds – Lifecycle 2035 Institutional | $10,645,275 |
| CREF Variable Annuity – Equity Index Account R3 | $10,610,613 |
| TIAA-CREF Mutual Funds – Lifecycle 2025 Institutional | $9,505,395 |
| TIAA-CREF Mutual Funds – Large-Cap Growth Index Institutional | $9,030,353 |
| TIAA-CREF Mutual Funds – Lifecycle 2045 Institutional | $8,910,645 |
| TIAA-CREF Mutual Funds – Lifecycle 2030 Institutional | $8,868,817 |
| CREF Variable Annuity – Inflation-Linked Bond Account R3 | $8,524,401 |
| TIAA-CREF Mutual Funds – Lifecycle 2020 Institutional | $8,083,021 |
| CREF Variable Annuity – Money Market Account R3 | $6,401,690 |
| TIAA-CREF Mutual Funds – Lifecycle 2050 Institutional | $6,169,562 |
| ***Vanguard – Total Bond Market Index Fund*** | $5,970,397 |
| TIAA-CREF Mutual Funds – Lifecycle 2015 Institutional | $4,645,357 |
| ***Vanguard – Federal Money Market Fund*** | $3,713,136 |
| TIAA-CREF Mutual Funds – Lifecycle 2055 Institutional | $2,638,807 |
| TIAA-CREF Mutual Funds – Lifecycle 2010 Institutional | $1,403,148 |
| ***Vanguard – Inflation Protected Securities Fund*** | $1,055,246 |
| TIAA-CREF Mutual Funds – Lifecycle 2060 Institutional | $486,905 |
| TIAA-CREF Mutual Funds – Lifecycle Retirement Income Institutional | $224,215 |

77.     The following options were available to Plan II participants as of December 31, 2020 (non-Fidelity options are bolded and italicized):

| Fund Name | Total Assets |
|---|---|
| Fidelity Mutual Funds – Fidelity Growth Company Class K | $61,130,927 |
| Fidelity Mutual Funds – Fidelity Contrafund Class K | $45,923,096 |
| Fidelity Mutual Funds – Fidelity 500 Index | $45,482,043 |
| Fidelity Mutual Funds – Fidelity Freedom K 2030[13] | $38,128,936 |
| Fidelity Mutual Funds – Fidelity Freedom K 2025 | $30,161,302 |
| Fidelity Mutual Funds – Fidelity Freedom K 2020 | $27,976,328 |
| Fidelity Mutual Funds – Fidelity Freedom K 2035 | $24,233,478 |
| Fidelity Mutual Funds – Fidelity Freedom K 2040 | $21,468,476 |
| Fidelity Mutual Funds – Fidelity Extended Market Index Advantage | $18,251,501 |
| Fidelity Mutual Funds – Fidelity Low Priced Stock Class K | $17,510,001 |
| Fidelity Money Market Fund – Fidelity Retirement Gov't Money Mkt. | $16,544,211 |
| Fidelity Mutual Funds – Fidelity Diversified International Class K | $14,280,960 |
| Fidelity Mutual Funds – Fidelity US Bond Index | $13,631,207 |
| Fidelity Mutual Funds – Fidelity Freedom K 2045 | $11,469,668 |
| Fidelity Mutual Funds – Fidelity Freedom K 2050 | $10,375,022 |
| Fidelity Mutual Funds – Fidelity Freedom K 2015 | $9,593,111 |
| ***PIMCO – Total Return Fund Institutional Class*** | $9,591,676 |
| ***Vanguard – Total International Stock Index Fund*** | $7,219,981 |
| Fidelity Mutual Funds – Fidelity Small Cap Value | $5,604,189 |
| ***MFS – Value Class R6*** | $5,527,840 |

---

[13] While the Form 5500 lists this and other target date funds as simply "Freedom K," Plan II's 2021 Fee Disclosures list each respective fund as the Fidelity Freedom *Index* Fund, in the Institutional Premium share class. Fidelity appears to offer K share classes for its standard Fidelity Freedom funds, see infra ¶ 95, but not for its Fidelity Freedom Index Funds. Plaintiffs anticipate discovery will help explain this discrepancy.

| | |
|---|---|
| Fidelity Mutual Funds – Fidelity Freedom K 2055 | $5,187,014 |
| Fidelity Mutual Funds – Fidelity Freedom K 2010 | $3,863,289 |
| ***Vanguard – Inflation-Protected Securities Admiral Shares*** | $3,799,134 |
| Fidelity Mutual Funds – Fidelity Freedom K Income | $2,353,399 |
| Fidelity Mutual Funds – Fidelity Freedom K 2060 | $1,227,784 |
| Fidelity Mutual Funds – Fidelity Freedom K 2005 | $74,628 |
| Fidelity Mutual Funds – Fidelity Freedom K 2065 | $144 |

78.     A participant who enrolls in a Plan but does not specify an investment allocation will have contributions invested in that Plan's "qualified default investment alternative" ("QDIA"), selected by the Plan's fiduciaries operating under DOL guidelines. For each Plan, the applicable QDIA is one of the age-based funds (the TIAA Lifecycle or Fidelity Freedom funds). *See* SPD at 9.

79.     Each fund has an associated "expense ratio," reflecting the fee investing participants are charged for investment management and other services. "The size of the expense ratio varies based on a host of factors unique to each investment, such as the size of the fund, the frequency of trading, and the complexity of its holdings." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478 , 482 (8th Cir. 2020) (citing DOL guidance). The expense ratio is based on a percentage of assets. An expense ratio of 0.5% means a participant will pay $5.00 annually for every $1000 in assets invested in that fund. The expense will then reduce the participant's return and the compounding effect of that return, as outlined in the DOL's "A Look at 401(k) Fees" guidance. *Supra* ¶ 69. This effect increases the importance of having prudent fiduciaries monitoring investment fees and net performance.

80.     Each of the Plans has included investment options with unreasonably high expense ratios. Plan I, for example, has included the TIAA Real Estate Account throughout the Class Period. And as shown above, the Real Estate account is the sixth largest holding in Plan I. TIAA has disclosed that participants invested in the Real Estate Account pay a 0.865% expense

ratio for the privilege of investing in it. As courts have noted in other cases involving the Real Estate Account, *see infra* ¶ 85, the account is structured in a way that inevitably leads to higher expenses. The result is that, while typical real estate funds available to retirement plan participants average expense ratios of 0.59% to 0.64%,[14] Plan I's participants are paying almost a third higher.

81.     As with recordkeeping expenses, plan fiduciaries should evaluate investment fees by obtaining detailed pricing information and comparing existing investment options in the relevant Plan to potential alternatives. Again, larger plans generally qualify for lower fees. The effect is pronounced compared to recordkeeping fees, because mutual funds offer lower-fee share classes to investors that satisfy a threshold amount invested. Indeed, Plan II appears to qualify for lower-fee share classes for many of the Fidelity options it offers. *See infra* ¶ 95 (outlining alternatives). In addition, the same investments may be available through lower-cost vehicles such as Separate Accounts and Collective Investment Trusts ("CITs").

82.     Here, the available facts indicate Defendants did not engage in a prudent monitoring process. Indeed, throughout the class period, it appears only one option in each Plan —the CREF Stock Account and the MFS Value fund—saw a change in share classes. That is only two out of sixty-nine total options. Defendants' lack of prudence cost participants dearly.

**B.**     **Defendants Ignored Public Red Flags About TIAA and Fidelity Contrary to Participants' Interests**

83.     While the foregoing examples of failed oversight—subjecting participants to costly services and investments—arise in other cases challenging ERISA fiduciary breaches, the facts here even more clearly indicate Defendants breached their duties because they ignored multiple red flags about TIAA and Fidelity, including court decisions concluding that specific investments in the Plans were imprudent.

---

[14] *See* ICI Report, *supra* n.6 at 54, 34 (reporting average expense ratios for funds in "other" category, which includes real estate funds).

**(1) <u>TIAA and "Fear Selling"</u>**

84.      Participants in many university-sponsored plans throughout the country have raised red flags about TIAA's offerings. TIAA has essentially exploited its first-mover advantage and its market clout in the higher-education field, and taken advantage of plan fiduciaries' neglect, to saddle plans with underperforming, costly funds.

85.      In 2019, the Third Circuit held a complaint plausibly alleged that the fiduciaries of the University of Pennsylvania's retirement plans breached their fiduciary duties in part because their plan offered the TIAA Real Estate Account and the CREF Stock Account. *See Sweda v. Univ. of Penn.*, 923 F.3d 320, 331 (3d Cir. 2019). A year before, a Court within the First Circuit—the District of Rhode Island—similarly concluded that participants in Brown University's retirement plan stated a claim based on the underperformance and costly nature of the TIAA Real Estate Account and the CREF Stock Account. *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 372 (D.R.I. 2018). Nevertheless, both options remain in Plan I and have been retained throughout the Class Period.

86.      Even more troublingly, a joint investigation by the Securities and Exchange Commission and New York's Attorney General brought to light disturbing information about a TIAA subsidiary's marketing practices. That subsidiary had a years-long record of taking advantage of TIAA's privileged access to retirement plan participants to, essentially, scare them into buying services they didn't need. The NYAG's findings lay out the practice: "Beginning in or about 2012, TIAA Services and its salespeople used a false and misleading marketing pitch to convince investors to roll over assets from low-fee employer-sponsored retirement plans to individual managed accounts in TIAA Services' Portfolio Advisor program, on which TIAA Services charged lucrative management fees." *In re Investigation by Letitia James of TIAA-CREF Individual & Institutional Services, LLC*, Assurance of Discontinuance at 1, 21-035 (July 13, 2021).

87.    TIAA's subsidiary trained and incentivized salespeople "to identify clients' 'pain points.'" (*i.e.,* their concerns about their retirement readiness) and sell them managed services, which earned the company more money. *Id.* at 2, 4.

88.    As the investigation noted, the practice grew out of TIAA's realization a decade ago, that its business line of administering employer-sponsored plans (like Plan I) was in trouble, in part due to demographic trends and in part due to the competitive nature of the retirement plan marketplace, described above. *Id.* at 2-3. TIAA's subsidiary leveraged two key assets enjoyed by its parent—access to retirement plan participants and "the trust of its clients." *Id.* at 3.

89.    TIAA's subsidiary specifically targeted participants in TIAA-administered retirement plans, and used the "false and misleading" marketing tactics the New York Attorney General described:

"The first step of the Sales Process was for Advisors to cold-call preselected participants in TIAA-administered employer-sponsored retirement plans to offer free financial planning services. These services were often described as included in, or a benefit of, the investor's retirement plan. If an investor accepted the offer, Advisors held a "discovery" meeting with the client to gather information about the client's finances, goals, and risk profile.

TIAA Services trained Advisors to use the discovery meeting to uncover "pain points" that could be used to help motivate an investor to make changes to their financial portfolio. Under the Sales Process, Advisors were coached to frame the discussion around four financial planning challenges – asset management and allocation, income distribution, incapacity, and estate planning – and to get the client to "self-realize" that they needed help in one or more of these areas. Some Advisors expressed discomfort with this approach, describing it as a form of 'fear selling.'"

*Id.* at 4.

-24-

90.     The Attorney General issued her findings in July 2021, but the investigation and

underlying allegations were public knowledge as early as November 2017.  Indeed, a New York

Times article detailing the investigation made clear: a) the nature of TIAA's marketing; b) the

equally troubling practice of targeting participants in retirement plans contracting with TIAA;

and c) the fact that this had been going on for years by that point. *See* Gretchen Morgenson,

*TIAA Receives New York Subpoena on Sales Practices* (N.Y. Times Nov. 9, 2017), *available at*

https://www.nytimes.com/2017/11/09/business/tiaa-subpoena.html ("Most of TIAA's clients

invest with the firm because their employers have hired it to administer their workers' retirement

plans. TIAA typically acts as record keeper to these institutions, administering accounts that

allow plan participants to choose among an array of mutual funds and annuities."); *id.*

(describing 2012 training materials titled "The Probing Sequence, Making the Client 'Feel the

Pain.'").

91.     In the face of all of this, Defendants did—nothing. TIAA was and remains Plan

I's recordkeeper—enjoying access to information about that Plan's thousands of participants.

Defendants have not removed the TIAA Real Estate Account, the CREF Stock Account, or any

other TIAA option from Plan I's investment lineup. Nor have they, to Plaintiffs' knowledge,

warned participants about TIAA's marketing practices at any point in the Class Period.

**(2) Fidelity and Its Costly Offerings**

92.     The red flags associated with Fidelity were less headline-grabbing but were also

harmful to Plan II's participants and equally demanding of Defendants' attention. That attention

likewise never came.

93.     As with TIAA, a 2017 court opinion provided strong notice to the Plans'

fiduciaries to scrutinize Fidelity closely. In *Tracey v. Massachusetts Inst. of Technology*, No. CV

16-11620-NMG, 2017 WL 4478239 (D. Mass. Oct. 4, 2017), the District of Massachusetts

allowed a suit challenging Fidelity's investment and recordkeeping fees to proceed. Two years

later, the Court refused to grant the defendants summary judgment on the question of whether

those defendants were imprudent in keeping several Fidelity investment options, including its target date funds. *Tracey v. Mass. Inst. of Tech.*, 404 F. Supp. 3d 356, 362 (D. Mass. 2019).

94.     The MIT case is no outlier. Fidelity's costly offerings and recordkeeping services have been challenged by participants in numerous plans, including in those offered to Fidelity's own employees. *See Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 218-19 (D. Mass. 2020) (noting stipulated facts that "recordkeeping services would have been available to the Plan for a significantly lower cost per head" than that charged by Fidelity and concluding fiduciaries were negligent in failing to monitor the costs).

95.     Compounding these issues, Defendants failed to move Plan II into less expensive versions of options already in the Plan. The Plan was invested in the "K" share class for different Fidelity options, including the Fidelity Growth Company Fund and Fidelity Contrafund, the two largest options in the Plan. As Fidelity's own materials show, the Plan qualified for K6 shares. Defendants' failure to make these funds available resulted in participants paying expense ratios over 50% higher in some instances:

| Fund | Expense Ratio – *K Class (In Plan II)* | Expense Ratio – K6 Class |
|---|---|---|
| Fidelity Growth Company | 0.75 | 0.45 |
| Fidelity Contrafund | 0.78 | 0.45 |
| Fidelity Low-Priced Stock Fund | 0.56 | 0.50 |
| Fidelity Diversified International Fund | 0.94 | 0.60 |

*See* Fidelity Pricing Options for Retirement Plans, As of April 30, 2022 at 2-3, *available at* https://institutional.fidelity.com/app/proxy/content?literatureURL=/9861765.PDF.[15]

---

[15] Defendants' imprudence is clear even from this comparison based on public pricing information, but it bears emphasizing that Plan II's superior bargaining power based on its asset size and participant count, should open the door to even lower rates.

96.     As with TIAA, despite this record replete with red flags about Fidelity, Defendants failed to take action to ensure Plan II participants were not overcharged and underserved.

**C.      Defendants' Failure to Take Action with Respect to TIAA and Fidelity Is Not Justified by Their Underperforming Investment Offerings**

97.     Defendants' failure to replace TIAA, Fidelity, and/or their investment offerings finds no justification in those investments' performance. Indeed, the CREF Stock Account (flagged in prior litigation) continued to underperform lower-cost funds in the same category that measured their performance against the same benchmark index.

98.     As the Plaintiffs in the litigation involving Brown University pointed out, the CREF Stock Account underperformed in comparison to the following actively managed, large-cap funds with similar underlying asset allocations: The Vanguard Diversified Equity Fund (Investor Class) (VDEQX), the Vanguard PRIMECAP Fund (Admiral) (VPMAX), and the Vanguard Capital Opportunity Fund (Admiral) (VHCAX)." Compl. ¶ 70, *Short v. Brown Univ.*, No. 17-cv-00318-M-PAS (D.R.I. July 6, 2017). Unsurprisingly, the CREF Stock Account has continued to underperform *all* of these alternatives, for the critical  3- and 5-year periods, in some cases, it has underperformed by over a third:

| | 5-Year Performance | 3-Year Performance | 1-Year Performance |
|---|---|---|---|
| ***CREF Stock Account (In Plan)*** | 9.67% | 9.52% | -7.15% |
| **Vanguard Diversified Equity** | 13.22% | 13.01% | -8.84% |
| **Vanguard PRIMECAP** | 13.25% | 11.93% | -5.03% |
| **Vanguard Capital Opp.** | 12.79% | 11.71% | -7.71% |

99.     As detailed in the chart above, each of the comparator funds the Brown University Plan participants identified outperformed the CREF Stock Account dramatically over the 3- and 5-year periods, with the CREF Stock Account only edging out two for the volatile, trailing 12-

months. All of these times are within the Class Period. And the CREF Stock account had been underperforming for years even before the *Brown* plaintiffs filed. Prudent fiduciaries would have investigated and sought out better performing, lower-cost alternatives to the CREF Stock Account either from among those *specifically* identified in public litigation or from the myriad alternatives available in the marketplace. That Defendants failed to do so shows they failed to implement a prudent process for monitoring the Plans' investment options.

100.    The options listed in the above chart are simply examples of the superior options available in the marketplace.

101.    Given the CREF Stock Account's clear and continuing underperformance, and given the substantial red flags associated with TIAA in general, Plan I's fiduciaries should have replaced it during the Class Period.

102.    Defendants' failure to take action had a profound impact on Plan participants. The CREF Stock Account is the second-largest investment in Plan I, after the TIAA Traditional Annuity. Fully a fifth of that Plan's total assets are invested in the CREF Stock Account. *See supra* ¶ 76. If any investment option merited close scrutiny, this was it.

103.    Had Defendants prudently monitored the investments within the Plans, Defendants would have removed the CREF Stock Account and other funds in favor of superior funds featuring comparable investment objectives, superior performance, and charging lower fees. Certainly, the performance of the CREF Stock Account and other TIAA or Fidelity offerings did not provide Defendants a justification for maintaining the Plans' relationships with TIAA and Fidelity in the face of the numerous red flags outlined above.

104.    While the Investment Policy Statement itself requires the fiduciaries to monitor the Plans' investment options and provides a roadmap for them to do so, *see* Investment Policy Statement at 4-5, Defendants did not take meaningful action. The Investment Policy Statement provides that problematic investment options can be frozen (i.e., closed to new investments), replaced, or eliminated. *Id.* However, throughout the Class Period, Defendants did not freeze or remove a single investment option from either Plan.

105.    Defendants may have hesitated to part ways with Fidelity, at least, due to the school's relationship with Trustee Associate Peter Lynch, who built a national profile in the 1980s and 1990s from steering Fidelity's Magellan Fund, who Boston College credited with a then-recordbreaking contribution, and who now has an entire school on campus named after him. Plaintiffs reserve the right to amend this Complaint to add a claim for breach of ERISA's Duty of Loyalty if discovery shows that this relationship or any other self-interest motivated Defendants' actions and inactions.

## CLASS ACTION ALLEGATIONS

106.    Plaintiffs bring causes of action as a class action on behalf of themselves and all others similarly situated. ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2) allows participants to bring actions on behalf of a plan. Plaintiffs seek certification pursuant to that provision and pursuant to Federal Rule of Civil Procedure 23(a) and (b). The putative Class that Plaintiffs seek to represent is defined as follows:

> All persons, except Defendants and their immediate family members, who were participants in, or beneficiaries of the Plans, at any time between June 10, 2016 through the date of judgment (the "Class Period").[16]

107.    Numerosity: The members of the Putative Class are so numerous that joinder of all members is impractical. As of December 31, 2020, Plan I had 3,631 "participants with account balances as of the end of the plan year" 2020 Form 5500—Plan I, at 2. As of December 31, 2020, Plan II had 3,147 "participants with account balances as of the end of the plan year."[17] To require individual actions would prejudice putative Class Members and Defendants. The identities of the putative Class Members, and the details of their retirement plan accounts, will be determined from Defendants' records.

---

[16] Plaintiffs reserve the right to propose different or additional classes or subclasses in their motion for class certification or subsequent pleadings.

[17] These numbers double-count some participants, since participants can be in both plans, but either of the Plans' participant count is, standing alone, enough to satisfy the numerosity element.

108.    Typicality: Plaintiffs' claims are typical of those of other members of the Putative Class. Plaintiffs participated in the Plans and have suffered injuries as a result of Defendants' mismanagement, like other Class members. Defendants treated Plaintiffs and other Class members consistently and managed each of the Plans uniformly as to all Participants. Plaintiffs' claims arise out of the same conduct and misconduct by Defendants, as alleged herein, that form the basis of Class Members' claims. Defendants' wrongful conduct has affected all members of the Class similarly. Plaintiffs' claims are thereby representative of and co-extensive with the claims of the Class.

109.    Commonality: There are questions of law and fact common to Plaintiffs and putative Class Members that predominate over any questions affecting only individual members of the putative Class. These common questions of law and fact include, but are not limited to:

a)  Whether Defendants are and/or were fiduciaries of either or both of the Plans;

b)  Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

c)  Whether Defendants breached their duty to act in accordance with Plan documents;

d)  Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

e)  The proper form of equitable and injunctive relief; and

f)  The proper measure of monetary relief.

110.    Adequacy of Representation: Plaintiffs have no conflicts of interest with other Class Members, will fairly and adequately represent the Class, and will prosecute the case vigorously on behalf of the Class. Counsel representing Plaintiffs are competent and experienced in litigating complex cases and large class actions, including ERISA and other employment law cases.

111.   <u>Superiority of Class Action</u>:  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Putative Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests. An award of equitable relief, such as removal of fiduciaries would apply to all participants in the Plans and would thus be dispositive of their interests.

112.   In the alternative, certification is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

113.   Finally, certification is warranted under Rule 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' misconduct applied uniformly to all Class members, who individually do not have an interest in pursuing separate actions. The amount of each individual's recovery is relatively small compared to the burden of individual prosecution. Certification will also obviate the need for duplicative litigation that might render inconsistent judgment, and management of this action as a class action will not present likely difficulties.

114.   If each individual Member of the Putative Class were required to file an individual lawsuit, Defendants would necessarily gain an unfair advantage because Defendant would be able to exploit and overwhelm the limited resources of each Class Member with Defendants' vastly superior financial legal resources.

115.   Requiring each individual Member of the Putative Class to pursue an individual remedy would also discourage the assertion of lawful claims by those Class Members, particularly

by those still employed by Boston College, who would be disinclined to pursue these claims against Defendant because of an appreciable and justifiable fear of retaliation and permanent damage to their careers and well-being.

**FIRST CAUSE OF ACTION**

**Breach of Fiduciary Duty of Prudence and Fiduciary Duty to Comply with Plan Documents in Violation of ERISA (29 U.S.C. § 1104(a)(1)(B), (D))**

116.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

117.    As alleged above, Defendants are fiduciaries with respect to each of the Plans and are subject to ERISA's fiduciary duties.

118.    ERISA Section 404, 29 U.S.C. § 1104, imposes fiduciary duties of prudence upon the Defendants in connection with the administration of the Plans, the selection and monitoring of Plan investments, and the monitoring of service providers to the Plans.

119.    Defendants' fiduciary responsibilities include managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with appropriate care, skill, diligence, and prudence. Defendants are also required to act in accordance with the documents and instruments governing the plan insofar as they are consistent with ERISA. Finally, Defendants are obligated to ensure that the Plans' fees are reasonable, to select and retain prudent investment options, evaluate and monitor the Plans' investments on an ongoing basis and eliminate imprudent ones, and take all necessary steps to ensure that the Plan's assets are invested prudently. This duty includes "a continuing duty . . . to monitor investments and remove imprudent ones[.]" *Hughes*, 142 S. Ct. at 741; *Tibble*, 575 U.S. at 529.

120.    The Plans' Investment Policy Statement is a document and instrument governing the Plans within the meaning of ERISA Section 404. The Investment Policy Statement requires the Plans' fiduciaries to, among other things, ensure that the investment options made available to participants "charge fees that are reasonable for the asset class and investment style." The

Investment Policy Statement also sets forth a procedure for the fiduciaries to monitor and if necessary, replace or eliminate investment options.

121.    As detailed above, Defendants failed to prudently and objectively monitor the Plans' investments to ensure that each of the investments was and remained appropriate for the Plans. Defendants also failed to comply with the Investment Policy Statement. Defendants failed to remove those investments that were no longer appropriate. Defendants retained imprudent funds as Plan investments despite the availability of superior alternative investments that would have cost Plan participants significantly less and performed significantly better. Defendants failed to remove TIAA and Fidelity funds, and to investigate alternatives to them as recordkeepers, despite multiple, public red flags associated with each company.

122.    Each of the actions and omissions described in Paragraph 121 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

123.    Defendants' conduct also constitutes a breach of their duty to act in accordance with the documents and instruments governing the plan, in violation of ERISA Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

124.    The Plans and their participants suffered millions of dollars in losses as a consequence of Defendants' fiduciary breaches.

125.    Under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to make good to each Plan all losses resulting from the aforementioned fiduciary breaches, to restore to the Plans any profits Defendants made through use of Plan assets, and to restore to the Plans any profits resulting from their breaches of fiduciary duties.

126.    Each Defendant knowingly participated in each breach of the other Defendants, with knowledge that such acts were a breach, and enabled other Defendants to commit breaches

by failing to lawfully discharge such Defendant's own duties. Each Defendant knew of the other Defendants' breaches and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Under ERISA Section 405, 29 U.S.C. § 1105(a), each Defendant is therefore also liable for the losses caused by the breaches of their co-fiduciaries.

127.    Wherefore, Plaintiffs and Members of the putative Class request relief as hereinafter provided.

## SECOND CAUSE OF ACTION

**Failure to Monitor Fiduciaries**

128.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

129.    Defendant Trustees of Boston College is a fiduciary of each of the Plans with responsibilities relating to the selection and monitoring of Plan investment options.

130.    Trustees of Boston College is responsible for appointing and removing members of the Plan Investment Committee. Trustees of Boston College therefore has a fiduciary responsibility to monitor the performance of the Plan Investment Committee and its members.

131.    ERISA requires monitoring fiduciaries to ensure that the fiduciaries they monitor in turn satisfy their fiduciary obligations. These obligations include those with respect to investment selections, monitoring of service providers, and compliance with plan documents. Monitoring fiduciaries are required to act promptly to protect plans, participants, and beneficiaries when monitored fiduciaries breach their own obligations.

132.    The Trustees of Boston College breached its fiduciary monitoring duties in numerous ways, including:

a)   failing to monitor and evaluate the performance of the Plan Investment Committee and failing to have a system in place for doing so. The Trustees of Boston College did nothing as the Plans suffered significant losses as a result of the Committee's imprudent actions and omissions;

b) failing to monitor the processes by which those responsible selected and monitored Plan investments. The monitored fiduciaries actions and inactions would have alerted a prudent fiduciary to the breaches of fiduciary duties outlined above; and

c) failing to remove Investment Committee members whose performance was inadequate as demonstrated by their retaining imprudent, excessively costly, and poorly performing investments within the Plan to the detriment of the Plan and Plan participants' retirement savings.

133.   Due to these foregoing breaches of the duty to monitor, the Plans suffered millions of dollars per year in losses due to excessive fees and investment underperformance.

134.   ERISA Sections 409 and 502, 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), render Boston College liable to restore to the Plans all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor its appointed fiduciaries on the Investment Committee.

135.   Wherefore, Plaintiffs and putative Class Members request relief as hereinafter provided.

## **PRAYER**

136.   For these reasons, Plaintiffs and Class Members respectfully request that judgment be entered in their favor awarding the following relief:

a) A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

b) Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

c) A Declaration that the Defendants have breached their fiduciary duties under ERISA;

d) An Order compelling the Defendants to personally make good to each Plan all losses to that Plan incurred as a result of Defendants' breaches of their fiduciary duties described above and to restore each Plan and its participants to the position they would have been in but for this unlawful conduct;

e) An order requiring Defendants to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Defendants as necessary to effectuate said relief, and to prevent Defendants' unjust enrichment;

f) Restoration of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

g) An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

h) Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run each Plan, transfer of Plan assets out of imprudent investments into prudent alternatives, and removal of fiduciaries deemed to have breached their fiduciary duties;

i) An award of pre-judgment interest;

j) An award of attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g) and the common fund doctrine; and

k) An award of such other and further relief as the Court deems equitable and just.

Dated: June 10, 2022

Respectfully submitted,


*/s/  Stephen Churchill*
Stephen Churchill, BBO #564158
Osvaldo Vazquez, Fl. Bar #0070995; Mass. Bar
Application Pending
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
Tel.          (617) 607-3260
Fax.          (617) 488-2261
steve@fairworklaw.com
oz@fairworklaw.com


*Attorneys for Plaintiffs and Class Members*