UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
CONNIE SELLERS AND SEAN COOPER,  )
individually and as the         )
representatives of a class of   )
similarly situated persons, and )
on behalf of the Boston College )
401(K) Retirement Plan I and    )
the Boston college 401(K)       )
Retirement Plan II,             )
                                )
                  Plaintiffs,   )
                                )
          v.                    )     CIVIL ACTION
                                )     NO. 22-10912-WGY
TRUSTEES OF BOSTON COLLEGE,     )
PLAN INVESTMENT COMMITTEE,      )
JOHN AND JANE DOES 1-10,        )
                                )
                  Defendants.   )
_____)
```

YOUNG, D.J.                              April 11, 2024

**MEMORANDUM OF DECISION**

I.   INTRODUCTION...........................................3
     A. Procedural History .................................4
     B. Undisputed Facts ...................................6
        1.  The Parties ....................................6
        2.  The Plans ......................................6
        3.  The Committee & Fiducient ......................7
        4.  Investment Policy Statement ....................8
        5.  Recordkeeping Fees .............................9
        6.  Challenged Investments ........................12
II.  ANALYSIS..............................................15
     A. ERISA – Duty of Prudence ..........................15
        1.  History of ERISA ..............................15
        2.  ERISA'S Duty of Prudence ......................15
     B. Pleading Standard .................................18

   C. Boston College Fails to Show as Matter of Law that the Committee Did Not Breach its Fiduciary Duties with Respect to the Recordkeeping Fees Claim. ............. 21
      1. Overall Principles Related to Monitoring Recordkeeping Fees ................................ 21
      2. Negotiations and Benchmarking ..................... 22
      3. Requests for Proposal (RFP) ...................... 28
      4. Decision to Not Consolidate and Keep Incumbent Recordkeepers ................................... 31
      5. TIAA's Compensation ............................. 40
      6. Potential Conflicts of Interest Between Committee Members and the Incumbent Recordkeepers .......... 45
   D. Boston College's Motion for Summary Judgment on Breach for the Challenged Investments Claim is DENIED. ...... 48
      1. Overall Principles and Factual Disputes Concerning Monitoring and Evaluating the Challenged Investments ................................................ 49
      2. The CREF Stock Account .......................... 56
      3. TIAA Real Estate Account ........................ 70
      4. The Committee's Good Faith ....................... 77
   E. Boston College Did Not Violate the Plans' Documents. . 83
   F. Although Participants Show Loss on the Recordkeeping Fees Claim from 2019 to Present, They Fail to Show Loss from 2016 to 2018.  Although Participants Show Loss for the CREF Stock Account, They Fail to Show Loss for the TIAA Real Estate Account.  Boston College Fails to Meet its Burden in Establishing that the Committee's Decisions Were Objectively Prudent. .................. 85
      1. General Principles Relevant to Loss or Objective Prudence ........................................ 87
      2. Participants Fail to Show Loss from 2016 to 2018 for the Recordkeeping Fees Claim but Do Show Loss for the Fees from 2019 to 2023.  Boston College Fails to Show the Fees Were Objectively Prudent as Matter of Law. ............................................. 89
      3. While Participants Show Loss for the CREF Stock Account, Participants Fail to Show Loss for the TIAA Real Estate Account.  Boston College Fails to Show that Retaining the CREF Stock Account Was Objectively Prudent as Matter of Law. ............ 99
   G. This Court GRANTS Summary Judgment on Whether the Trustees Prudently Monitored Their Fiduciaries. ..... 118
III. CONCLUSION............................................ 120
IV. EPILOGUE – A BRIEF REFLECTION ON SUMMARY JUDGMENT....... 120

## I.    INTRODUCTION

Plaintiffs ("Participants"), former or current participants in Boston College's 401(k) Retirement Plans, bring a class action against the Trustees of Boston College ("Trustees") and the Plan Investment Committee (the "Committee") (together "Boston College"), for failure to: (1) prudently administer the Retirement Plans (the "Plans") with respect to the Plans' recordkeeping fees ("Recordkeeping Fees") and certain investments ("challenged investments"); (2)comply with the Plans' investment policy statement ("Investment Policy Statement" or "IPS"); and (3) monitor fiduciaries and service providers to the Plans.  Compl., ECF No. 1.  The Participants bring suit under Sections 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109, 1132. Id.

Boston College moves for summary judgment, Defs.' Mot. Summ. J., ECF No. 58, arguing that Boston College "followed a robust fiduciary process to monitor [its] two 401(k) plans consistent with industry standards," and that the Participants cannot demonstrate a genuine dispute of material fact on breach or loss.  Defs.' Mem. Law Supp. Defs.' Mot. Summ. J. ("Mem.") 1, 14-17, ECF No. 59.  Boston College further argues that, even if the Participants do show a genuine dispute of material fact on breach or loss, Boston College shows, as matter of law, that the

Plans' fees and the challenged investments were objectively prudent.  Id. at 1, 17, 19.

## A. Procedural History

On June 10, 2022, Plaintiffs Connie Sellers ("Sellers") and Sean Cooper ("Cooper"), individually and as the representatives of a class of similarly situated persons, and on behalf of the two Boston College 401(k) retirement plans, filed a putative class action complaint ("Complaint") against Boston College and its trustees (the "Trustees").  Compl. ¶¶ 16-18.  The Complaint alleges one count against all Defendants (Count One: Breach of Fiduciary Duty of Prudence and Fiduciary Duty to Comply with Plan Documents) and one count against only the trustees of the retirement plans for failing to monitor the Committee and the ten John and Jane Does (Count Two: Failure to Monitor Fiduciaries).  Id. ¶¶ 116-35.

On August 15, 2022, Boston College moved to dismiss Participants' Complaint, see Defs.' Mot. Dismiss Compl., ECF No. 12, which this Court denied on November 10, 2022.  See Elec. Clerk Notes, ECF No. 26; see also Mem. Decision, ECF No. 32. This Court certified the class on May 19, 2023.  Order, ECF No. 46.  On September 29, 2023, Boston College moved for summary judgment on all of Participants' claims.[1]  Defs.' Mot. Summ. J..

---

[1] Boston College indicates that the Participants alleged a claim related to investment fees in the Complaint but have

The parties fully briefed the issues before oral argument. Mem.; Defs.' Statement Facts ("SOF"), ECF No. 60; Pls.' Opp'n Defs.' Mot. Summ. J. ("Opp'n"), ECF No. 69; Pls.' Counter Statement of Material Facts ("CSOF"), ECF No. 70; Defs.' Reply Support Defs.' Mot. Summ. J. ("Reply"), ECF No. 75; Defs.' Reply Statement Facts Support Defs.' Mot. Summ. J. ("RSOF"), ECF No. 76.

This Court heard oral argument on Boston College's motion for summary judgment on November 14, 2023, and took this motion under advisement. Elec. Clerk Notes, ECF No. 91. After the hearing, the parties submitted supplemental briefing regarding additional authorities and on the issue of loss and objective prudence. Notice Suppl. Authority Supp. Defs.' Mot. Summ. J., Mot. Exclude Opinions Pls.' Expert Minnich, and Mot. In Limine Preclude Evidence and Argument Re Damages ("Supp. Authority"), ECF No. 90; Pls.' Supp. Filing Re Prima Facie Loss Further Opp'n Defs.' Mot. Summ. J. ("Supp. Loss"), ECF No. 95; Defs.' Mem. Further Supp. Defs.' Mot. Summ. J., ECF No. 98 ("Supp. Opp'n

---

abandoned this claim.  Mem. 12 n.13; Reply 2 n.2.  The Participants do not mention investment fees in their opposition. See generally Opp'n.  Thus, this Court assumes that the Participants are no longer pursuing the investments fees' claim. Similarly, the parties agree that the Participants do not bring any claims against investments in Plan II, only Plan I.  Mem. 8 n.9; Reply 2 n.2; Opp'n 17 n.15.

Loss"); Pls.' Response Defs.' Unopposed Mot. Leave File Response Pls.' Supp. Filing Re Loss ("Supp. Response Loss"), ECF No. 99.

**B. Undisputed Facts**

**1.   The Parties**

Boston College offers retirement plans to its full-time employees.  CSOF ¶ 1.  Among those plans are Boston College 401(k) Retirement Plan I ("Plan I") and Boston College 401(k) Retirement Plan II ("Plan II"), id. ¶ 2, which are defined contribution plans, sponsored and administered by Boston College.  Id. ¶¶ 3, 5.  Employees eligible for these Plans can participate in both plans, can allocate contributions, and may transfer portions between the Plans.  Id. ¶ 7.  Sellers is a former employee of Boston College and has been a participant of both Plans for the duration of the class period, id. ¶ 9, which extends from June 10, 2016, to present (the "Class Period").  Id. at 9 n.2.  Cooper is also a former employee of Boston College and a participant of Plan I.  Id. ¶ 10.

**2.   The Plans**

From 2015 to 2021, Plan I had 3,538 to 3,697 participants and approximately $447,000,000 to $731,000,000 in assets, and Plan II had 2,760 to 3,221 participants and assets between $239,000,000 and $516,000,000.  Id. ¶¶ 13, 34.  Plan I offers various investment options, such as

international and domestic equity funds, annuity products
(real estate account and target-date funds), bond funds,
and money market funds.  Id. ¶ 14.  Its investment options
include fixed annuities (TIAA Traditional), as well as
variable annuity products, including –– and at issue here -
- the CREF Stock Account and TIAA Real Estate Account (the
"challenged investments").  Id. ¶ 15.

### 3.   The Committee & Fiducient

In 2005, Boston College established the Committee as
an ERISA fiduciary of the Plans.  Id. ¶ 43.  The Committee
is responsible for overseeing the control and management of
the Plans' assets, which includes deciding what investment
options to offer, monitoring performance of the Plans'
investments, establishing benchmarks to assess the
investments' performance, and monitoring the Plans' fees.
Id. ¶ 44.

The Committee makeup during the Class Period is as
follows: John Zona (Chief Investment Officer) ("Zona"),
David Martens (Director of Investments) ("Martens"), John
Burke (Benefits Director) ("Jack Burke"), Jeffrey Pontiff
(Chair in Finance) ("Pontiff"), David Trainor (Vice
President of Human Resources) ("Trainor"), and John Burke

(Financial Vice President & Treasurer) ("John Burke").  Id.
¶¶ 45-54.

The Committee retained Fiducient, an independent
financial consultant, "to assist in its deliberative
process."  Id. ¶ 57.  Fiducient acted as co-fiduciary and
investment advisor of the Plans during the Class Period.
Id. ¶ 58.  Vincent Smith ("Smith"), Partner and Senior
Consultant of Fiducient, worked with the Committee and
attended every Committee meeting.  Id. ¶ 59.  Fiducient
also prepared quarterly investment reviews ("QIRs") on the
Plans' investments, which "discussed several qualitative
and quantitative factors."  Id. ¶¶ 61, 63.  The Committee
received these QIRs before each Committee meeting.  Id.

The Committee met three to four times per year to review
and discuss the Plans' fees and investments.  Id. ¶¶ 71,
75-77.  The Committee reported annually to the Board of
Trustees.  Id. ¶ 79.

### 4.   Investment Policy Statement

The Committee has an Investment Policy Statement to
help guide its monitoring and managing of the Plans'
investments.  Id. ¶ 67.  The IPS guides the Committee to
consider several factors when evaluating and choosing
investments.  Id. ¶ 68 (listing factors).  The IPS allows

investment options to be decided "at the sole discretion of
the Committee," that "the Committee may . . . establish a
probationary period" to assess and correct any investment
concerns, and the Committee must document investment
changes.  Id. ¶ 69.

### 5. Recordkeeping Fees

"[R]etirement plans . . . pay fees for recordkeeping
services.  Recordkeepers help plans track the balances of
individual accounts, provide regular account statements,
and offer informational and accessibility services to
participants."  Hughes v. Nw. Univ., 595 U.S. 170, 174
(2022).  Plan I's recordkeeper is Teachers Insurance and
Annuity Association ("TIAA").  CSOF ¶¶ 3, 24.  TIAA has
been the recordkeeper for Plan I (or its predecessor) since
1947.  Id. ¶¶ 3, 11.  TIAA also provided recordkeeper
services for three of Boston College's other, non-ERISA
retirement plans.  Id. ¶ 25.  Between 2016 and 2019, TIAA's
contracts with Boston College listed the "per unique
participant" price, which reflected the services and fees
for all four Plans, not just Plan I.  Id.  Plan II's
recordkeeper is Fidelity Investments Institutional
Operations Company, Inc. ("Fidelity").  Id. ¶¶ 4, 36.

For Plan I's annuities (or "TIAA annuities"), Boston College cannot transfer ("map") annuity assets to other investments without the direction of the plan participant. Id. ¶ 20.  Thus, if a participant's assets are held in an individually controlled annuity contract, Boston College can "freeze" these assets, preventing future contributions, but cannot transfer the assets to another investment.  Id. ¶¶ 20, 23.  Frozen annuities still, however, require recordkeeping management and oversight until the annuities' assets are distributed or transferred, by the participant, to another recordkeeping platform.  Id. ¶¶ 23, 211.  Unlike annuities, the Committee can both transfer mutual funds (like those offered in Plan II by Fidelity) from a discontinued recordkeeper's platform and direct future contributions to a new recordkeeper's platform.  Id. ¶ 22. The Committee cannot do this for investments held in TIAA annuities.  Id.

### a.  Benchmarking and Negotiation of Recordkeeping Fees

The Committee reviewed and discussed fee analyses prepared by Fiducient on at least an annual basis, and these analyses "quantified total Plan I and II costs, identified plan average account balances, [ ] benchmarked total Plan I and II costs and recordkeeping fees, [and]

illustrated alternative fee arrangements." Id. ¶¶ 82, 91.
The Committee met with TIAA and Fidelity at times during
the Class Period to discuss fees. Id. ¶ 98.

### b.   2018 RFP

Fiducient assisted the Committee with its 2018 Request
for Proposal ("RFP"), a competitive bidding process used so
that the Committee could explore its recordkeeping options.
Id. ¶ 66. The Committee reviewed proposals from TIAA,
Fidelity, Empower, Vanguard, and Transamerica, each
"describing their services and fees for the existing two-
plan, one vendor structure as well as [proposing] a
possible one-plan, one-vendor structure." Id. ¶ 103.
Boston College had the option to retain its two incumbent
recordkeepers (TIAA and Fidelity), keep one recordkeeper
and replace the other, replace both, or consolidate into a
single recordkeeper (whether that be TIAA, Fidelity, or
another recordkeeper). Ex. 71 (Request for Proposal
Analysis, November 12, 2018, BC-SELLERS001089, at 1092),
ECF No. 63-27. TIAA and Fidelity's recordkeeping proposals
provided certain non-core services that other proposals
required additional fees for, waived contract termination
fees, and provided a fee guarantee for five years. CSOF ¶¶
105-06. The lowest bid submitted during the 2018 RFP was

$31 for a single recordkeeping arrangement under Fidelity (incumbent) or Empower.  Ex. 71 at 1098-1101.

The Committee ultimately kept both TIAA and Fidelity as its recordkeepers and did not consolidate to a single recordkeeper for both Plans.  CSOF ¶¶ 21-22, 109.  The Committee considered several factors in deciding which recordkeeper(s) to retain, as reflected by the RFP's corresponding meeting minutes.  RSOF ¶ 224.  The Committee also considered factors such as participant choice and disruption to participants.  CSOF ¶ 107.

### 6.   Challenged Investments

The Committee reviewed the Plans' investments at each meeting and discussed performance data (QIRs) provided by Fiducient.  Id. ¶¶ 119-21.  Fiducient assigned each investment one of the following status ratings: "Maintain," "Watch," "Discuss," or "Terminate."  Id. ¶¶ 122-23.  During the Class Period, some of the Plans' investments were placed on the "Watch" list, id. ¶ 126, and, at times, the Committee made changes to its investment lineups.  Id. ¶¶ 127-34.

The CREF Stock Account is "an actively-managed variable annuity that seeks favorable long-term returns through capital appreciation and investment income."  Id. ¶ 135.  The TIAA Real Estate Account is "a tax-deferred variable annuity account that

seeks to generate favorable returns primarily through rental income and the appreciation of a diversified portfolio of directly held, private real estate-related investments" by "purchasing direct ownership interest in income-producing properties," including residential, official, industrial, and foreign properties ("Real Estate Account"). Id. ¶¶ 138-39. The Committee reviewed and discussed QIRs on the challenged investments' performances throughout the Class Period. Id. ¶ 149.

### a. CREF Stock Account

In March 2016, the Committee discussed assigning peer group rankings and benchmarks to the CREF Stock Account. Id. ¶ 151. Fiducient added an additional peer group to compare the CREF Stock Account's performance, noting that the CREF Stock Account's equity composition (containing a mix of both foreign and domestic equities) made it difficult to "select[] [an] appropriate peer universe for comparison." Id.

In December 2020, as per Fiducient's advice, the Committee put the CREF Stock Account on "Watch." Id. ¶ 157. Fiducient's QIRs cited two reasons for this designation: (1) the departure of a portfolio manager; and (2) "sustained underperformance." RSOF ¶ 215. It remained on "Watch" until September 2021. CSOF ¶ 158. Since then, Fiducient has designated its status as "Maintain." Id. ¶ 159. In a 2019 email, Fiducient's Smith

indicated that the Committee did "consider[] freezing contributions to [CREF annuities] and re-directing low-cost index funds," but the Committee ultimately decided not to do so. Id. ¶ 160.

### b.   TIAA Real Estate Account

The Committee regularly received and discussed reporting on the TIAA Real Estate Account's performance. Id. ¶ 162. In early 2018, QIRs on TIAA benchmarked the Real Estate Account's performance with the NCREIF ODCE Index on both an absolute and adjusted basis. Id. ¶ 163. The "adjusted" performance accounted for the Real Estate Account's liquidity restriction: as part of its investment strategy, it maintained 15-25% "of its net assets in publicly traded liquid investments" to "meet participant redemption requests and purchase and improve properties." Id. ¶ 142. Before September 2022, Fiducient consistently designated the Real Estate Account with a "Maintain" status. Id. ¶ 168. In September 2022, the Real Estate Account's status was changed to "Discuss" following the departure of the lead portfolio manager. Id. ¶ 169. The designation changed back to "Maintain" by the fourth quarter of 2022. Id. ¶ 170.

## II.  ANALYSIS

### A.    ERISA – Duty of Prudence

#### 1.    History of ERISA

Congress enacted ERISA in 1974.  Pub.L. No. 93-406, 88 Stat. 829, codified as amended at 29 U.S.C. §§ 1001-1461; see Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 50 (1st Cir. 2014).  ERISA is a "comprehensive and reticulated statute," governing private employee benefit systems, including retirement plans.  Tracey v. Massachusetts Inst. of Tech., No. CV 16-11620-NMG, 2017 WL 4453541, at *8 (D. Mass. Aug. 31, 2017) (Bowler, M.J.) (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 251 (1993)), report and recommendation adopted in part, rejected in part, 2017 WL 4478239 (D. Mass. Oct. 4, 2017) (Gorton, J.).  One of ERISA's principal goals is to afford appropriate protection to employees and their beneficiaries with respect to the administration of employee welfare benefit plans.  Merrimon, 758 F.3d at 50 (citing Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 361-62 (1980)).

#### 2.    ERISA'S Duty of Prudence

Section 404(a) of ERISA requires a fiduciary to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries."  29 U.S.C. § 1104(a)(1).  An ERISA fiduciary is

[15]

also obligated to follow the terms of the plan, so long as they do not conflict with the statute.  Id. § 1104(a)(1)(D).  The obligations imposed by ERISA, including the duties of loyalty and prudence, are among "the highest known to the law." Moitoso v. FMR LLC, 451 F. Supp. 3d 189, 204 (D. Mass. 2020) (quoting Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 598 (8th Cir. 2009) (quoting Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982))).

   To prevail on a claim under this provision, plaintiffs must show: (1) that defendants acted as the Plans' fiduciary; (2) that defendants breached their fiduciary duties; and (3) that the breach caused a loss to the Plan.  Tracey, 2017 WL 4453541, at *9 (citing Pegram v. Herdrich, 530 U.S. 211, 225-26 (2000); and Braden, 588 F.3d at 594).  Once plaintiffs show breach and loss, the burden of persuasion shifts to defendants to disprove loss causation by showing that the decision regarding the investments or fees was objectively prudent.  Brotherston v. Putnam Invs., LLC, 907 F.3d 17, 33, 39 (1st Cir. 2018).

   The parties do not dispute that Boston College is a fiduciary and that the Plans qualify as ERISA plans.  See Compl. ¶¶ 23, 117.  The parties do, however, dispute whether Boston College breached its fiduciary duties, whether the alleged breach caused a loss to Participants, and whether the

Committee's decisions with respect to the fees or investments were objectively prudent.

The duty of prudence requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a [fiduciary] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B); see also 29 C.F.R. § 2550.404a-1 ("[T]he requirements of section 404(a)(1)(B) . . . are satisfied if the fiduciary: (i) Has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved . . . .").  A fiduciary who breaches the duty of prudence must "make good" to the plan of "any losses to the plan resulting from . . . such breach . . . ."  29 U.S.C. § 1109(a).

When examining an alleged breach of the duty of prudence, the key question is "whether the fiduciary took into account all relevant information" in performing its duties under ERISA. Turner v. Schneider Elec. Holdings, Inc., 530 F. Supp. 3d 127, 133 (D. Mass. 2021) (Gorton, J.) (citing Moitoso, 451 F. Supp. 3d at 204 (internal citations and quotation marks omitted)). "Importantly, the Supreme Court has explained that the content

[17]

of the duty of prudence turns on the circumstances . . . .
prevailing at the time the fiduciary acts." Barchock v. CVS
Health Corp., 886 F.3d 43, 44 (1st Cir. 2018) (internal
quotation marks omitted) (quoting Fifth Third Bancorp v.
Dudenhoeffer, 573 U.S. 409(2014)); see also Estate of
Smith v. Raytheon Co., 573 F. Supp. 3d 487, 510 (D. Mass.
2021) (Woodlock, J.).

Therefore, to determine whether a fiduciary acted
prudently, a court will evaluate conduct under the
"totality of the circumstances" and assess a fiduciary's
procedures, methodology and thoroughness, Tracey v.
Massachusetts Inst. of Tech., 404 F. Supp. 3d 356, 361 (D.
Mass. 2019) (Gorton, J.), not the results of the
investment's performance. Barchock, 886 F.3d at 44 (citing
Bunch v. W.R. Grace & Co., 555 F.3d 1, 7 (1st Cir. 2009)
("[T]he test of prudence — the Prudent Man Rule — is one of
conduct, and not a test of the result of performance of the
investment.") (emphasis omitted) (quoting Donovan v.
Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983))).

### B.  Pleading Standard

Summary judgment is required when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue
of material fact is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
Materiality depends on the substantive law, and only factual
disputes that might affect the outcome of the suit can preclude
summary judgment.  Id.  In reviewing the evidence, this Court
must "draw all reasonable inferences in favor of the nonmoving
party, and it may not make credibility determinations or weigh
the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530
U.S. 133, 150 (2000).  This Court must also "disregard all
evidence favorable to the moving party that the jury is not
required to believe."  Id. at 151.

The moving party bears the initial burden of
demonstrating that "the nonmoving party has failed to make
a sufficient showing on an essential element of her case
with respect to which she has the burden of proof."
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the
movant does so, then the nonmovant must set forth specific
facts sufficient to establish a genuine issue for trial.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
574, 586–87 (1986).

When the moving party also bears the burden at trial,[2] its
burden of proof includes "producing incontrovertible prima facie

---

[2] Boston College has the burden of disproving loss causation
if Participants meet their burden on breach and loss.

evidence of its claims." Atlantic Specialty Ins. Co. v. Karl's Boat Shop, Inc., 480 F. Supp. 3d 322, 329 (D. Mass. 2020) (citing Celotex Corp., 477 U.S. at 331). If the movant does so, then the nonmovant must set forth specific facts sufficient to establish a genuine issue for trial. Matsushita Elec. Indus. Co., 475 U.S. at 586-87.

As stated in Brotherston, in enacting ERISA, Congress intended to offer enhanced protections for employees. Brotherston, 907 F.3d at 37. This congressional intent, coupled with the fact that duty-of-prudence inquiries involve reasonableness determinations, which are more appropriately decided at trial,[3] is telling: it is difficult for a fiduciary to show that as matter of law it did not violate its duty-of-prudence.

---

Brotherston, 907 F.3d at 39 ("[O]nce an ERISA plaintiff has shown a breach of fiduciary duty and loss to the plan, the burden shifts to the fiduciary to prove that such loss was not caused by its breach, that is, to prove that the resulting investment decision was objectively prudent.").

[3] See Board of Trustees of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon Corp., No. 09 CIV. 6273 RMB, 2011 WL 6130831 at *3 (S.D.N.Y. Dec. 9, 2011) ("Rarely will [application of ERISA's reasonableness standard] be appropriate on a motion for summary judgment."); see also Harley v. Minnesota Mining & Mfg. Co., 42 F. Supp. 2d 898, 907 (D. Minn. 1999), aff'd sub nom. Harley v. Minnesota Min. & Mfg. Co., 284 F.3d 901 (8th Cir. 2002) ("Typically, whether a fiduciary acted prudently—or in other words, as a reasonably prudent fiduciary—is a question of fact.").

**C.   Boston College Fails to Show as Matter of Law that the Committee Did Not Breach its Fiduciary Duties with Respect to the Recordkeeping Fees Claim.**

This Court does not assess whether the Committee breached its fiduciary duties from 2016 until the 2018 RFP,[4] because, as discussed <u>infra</u> Section II.F.2, Participants fail to set forth any admissible evidence as to loss before the 2018 RFP.

Relative to the time period after the 2018 RFP (2019 to present), this Court rules that there are genuine disputes of material fact as to (1) whether it was prudent for the Committee to not consolidate the Plans to a single recordkeeper; (2) whether the Committee was aware of the distinction between the unique participant fee and the per participant fee; and (3) whether some Committee members had conflicts of interest that warranted recusal during the 2018 RFP vote.

### 1.   Overall Principles Related to Monitoring Recordkeeping Fees

The duty of prudence requires fiduciaries to "employ appropriate methods to investigate the merits of the investment," <u>Turner</u>, 530 F. Supp. 3d at 133, which includes "a continuing duty to monitor investments and remove imprudent ones," <u>id.</u> (citing <u>Tibble</u> v. <u>Edison Int'l</u>, 575 U.S. 523 (2015));

---

[4] Specifically, the Court does not address whether the Committee breached its fiduciary duties by not conducting an RFP earlier in the Class Period, nor whether the Committee was aware of the Plans' fees before the 2018 RFP.

see <u>Beddall</u> v. <u>State St. Bank & Tr. Co.</u>, 137 F.3d 12, 18 (1st
Cir. 1998).  Fiduciaries have a duty to ensure that the plan's
recordkeeping fees are not "excessive relative to the services
rendered."  <u>Young</u> v. <u>General Motors Inv. Mgmt. Corp.</u>, 325 F.
App'x 31, 33 (2d Cir. 2009) (internal quotation marks omitted);
<u>see also</u> <u>Sacerdote</u> v. <u>New York Univ.</u>, 328 F. Supp. 3d 273, 286
(S.D.N.Y. 2018).

Below, the Court assesses whether there exists a genuine
dispute of material fact as to: (1) whether the Committee
conducted negotiations with the recordkeepers to drive down
fees; (2) whether the Committee reviewed benchmarking conducted
by Fiducient and the adequacy of that benchmarking; (3) whether
the Committee conducted sufficient RFPs; (4) whether the
Committee prudently decided to not consolidate the Plans during
the 2018 RFP; (5) whether the Committee was aware of TIAA's fees
and what TIAA's fees actually were; and (6) whether it was
imprudent for certain Committee members to not recuse themselves
from the 2018 RFP due to potential conflicts of interest.

### 2.   Negotiations and Benchmarking

This Court rules that there is no genuine dispute of
material fact as to whether the Committee monitored the Plans'
fees through regular review of benchmarking and negotiations.

### a. Negotiations

There is no genuine dispute as to whether the Committee engaged in negotiations throughout the Class Period to lower recordkeeper fees.

Boston College provides evidence that the Committee engaged in negotiations to lower recordkeeper fees.  SOF ¶ 92; Ex. 5 (Trainor Tr.) 188:16-189:3, 191:11-192:8, ECF No. 62-5 (stating that the Committee has "stringently and effectively [made] cases to [their recordkeepers] that the fees that they were charging were not appropriate and they needed to be driven down").  The Participants attempt to rebut this with testimony from Smith indicating that he could not recall the most recent fee negotiation but that the Committee does "go through an annual exercise" (at least for TIAA) to negotiate fees.  Ex. H (Smith Tr.) 278:16-279:2, ECF No. 71-8; CSOF ¶ 92.  Despite Smith's inability to recall the most recent negotiation, he confirms that fee negotiations are conducted annually.  Thus, the Participants fail to show a factual dispute as to whether the Committee negotiated with recordkeepers.

Relatedly, this Court rules that, while there is a factual dispute as to whether the Committee's negotiations caused fee decreases,[5] this dispute is not material -- holding otherwise

---

[5] Boston College submits deposition testimony showing that the Committee successfully negotiated to reduce fees.  Mem. 1, 6; Ex. 5 (Trainor Tr.) 188:16-189:3, 191:11-192:8.  Participants

would improperly focus on the results of the fiduciary's conduct
(success of the negotiations), instead of the fiduciary's
conduct itself (act of engaging in negotiations).  See Barchock,
886 F.3d at 44.  Thus, whether the negotiations successfully
caused the fee decrease would have no bearing on whether the
Committee acted imprudently.[6]

### b. Benchmarking

This Court rules that the Participants do not genuinely
dispute that the Committee monitored the Plans' fees through
Fiducient's regular benchmarking, which showed that the fees
were comparable to its benchmarks.

Fiducient prepared benchmarking of fees and Committee
members discussed these reports at meetings at least annually.
CSOF ¶¶ 82, 91.  The Participants attempt to dispute whether the
Committee reviewed and discussed these reports by showing that
some Committee members did not know what plans were included in
Fiducient's benchmarking.  Id. ¶ 41; Ex. A (Jack Burke Tr.)

---

cite evidence showing that the fee decrease actually could have
been from fee compression in the industry or TIAA voluntarily
reducing its fees. Opp'n 6-7; CSOF ¶ 66; Ex. H (Smith Tr.)
281:9-12; Ex. J (10.10.2018 TIAA Response RFP) at 1, ECF No. 71-
10.

[6] While the court in Garthwait, in denying summary judgment,
noted that the "parties dispute and the record is mixed as to
whether the defendants' actions brought about this decrease [in
fees,]" that court also identified as a contested fact whether
defendants actually engaged in negotiations, see Garthwait v.
Eversource Energy Co., No. 3:20-CV-00902 (JCH), 2022 WL 3019633,
at *5, 18 (D. Conn. July 29, 2022), which is not genuinely
disputed in the present case.

123:3-13, ECF No. 71-1; Ex. B (John Burke Tr.) 97:23-98:4, ECF
No. 71-2; Ex. F (Pontiff Tr.) 174:4-7, ECF No. 71-6.  This is
insufficient to cast doubt on whether the Committee reviewed the
benchmarking -- the Participants admit that the Committee went
through annual exercises to review and discuss these
benchmarking reports and the Plans' fees.  CSOF ¶ 91; see also
Ex. H (Smith Tr.) 97:4-11.  No reasonable factfinder could find
to the contrary, even when faced with evidence showing that some
Committee members could not recall what plans were included in
benchmarking prepared by its consultant.  While courts have held
that the fiduciary cannot act prudently if the fiduciary does
not know "how and to what extent a service provider is
compensated[,]" see, e.g., Bugielski v. AT&T Servs., Inc., 76
F.4th 894, 912-13 (9th Cir. 2023), the Participants do not cite
any case to suggest that some Committee members' lack of
knowledge (or lack of recollection) as to which comparator plans
a co-fiduciary consultant included in benchmarking fees
demonstrates imprudence.

    Participants also do not genuinely dispute that the
Committee's benchmarking practices did not follow industry
protocol.  Defense expert Gissiner opines that Fiducient's
benchmarking -- reviewed by the Committee regularly -- showed
that both Plans' fees were "comparable to the recordkeeping fees
paid by similarly-sized plans" and that Fiducient "appropriately

[25]

monitored recordkeeping fees paid to TIAA and Fidelity in accordance with industry practice." Ex. 12 (Gissiner Report) ¶¶ 120, 138, ECF No. 62-12. While the Participants attempt to dispute this benchmarking process through Plaintiffs' expert Minnich, who opines that "the proper comparison [for monitoring fees] is to the entire [defined contribution] market of recordkeepers[,]"[7] CSOF ¶ 83 (disputing whether the benchmarking conforms to industry standards), the Participants fail to dispute the appropriateness of Fiducient's actual benchmarks, which showed that Plan I's fees were lower than comparable plans (in all but one benchmark in 2019). Ex. 12 (Gissiner Report) at Exhibit 7A (compiling Fiducient's benchmarking results). In fact, Minnich testified that he is not opining on the Committee's process for monitoring fees. Ex. 2 (Minnich Tr.) 111:5-12, ECF No. 68-2. Over the Class Period, Fiducient benchmarked based on the following criteria for Plan I:[8] (1)

---

[7] In his report, Minnich criticizes Gissiner for comparing the Plans' fees to "a very limited set of overpriced, benchmarked pricing data from High Education Plans." Ex. 18 (Minnich Rep.) 4, ECF No. 62-18. Gissiner does opine that Fiducient's "[b]enchmarking results using similarly-sized comparator TIAA plans . . . are the most appropriate benchmarking group," Ex. 12 (Gissiner Rep.) at Exhibit 7A, and he provides calculations as to how the Plans' fees measure up against those paid by TIAA and Fidelity's other clients, id. at Exhibit 8A, 8B.

[8] To contextualize this benchmarking, the Courts notes that, throughout the Class Period, Plan I had 3,538 to 3,697 participants and approximately $447,000,000 to $731,000,000 in

assets from $250,000,000-500,000,000; (2) assets over
$500,000,000; (3) TIAA Plans with assets over $500,000,000; and
(4) 2,500-5,000 participants. Ex. 12 (Gissiner Report) at
Exhibit 7A (summarizing Fiducient's benchmarking). For Plan
II's fees, Fiducient's benchmarking criteria included assets
from $100,000,000 to $250,000,000, $250,000,000-$500,000,000,
and $500,000,000-$1,000,000,000 (changing as Plan II's total
assets grew) and showed the Plan's fees were below its
benchmarks. Id. at Exhibit 7B. The underlying data for
Fiducient's benchmarking, according to the QIRs, came from the
Fiducient's institutional consultants plan survey, consisting of
over 500 retirement plans and includes "plans of varying size
and type." Ex. 61 (Q1 2016 QIR, BC-SELLERS001157, at 165-67,
169-171), ECF No. 63-16; Ex. 86 (Q1 2022 QIR, BC-SELLERS002920,
at 2928), ECF No. 63-44 (stating that the survey included 587
defined contribution plans, with the average plan of
$335,000,000 in assets and 2,813 participants). Thus, there is
no indication that the Plans included in the benchmarking were
only overpriced Higher Education Plans (following Minnich's
criticism of Gissiner), see supra note 7, as the survey included
a variety of defined contribution plans.

_____

assets, and Plan II had 2,760 to 3,221 participants and assets
between $239,000,000 and $516,000,000. CSOF ¶¶ 13, 34.

Thus, this Court rules that there is no genuine dispute of material fact as to whether the Committee reviewed and discussed Fiducient's benchmarking or whether Fiducient's benchmarking reports followed industry protocols.

### 3.    Requests for Proposal (RFP)

The Participants ask "why the Committee has no plans to conduct an RFP in the future, despite over five years having passed since the last."  Opp'n 7; Ex. D (Trainor Tr.) 199:6-14, ECF No. 71-4 (stating that there is no plan to conduct an RFP in 2023 and the Committee has not yet discussed planning one in 2024); Ex. B (John Burke Tr.) 76:12-24 (explaining that the Committee does not have plans to conduct an RFP "to his knowledge").  Whether the Committee has plans to conduct RFPs in the future is not genuinely disputed -- Committee member Zona indicates that the Committee has general plans for a RFP in the future, it just had not yet discussed specifics for when exactly the RFP will occur.  Ex. G (Zona Tr.) 224:21-225:13, ECF No. 71-7 (explaining that while the Committee did not discuss conducting an RFP for 2023, the Committee has discussed planning one in the future, but that there is "no urgency" to do so at this time).  Thus, this dispute is not genuine.  Regardless, this Court agrees with Boston College that this claim is speculative -- Participants are speculating as to a future breach by the Committee.

[28]

To the extent the Participants are suggesting that Boston College should have conducted an RFP from the 2019 to present, this Court rejects those arguments.  The Committee conducted an RFP in 2018, benchmarked its fees (which showed its fees were reasonable), and negotiated a moderate fee decrease in fees in 2021 for both Plans.  CSOF ¶¶ 28, 40.  Although the Participants dispute Plan I's actual fees, they do not dispute that the Plans' fees declined throughout the Class Period.[9]  The Participants do not address the cases cited by Boston College demonstrating that conducting RFPs, along with regular benchmarking and negotiations, sufficiently demonstrates a prudent process on summary judgment.  Mem. 7; Marshall v. Northrop Grumman Corp., No. 216CV06794ABJCX, 2019 WL 4058583, at *3-4, 11 (C.D. Cal. Aug. 14, 2019) (holding for the fiduciary on summary judgment when the fiduciary conducted an RFP to hire a recordkeeper in 2005, benchmarked fees with a consultant in 2010, renegotiated fees in 2011, issued new RFP in 2014, and renegotiated fees in 2015) (9 years between each RFP); Huang v. TriNet HR III, Inc., No. 8:20-CV-2293-VMC-TGW, 2023 WL 3092626, at *1-2, 10-11 (M.D. Fla. Apr. 26, 2023) (holding for fiduciary

---

[9] Ex. 17 (Minnich Report) 23, ECF No. 62-17; see id. at 40 (parties agreeing that Plan II's fees decreased in terms of basis points, or percentage of required revenue); CSOF ¶ 28. But see Ex. 17 (Minnich Report) at 23 (showing that Plan II's fees in dollar terms fluctuated throughout the Class Period, but ultimately decreased from 2016 to 2022).

on summary judgment when the fiduciary conducted an RFP in 2015, conducted a request for information in 2018, held another RFP in 2021 that consolidated the plans, and reviewed fees/benchmarking in the interim between RFPs, over a class period from 2014 to 2023); see also Troudt v. Oracle Corp., No. 16-CV-00175-REB-SKC, 2019 WL 1006019, at *7-8 (D. Colo. Mar. 1, 2019) (granting summary judgment for fiduciary when it met quarterly, regularly reviewed its fees and benchmarking, and secured significant price concessions from recordkeepers through negotiations).  The Participants' caselaw is inapposite.[10]  Although Participants cite evidence that Department of Labor regulations say it is normal for providers to conduct an RFP every three to five years, CSOF ¶ 223, as of the date of Boston College's motion for summary judgment, it had been less than five years since the last RFP.  Id. ¶ 109 (Committee voting on RFP bids in late 2018).  See generally Mem. (filing for summary judgment in late September 2023).  Thus, this Court holds that there is no

---

[10] Participants cite to Garthwait, in which the court denied the fiduciary's motion for summary judgment. Garthwait, 2022 WL 3019633, at *5, 15, 18. In Garthwait, the fiduciary did not conduct competitive bidding, there was no evidence that the fiduciary engaged in negotiations to reduce fees, and the fiduciary relied on assurances of its recordkeeper that fees were reasonable. Id. This is distinguishable from the actions taken by the Committee. Similarly, Tracey is distinguishable. In Tracey, the fiduciary knew its fees were much higher than the market rate and repeatedly rejected its consultant's recommendations to conduct an RFP. Ex. 135 (Tracey SOF) ¶¶ 123, 156, ECF No. 79-4; Tracey, 404 F. Supp. 3d at 359.

genuine dispute of fact that Boston College conducted sufficient RFPs during the Class Period.

### 4.   Decision to Not Consolidate and Keep Incumbent Recordkeepers

The Court next addresses whether there is a genuine dispute of material fact as to the Committee's decision not to consolidate the Plans during the 2018 RFP.

This Court rules that there is a genuine issue of material fact as to whether the Committee acted prudently in deciding not to consolidate the plans to a single recordkeeper after the 2018 RFP.

In 2018, the Committee considered an RFP for its recordkeeping fees, soliciting bids from five vendors and considered both single and multi-recordkeeping arrangements. CSOF ¶ 103.  The Participants dispute whether it was prudent for Boston College to turn down a $31 consolidated bid from Fidelity and whether the Committee's beliefs regarding consumer choice and disruption were appropriate considerations in deciding whether to consolidate.  Opp'n 8-9.

The meeting minutes from the RFP state that the Committee considered the following factors during the RFP process: the recordkeeper's experience in administering university plans, fees, cybersecurity, administrative services, "participant and plan sponsor technology platforms and websites," "participant

communication, advice and educational offerings," compliance
services, and service teams.  Ex. 48 (2018 Meeting Minutes), ECF
No. 63-3.  There is testimony, however, showing that the
Committee members heavily considered disruption and consumer
choice/preference in deciding not to consolidate to a single
recordkeeper.[11]

Participants challenge whether it was prudent for the
Committee to weigh the value of providing consumer choice in
favor of consolidation.  Opp'n 9.  Participants provide evidence
that Boston College did not conduct a survey or procure other
"objective" data showing any participant preference for
retaining incumbent recordkeepers as opposed to a consolidated
plan.  Opp'n 9; CSOF ¶¶ 18, 107.[12]  But see Ex. 5 (Trainor Tr.)

---

[11] Trainor's testimony on why the Committee did not
consolidate focused mostly on disruption concerns and
participant preference, while also mentioning that TIAA offers
unique investments, has lowered fees in the past, and that the
Committee had positive experiences with incumbent recordkeepers.
Ex. 5 (Trainor Tr.) 209:10-213:6.  When asked why he did not
think consolidating would be in the best interests of
participants, Jack Burke first mentioned disruption --
ultimately saying that the fee savings were not worth the
disruption to participants.  Ex. A (Jack Burke Tr.) 107:6-
109:10.  John Burke similarly stated that, in deciding not to
consolidate, he considered the tradeoff between fee savings and
consumer/participant preference.  Ex. 10 (John Burke Tr.) 71:3-
15, ECF No. 62-10.  Zona cited participant choice as the primary
reason for not consolidating.  Ex. G (Zona Tr.) 100:10-102:5.

[12] Ex. D (Trainor Tr.) 196:17-23 (admitting that there is no
survey on consumer preferences for TIAA products); Ex. A (Jack
Burke Tr.) 178:13-180:24 (admitting that the Committee did not
measure participant preference for keeping TIAA through any
surveys).  Several Committee members could not recall or did not

218:24-219:7 (stating that the Committee heard "anecdotally . .
. about a high level of satisfaction that [their] faculty and
staff had with the options that they have been provided at that
time"); Ex. G (Zona Tr.) 100:10-102:5 (believing that there were
surveys for consumer preference but not recalling specifics).

Participants also argue that "disruption" was not a valid
concern, providing evidence that "[p]articipants who were happy
with TIAA were free to keep TIAA investments," even if the
Committee consolidated under Fidelity.  Opp'n 9; see Ex. D
(Trainor Tr.) 31:20-32:9 (explaining that, when he was a
participant in another university plan and the employer
transitioned from TIAA to another recordkeeper, he "transferred
all [his] money to the [new recordkeeper's investments] with the
exception of the TIAA Traditional, which [was] . . . not an easy
thing to transfer money from").  Moreover, while Boston College
provides evidence that Trainor experienced "disruption
personally" as an administrator for another plan at another
university, Ex. D (Trainor Tr.) 196:17-21, and thus disruption
was a valid concern, Trainor also testified that transitioning
from TIAA to another recordkeeper was a "sound decision,"

---

know if any surveys were conducted to test whether participants
would have preferred a consolidated plan.  Ex. H (Smith Tr.)
267:3-10; Ex. B (John Burke Tr.) 88:5-89:1, 92:7-11; Ex. F
(Pontiff Tr.) 79:6-20; Ex. G (Zona Tr.) 100:10-102:5; Ex. 3
(Martens Tr.) 93:17-94:24, ECF No. 67-3.

because the quality of other recordkeeper's support was better than TIAA, "the investment menu was competitive," and noted that the new recordkeepers' fees were more competitive, id. 29:23-31:7.  This, coupled with the fact that Trainor kept his TIAA-CREF investments, weakens Trainor's contention that he experienced disruption, as Participants argue, CSOF ¶ 112. Boston College argues that there would be disruption because TIAA does not allow other recordkeepers to perform recordkeeping services for their TIAA annuities.[13]  Ex. 18 (Minnich Report) at 5.  Gissiner stated that "consolidation of existing multi-vendor arrangements can be disruptive to participants and creates transition costs."  Ex. 12 (Gissiner Report) ¶ 31.  Minnich stated, however, that new recordkeepers help smooth these transitions, that any bids typically would have factored in any disruption concerns, and that participants (if they wished) could keep the TIAA investments frozen while still paying a different recordkeeper a lower fee.  Opp'n 8, 9; CSOF ¶ 23; Ex. 18 (Minnich Report) at 6; Ex. 17 (Minnich Report) at 7 (disruption costs are seen as cost of doing business); see also

---

[13] For example, if the Plan consolidated under Fidelity, and the individual participant choose to keep her TIAA annuities, Fidelity could not act as recordkeeper for the TIAA annuities and the individual would have to pay an additional recordkeeping fee to TIAA if it wanted to keep the TIAA investments.  CSOF ¶¶ 20-23; Opp'n 8 n.8; see also Ex. 18 (Minnich Report) at 5 (pointing out that this is a business decision by TIAA).

[34]

Ex. J (10.10.2018 TIAA Response to RFP), ECF No. 71-10 (showing that the Committee asks bidders during the RFP how they would "reach out to participants with 'frozen' assets at a legacy provider").

Participants further argue that it is Boston College's burden to show why the Committee "refused to act in a way that saved participants money." Opp'n 8-9. The Committee did consider cost savings during the 2018 RFP, CSOF ¶ 110, and courts have suggested that the possibility of lower fee is not enough to show imprudence. Cryer v. Franklin Res., Inc., 2018 WL 6267856, at *10-11 (N.D. Cal. Nov. 16, 2018) (granting summary judgment for the fiduciary even though it did not pick the lowest bid as a result of a RFP and the fiduciary's expert presented unrebutted evidence that the fees were reasonable[14]);

---

[14] In its Notice of Supplemental Authorities ("Notice of Authorities"), ECF No. 103, Boston College brings the Court's attention to Rodriguez v. Hy-Vee, Inc., No. 422CV00072SHLWPK, 2024 WL 1070982 (S.D. Iowa Mar. 7, 2024). Boston College cites to Rodriguez for its proposition that Participants failed to create a genuine dispute of material fact as to their fees claim when Participants "identified only (i) the results of a competitive request as to their plan and (ii) four other retirement plans with lower recordkeeping fees but failed to produce evidence showing, among other things, where the defendant's plan falls in the market as a whole for similar plans." Notice of Authorities 1-2 (internal quotation marks omitted).

The Rodriguez court ruled no reasonable factfinder could find that defendants breached their fiduciary duties because: (1) the committee had an adequate process for monitoring and evaluating fees; (2) plaintiffs failed to identify a meaningful benchmark to compare the plan's fees; and (3) plaintiffs did not

---

provide context showing that the plan's fees were excessive
relate to "market as a whole" for similar plans.  Notice of
Authorities, Ex. A, Rodriguez Opinion ("Rodriguez"), ECF No.
103-1.  Similar to the case at bar, the defendants in Rodriguez
had an independent consultant, regularly discussed fees,
received fee benchmarking showing they were lower than
benchmarks, and conducted a request for information (similar to
RFP).  Id. at 18.  Unlike here, the fiduciary in Rodriguez
ultimately accepted the lowest bid from the competitive bidding
process: its incumbent recordkeeper matched the lowest bid.  Id.
at 23.  The Rodriguez court stated that plaintiffs failed to
identify a "meaningful benchmark" to which to compare the fees,
deeming the four comparator plans identified by plaintiff's
expert insufficient.  Id. at 20.  In the present case, the
Participants do not set forth any "comparator" plans but do
identify the $31 lowest bid from one incumbent (Fidelity) as a
"reasonable fee" or prudent alternative.  See infra Section
II.F.2.  The Rodriguez court explained that a plaintiff "must
produce evidence showing . . . where defendant's plan falls in
the market as a whole for similar plans" because otherwise the
plaintiff fails to show how a defendant's fees "were actually
excessive relative to the market as a whole."  Rodriguez at 20-
22.  Here, the Participants argue that the 2018 RFP bid results
provided a tailored "market baseline" for the Plans' fees and
thus comparator plans are not necessary to survive summary
judgment.  Opp'n 15-16; Opp'n Mot. Exclude Minnich 16, ECF No.
68.

Were the Court to state that a plaintiff must show how the
defendants' fees compare to the market as a whole in order to
survive on the element of breach or loss, the Court would
effectively place the burden of loss causation on plaintiffs.
In other words, if plaintiffs must show that defendants' fees do
not fall within comparable plans to survive summary judgment on
breach, plaintiffs are essentially tasked with disproving the
fees' objective prudence (i.e., the burden would be on
plaintiffs to show that defendants' fees are not objectively
reasonable).  The Participants' burden is breach (showing an
imprudent process) and loss (identifying a prudent alternative
or meaningful benchmark).  Brotherston, 907 F.3d at 39.  Putting
the burden on plaintiffs to show that their "prudent
alternative" is the only prudent alternative (by showing how
defendant's fees measure up against the market) improperly
places the burden of loss causation on plaintiffs.  See
Sacerdote,9 F.4th at 113-14.

Similarly here, the Participants do not need to show that
Boston College's fees were not economically reasonable (i.e.,

see also Ex. 132 (2023 DOL Advisory Opinion) at 6, ECF No. 79-1 ("The fiduciary should not consider any one factor, such as the lowest bid for services, to the exclusion of any other relevant factor, such as the quality of the services.").

The Court recognizes that a fiduciary does not have to select the lowest fee to satisfy its duty of prudence.  Still, in some instances, it may be imprudent to not consolidate plans. Minnich recommends consolidation because "it allows the plan to maximize its bargaining power" -- higher participant counts result in lower fees.  Ex. 17 (Minnich Report) at 10-12; Ex. 18 (Minnich Report) 3.  But see Ex. 4 (Minnich Tr.) 151:13-152:1 (acknowledging that it is not his opinion that it is "always unreasonable or not a best practice" to have multiple recordkeepers).  A consulting group reported to the Committee in 2016 that "[m]aintaining two plans is a more complex design than plans offered at most colleges and universities[,]" RSOF ¶ 221, and Fiducient advised the Committee in 2016 to consider consolidation, Ex. Q (Plan Enhancements Summary, BC-SELLERS001132, at 1151), ECF No. 71-17.  Moreover, here, there could have been significant cost savings were the Plans

---

not objectively prudent) to survive summary judgment on breach and loss -- these arguments instead relate to the fees' objective prudence, which Boston College has the high burden of proving once the Participants show breach and loss. Brotherston, 907 F.3d at 39; see infra Section II.F.2.b.

consolidated: instead of $51 for Plan I and $47 for Plan II, Ex. 74 (Q1 2019 QIR, BC-SELLERS003943, at 3952, 3954), ECF No. 63-30, a participant could have paid $31 under a consolidated plan after the 2018 RFP, Ex. 71 at 1101; Ex. 72 (RFP Analysis, BC-SELLERS004296, at 4299), ECF No. 63-28.

Courts have found fiduciaries compliant with ERISA when its decision-making process was "considered, careful, and prudent." See, e.g., Sacerdote, 328 F. Supp. 3d at 298, 300. In Bunch v. W.R. Grace & Co., the First Circuit granted summary judgment in favor of defendants when they "engaged in a substantively sound, reasonable analysis for all relevant circumstances" and "debated and considered ad nauseam the pros and cons of [an investment decision]." 555 F.3d at 10 (internal citation omitted). There is evidence that the Committee weighed the pros and cons of consolidation. Ex. 3 (Martens Tr.) 93:15-94:1; CSOF ¶ 110. The parties dispute, however, the underlying assumptions to the Committee's decisions (whether it was appropriate to consider disruption and participant choice), which is thus an attack on whether the decision was prudent and considered. See 29 C.F.R. § 2550.404a-1 (stating that ERISA's duty-of-prudence standard is "satisfied if the fiduciary: (i) Has given appropriate consideration to those facts and circumstances that . . . the fiduciary knows or should know are relevant to the particular

investment or investment course of action involved . . . ."
(emphasis added)).

A reasonable factfinder could find that the Committee
engaged in an imprudent decision-making process in rejecting the
consolidated bid.  A reasonable factfinder could find that the
Committee's reliance on "consumer choice" as a factor for
keeping incumbent recordkeepers was not an appropriate
consideration because its beliefs about consumer choice derived
from mere "anecdotal" evidence and not from any objective
measure of consumer preference.  A reasonable factfinder could
also find that disruption was not a valid concern, considering
participants could keep their TIAA investments even if there was
a change in recordkeepers and disruption concerns were factored
into the RFP bidder's bids.  These assumptions were especially
important, as several Committee members identified participant
choice and disruption as notable reasons for not choosing lower
bids.  With all reasonable inferences in favor of the
Participants and considering that reasonableness inquiries are
usually inappropriate for decision on a motion for summary
judgment, this Court holds that there is a genuine dispute of
material fact as to whether the Committee prudently decided to
not consolidate.

### 5. TIAA's Compensation

The Participants argue that there is a genuine material dispute as to whether the Committee knew the recordkeeper's compensation during the Class Period. Opp'n 9-10. Fiduciaries must have a strong understanding of "how and to what extent recordkeepers are compensated[]" to satisfy their duty of prudence obligations. Bugielski, 76 F.4th at 912; Turner, 530 F. Supp. 3d at 136. While there is no genuine dispute as to TIAA's compensation from the 2018 RFP to present, this Court rules that a reasonable factfinder could find that the Committee was not sufficiently aware of the distinction between the unique participant fee (fee for TIAA's entire relationship with Boston College) and the per participant fee (fee for Plan I).

As a threshold matter, the parties disagree on what Plan I's actual fees were. The Participants state Plan I's fees were higher than that reported by Boston College, citing evidence showing that Fiducient reported higher fees to the Committee (in some documents) and that these higher fees were also reflected in the meeting minutes after the 2018 RFP. CSOF ¶ 28. The meeting minutes and TIAA contracts report that TIAA reduced its fees from $90 to $79 after the 2018 RFP. Ex. 48; Ex. 27 (TIAA Contract) at 1, ECF No. 62-27. The internal RFP analysis also reported Plan I's fees (before the RFP) as $90 per participant, Ex. 71 at 1094. Boston College states that Plan I's actual fees

[40]

before the 2018 RFP was $59, not $90.  CSOF ¶¶ 25-26, 28, 96.

This discrepancy emerges because TIAA's contracted fee from 2016

and 2019 covered its entire relationship with Boston College,

including the fees for all four of Boston College's retirement

Plans, id. ¶¶ 25-26; see Ex. 12 (Gissiner Report) ¶ 204

(explaining the difference between the two fees).  The fee for

Boston College's entire relationship with TIAA is referred to as

the "unique participant fee," whereas the fee specific to Plan I

is referred to as the "per participant fee" -- as explained by

Fiducient's Smith.  Ex. H (Smith Tr.) 256:7-259:5.  Although the

Participants argue that "even the amount of compensation

actually paid to TIAA [for Plan I] is disputed[,]" Opp'n 9, and

their expert cites the higher unique participant fees in his

report,[15] the Participants do acknowledge that there is a

distinction between the unique participant fee (for Boston

---

[15] Participants' expert Minnich uses the unique participant
fee in his report, Ex. 17 (Minnich Report) at 23, because
Minnich felt it was important to use the fees reported to the
Committee.  Ex. 2 (Minnich Tr.) 53:4-54:8.  Minnich, however,
ignores that Fiducient reported both the unique participant fee
and the per participant fee in the QIRs (shared with the
Committee) since 2018.  See id.; CSOF ¶ 28 (citing QIRs as
evidence for Plan I's fees).  Ironically, in his report, Minnich
cited the QIRs as a basis for Plan II's fees in 2019 and 2020
and ignored that these very same QIRs that reported Plan I's per
participant fees.  Ex. 17 (Minnich Report) at 23 nn.16-17; Ex.
78 (Q1 2020 QIR, BC-SELLERS002602, at 2615-16); see Ex. 74 (Q1
2019 QIR, BC-SELLERS003943, at 3952-54).  Minnich later
testified that he has no reason to dispute that the per
participant fee for Plan I is lower than the fees he cites in
his report.  Ex. 2 (Minnich Tr.) 57:2-17.

College's entire relationship with TIAA) and the per-participant
fee (Plan I).  Opp'n 10 (stating the issue regarding the
discrepancy in fees "arises because the $90 figure was for
TIAA's entire relationship with BC").  In maintaining that
TIAA's actual compensation is in dispute, the Participants, and
their expert Minnich, ignore the fact that Fiducient did report
this per participant Plan I fee to the Committee in its QIRs
(specifically distinguishing the unique and per participant fee)
from 2018 to present.  CSOF ¶ 28 (Boston College citing QIRs as
source for Plan I's fees).  Participants' argument is further
weakened by an email from TIAA expressly stating that the unique
participant price was $79 after the RFP, and Plan I's actual
fees were $51.  Ex. K (Cobak Email, TIAA_BC_00048009, at 8009),
ECF No. 71-11.  Thus, given the Participants' failure to adduce
evidence disputing Plan I's actual fees, no reasonable
factfinder could find a factual dispute as to Plan I's fees from
2018 to present.[16]

_____

[16] The Participants also state that these fees do not
include ancillary revenue.  Opp'n 10.  Boston College does not
address this.  Minnich defines ancillary revenue as
"[a]dditional revenue sources from a plan not related to
recordkeeping" including cross-selling insurance, proprietary
investment options, IRA rollovers, and the use of wealth
advisors.  Ex. 17 (Minnich Report) at 15.  The Participants do
not cite to record evidence showing what ancillary revenue the
recordkeepers were receiving (if any) -- they only cite
testimony showing that Committee members were unable to quantify
or identify any ancillary revenue.  CSOF ¶ 27.  Participants
cite Bugielski, in which the court explained that, to satisfy

The parties do dispute, however, whether the Committee was aware of the distinction between the unique and per participant fees -- in other words, the parties dispute whether the Committee was aware of Plan I's actual fees.

The Participants provide evidence that Fiducient frequently reported the value of the "unique participant fee" to the Committee.  Ex. L (BC-SELLERS024163, at 4336), ECF No. 71-12 (summary of fees provided by Fiducient reporting the unique participant fee); Ex. 71 at 1094 (RFP analysis identifying the "current" fee as the unique participant fee).  Quarterly reports after the 2018 RFP do report both the per participant fee and the unique participant fee to the Committee.[17]  Thus, the Committee did receive, and regularly reviewed, reporting on both the unique and per participant fees after 2018.  When shown a

_____

their duty of prudence, fiduciaries must know how the recordkeeper is compensated "in connection with" the services provided to the Plan -- both directly and indirectly.  Bugielski, 76 F.4th at 912.  Indirect compensation is revenue obtained from any source other than the plan, while direct compensation is compensation directly from the plan.  Id. at 910.  Minnich defines ancillary revenue as unrelated to recordkeeping, and the Participants do not point the Court to record evidence that there was ancillary revenue for the Committee to be aware of, nor do they explain why ancillary revenue should be considered indirect compensation that fiduciaries ought be aware of.  Id. at 898.  Thus, the Court does not consider "ancillary revenue" in determining if the Committee satisfied its duty of prudence claim.

[17] See, e.g., Ex. 74 at 3950; Ex. 78 at 2616.  Ex. 82 (Q1 2021 QIR, BC-SELLERS002754, at 2762-2763), ECF No. 63-39; Ex. 86 at 2930, 2934.

fee summary sent to the Committee by Fiducient which reported the unique participant fee, Committee member Pontiff testified that he understood these fees to be the fees for Plan I (which is not correct). Ex. F (Pontiff Tr.) 170:2-24.  Pontiff similarly could not state the difference between the unique and per participant fee in 2022.  Id. 176:3-20.  Committee member Jack Burke was also unable to state the difference between the unique participant and per participant fee in 2022.  Ex. A (Jack Burke Tr.) 135:4-136:18.  Committee members Zona, Martens, and Fiducient's Smith, however, all demonstrated that they did understand the difference between the unique and per participant fee.  Ex. H (Smith Tr.) 254:12-258:14; Ex. G (Zona Tr.) 243:8-245:12, 249:15-251:5; Ex. E (Martens Tr.) 214:1-215:12, 217:2-11, 218:18-219:1, 222:13-226:2, ECF No. 71-5.  Moreover, the Committee had nuanced discussions to ensure that its members understood the Plan's "true net cost to participants."  Ex. G (Zona Tr.) 228:2-18; see Ex. A (Jack Burke Tr.) 117:9-118:2; Ex. F (Pontiff Tr.) 170:19-172:6.  Boston College argues that it is immaterial that some Committee members did not know the difference between these two fees, because there is record evidence that some Committee members did.  Reply 7.

While Boston College submits compelling evidence that the Committee was sufficiently aware of Plan I's fees, this Court cannot weigh evidence on summary judgment and thus rules that a

reasonable factfinder could find, based on Pontiff and Jack Burke's testimony, that the Committee did not have sufficient knowledge of the distinction between the unique participant fee and Plan I's actual fees.

### 6. Potential Conflicts of Interest Between Committee Members and the Incumbent Recordkeepers

This Court holds that potential conflicts of interests between Committee members and the incumbent recordkeepers present a genuine dispute of material fact.

The parties dispute whether the Court ought consider evidence of certain Committee members' relationships with, and more importantly, personal benefits from, both TIAA and Fidelity. See Defs.' Mem. Supp. Mot. In Limine, ECF No. 83; Pls.' Opp'n Mot. In Limine ("Loyalty Opp'n"), ECF No. 88.

The Participants state that there is reason to doubt the Committee's objectivity during the 2018 RFP, arguing that this counsels in favor of denying Boston College's motion for summary judgment. Opp'n 9. Committee member Jack Burke testified that he has accepted sporting event tickets from TIAA and Fidelity, Ex. A (Jack Burke Tr.) 226:3-227:20, and that he did not recuse himself from the vote related to the 2018 RFP, nor did he discuss this potential conflict with other members of the Committee, id. 221:23-223:3; see also Ex. F (Pontiff Tr.) 191:7-11 (Pontiff unaware of any Committee members who accepted

tickets from incumbent recordkeepers).  Further, from roughly
2017 to 2020, Committee member Zona was on the TIAA-Nuveen
investment council, which provided Zona access to networking
opportunities and consisted of TIAA clients.  Ex. G (Zona Tr.)
41:16-42:9, 43:19-44:1, 47:21-48:8.  While Zona was not directly
compensated for his role on the council, TIAA did reimburse
Zona's hotel and transportation expenses.  Id. 44:19-45:9.
Martens testified that, while he believed there was a conflict
of interest policy at the university level, he was unsure if
there was one specific to the Committee.  Ex. E (Martens Tr.)
256:21-257:2.

Boston College argues that these facts do not pertain to a
duty-of-prudence claim, but instead relate solely to duty of
loyalty.  Defs.' Mem. Supp. Mot. In Limine.  The Participants
failed to assert duty of loyalty claims, as this Court has
previously acknowledged, Mem. Decision at 21 n.2.  Boston
College also points to Jack Burke's testimony that these events
or his relationship with TIAA did not influence his decision
during the 2018 RFP.  Ex. A (Jack Burke Tr.) 220:15-223:5.  A
reasonable factfinder, however, is not required to believe this
testimony.

While these facts may implicate a duty of loyalty claim,
courts have found that such conflicts of interest can also be
evidence of a breach of the duty of prudence.  In Bunch v. W.R.

[46]

Grace & Co., the First Circuit explained that a defendant acted
prudently when, upon recognizing that a situation "augured a
potential conflict of interest with [defendant's] fiduciary
duties," the defendant took "the eminently correct decision of
insulating itself from that possibility." 555 F.3d at 8. Other
courts have also determined that a failure to prevent a conflict
of interest may be viewed as a breach of the duty of
prudence. See, e.g., Burke v. Boeing Company, 42 F.4th 716,
731-32 (7th Cir. 2022) (emphasizing that were there a conflict
of interest for fiduciaries, a breach of the duty of prudence
could have occurred) (citing Leigh v. Engle, 727 F.2d 113, 134-
35 (7th Cir. 1984) (suggesting that the duty of prudence
obligates fiduciaries to minimize conflicts of interest));
Donovan, 680 F.2d at 271 (noting that ERISA's duties of loyalty
and prudence require fiduciaries "to avoid placing themselves in
a position where their acts as officers or directors of the
corporation will prevent their functioning with the complete
loyalty to participants demanded of them" and explaining that
duty of prudence and duty of loyalty have "different although
overlapping standards"). ERISA's duty of prudence, which
requires fiduciaries to carry out their duties with "care,
skill, prudence and diligence[,]" includes the duty to "refrain
from placing himself in a position where his personal interest
may conflict with the interest of the beneficiary." Corley v.

[47]

<u>Hecht. Co.</u>, 530 F. Supp. 1155, 1163 (D.D.C. 1982).  <u>See</u> Loyalty Opp'n 7.

This Court holds that there is a genuine dispute as to whether certain Committee members acted imprudently by failing to recuse themselves from voting during the 2018 RFP, as they failed to remove themselves from a position where their personal interest may have come into conflict with the Participants'.  A reasonable factfinder could find that this failure to recuse demonstrated a process failure.  Thus, this Court rules that there is a genuine dispute of material fact as to breach on the Recordkeeping Fees' claim.

### D. Boston College's Motion for Summary Judgment on Breach for the Challenged Investments Claim is DENIED.

This Court rules that there is a genuine dispute of material fact as to whether the Committee breached its fiduciary duties in deciding to retain the challenged investments.

The Participants argue that the Committee imprudently maintained the CREF Stock Account and TIAA Real Estate Account. Compl. ¶ 8.  Boston College argues that it acted prudently as matter of law because the Committee reviewed and discussed reports on the investments regularly, made changes to its investment lineup, used a "Watch" list to monitor investments, and considered various factors when evaluating the investments. Reply 8; Mem. 8-12.  Boston College further argues that the

Committee prudently monitored the CREF Stock Account by adjusting its benchmarks as needed, put it on "Watch" for a manager's departure in 2020, and has kept it on "Maintain" status from 2021 to present.  Mem. 9.  Specific to TIAA Real Estate, the Committee put it on "Discuss" in 2022 due to a manager departure and shortly after placed it back on "Maintain".  Id.

The Participants argue that the Committee failed to act despite the challenged investments' poor performance throughout the Class Period, that there are material, factual disputes as to whether the Committee followed a prudent process in deciding to retain these funds, and dispute whether it was reasonable to retain the challenged investments considering their performance. Opp'n 10-13.  The Participants also dispute whether the Committee acted in good faith in monitoring the investments. Id. at 18-20.

> ### 1.  Overall Principles and Factual Disputes Concerning Monitoring and Evaluating the Challenged Investments
>
> #### a. General Principles Regarding Monitoring and Evaluating Funds under ERISA's Duty-of-Prudence Standard

In determining whether a fiduciary breached its duty of prudence, the Court must engage in a context-specific inquiry, without relying on hindsight, and ask whether the fiduciary employed the appropriate methods to investigate and evaluate an

investment. Cunningham v. Cornell Univ., 86 F.4th 961, 983 (2d
Cir. 2023). An "investment's drop in price or value" alone is
not enough to demonstrate imprudence, nor is it enough "to show
that better investment opportunities were available at the time
of the relevant decisions." See Cates v. Trustees of Columbia
Univ., No. 116CV06524GBDSDA, 2019 WL 8955333, at *12 (S.D.N.Y.
Oct. 25, 2019), report and recommendation adopted, No.
16CIV6524GBDSDA, 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020)
(quoting Jacobs v. Verizon Commc'ns, Inc., No. 16 CIV. 1082
(PGG), 2017 WL 8809714, at *8 (S.D.N.Y. Sept. 28, 2017)); see
also Cunningham v. Cornell Univ., No. 16-CV-6525 (PKC), 2019 WL
4735876, at *11 (S.D.N.Y. Sept. 27, 2019) (stating "investment
losses are not proof that an investor violated his duty of care"
because losses can be a part of a long-term investment
strategy), aff'd, 86 F.4th 961 (2d Cir. 2023).

A showing that an investment was performing poorly relative
to its benchmarks, however, is relevant in determining whether
the fiduciary engaged in a prudent process in retaining the
investment, because underperformance may signal that additional
review of the investment may be necessary. See Turner, 530 F.
Supp. 3d at 133 (the duty of prudence requires an analysis of
whether the "fiduciary took into account all relevant
information" in evaluating the challenged investment); Tracey,
404 F. Supp. 3d at 361 ("[C]ourt[s] will evaluate conduct under

the totality of the circumstances and assess a fiduciary's procedures, methodology and thoroughness." (internal quotation marks omitted)); Jacobs, 2023 WL 3027311, at *20 (explaining how underperformance may signal that the investment ought be subject to additional monitoring or review). A fiduciary is not entitled to judgment as matter of law when there is no evidence showing that the fiduciary conducted a process to monitor the imprudent investments or did not have a reason to maintain imprudent investments considering their poor performance. See Jacobs, 2023 WL 3027311, at *25.

Further, while hiring an advisor and having a review process for investments can be evidence of prudence, "the presence of a review process and an independent investment advisor does not have a talismanic effect." Id. at *22. In determining prudence, courts must look not only at the fiduciary's procedures, but also at the "methods used to carry out those procedures [and] . . . thoroughness of the analysis of the data collected in that investigation." Id. at *20 (quoting Sacerdote, 328 F. Supp. 3d at 284). That is, the fiduciary must show that the imprudent investment was actually considered. Id. at *22. The absence of evidence of discussions about alternatives to an imprudent investment "suggest[s] that the policies and procedures in place may not have functioned as intended." Id.

[51]

For example, in <u>Jacobs</u>, defendants moved for summary judgment on the grounds that there was no dispute of material fact as to the prudence of the Committee's fiduciary process to monitor and evaluate the investments, as well as because the investment itself was not imprudent.  <u>Id.</u> at *21-22.  The <u>Jacobs</u> court denied the fiduciary's motion for summary judgment, explaining that the fiduciary "provide[d] no explanation" for why they kept the imprudent investment, and that there was no evidence that the committee "discussed or considered what to do about the Fund's poor performance."  <u>Id.</u> at *23 ("[I]t is not clear as a matter of law that this [allegedly robust fiduciary review] process functioned as designed . . . .").[18]  Similarly, the <u>Jacobs</u> court also ruled that defendants were not entitled to summary judgment on the grounds that the challenged investments performed well, because plaintiff provided evidence that the challenged funds performed poorly by a "substantial amount" according to multiple metrics.  <u>See</u> <u>id.</u> at *25 (explaining how disputes as to the proper benchmarks are material factual disputes).

---

[18] <u>See also</u> <u>Ellis</u> v. <u>Fidelity Mgmt. Tr. Co.</u>, 257 F. Supp. 3d 117, 129 (D. Mass. 2017), <u>aff'd</u>, 883 F.3d 1 (1st Cir. 2018)(explaining that "[m]erely following a procedurally prudent process is not enough to establish that a fiduciary did not breach its duty" because "court[s] must look to the surrounding circumstances before properly determining whether a breach has occurred") (citing <u>Bunch</u> v. <u>W.R. Grace & Co.</u>, 532 F. Supp. 2d 283, 288 (D. Mass. 2008), <u>aff'd</u>, 555 F.3d 1 (1st Cir. 2009)).

First, this Court must assess whether there are factual disputes as to the Committee's procedures and general practices in monitoring and evaluating funds, with the understanding that these procedures and general practices alone will not demonstrate prudence.  Next, this Court proceeds to assess whether the Committee had reason to be concerned about the challenged investments' performance during the Class Period -- in other words, whether the challenged investments' performance necessitated additional review beyond its normal procedures. Lastly, the Court considers whether the Committee engaged in a thorough, prudent, and reasoned decision-making process in deciding to retain the challenged investments despite these performance concerns.  See Ellis, 257 F. Supp. 3d at 128-29 (explaining that in determining breach, courts must consider the "substantive reasonableness of the fiduciary's actions and the procedures by which the fiduciary made its decision").

### b.   The Committee's Overall Process

This Court holds that there is no genuine dispute of material fact regarding whether the Committee had a prudent process in place to evaluate investments: it met regularly to review and discuss investments, generally devoted more time to items placed on "Watch," and made changes to its investment lineups.  This prudent process, however, is not enough for Boston College to prevail on its motion for summary judgment.

Boston College submits evidence that the "Committee employed a robust process to monitor and evaluate all of the Plans' investment options." Mem. 8.  The Participants argue that the fact that the Committee acted prudently with respect to some investments does not outweigh "serious fact[ual] disputes in the record."  Opp'n 11 n.11.

This Court considers Boston College's overall process in determining whether it satisfied its duty of prudence as matter of law.  See In re Omnicom ERISA Litig., No. 20-CV-4141 (CM), 2021 WL 3292487, at *13 (S.D.N.Y. Aug. 2, 2021) ("[T]he ultimate issue in an ERISA [duty-of-prudence] case [] requires considering whether the **overall process** of decision-making was up to standard." (emphasis added)).  This Court also recognizes, however, that evidence of a deliberate process alone is not enough to establish prudence.  Sacerdote, 9 F.4th at 111 ("While the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not . . . suffice in every case to demonstrate prudence.").

It is undisputed that Fiducient provided the Committee reports on the Plans' investments prior to Committee Meetings each quarter, and that the Committee met three to four times a year to discuss investments and the QIRs with Fiducient.  CSOF ¶¶ 63, 71-72, 121.  Moreover, there is evidence that the Committee reviewed and evaluated the performance of all

investments throughout the Class Period, id. ¶ 145,[19] including factors such as performance, market conditions, diversification, risk, strategy, expenses, and management.[20]  Further, the Committee generally asked Fiducient questions about the investments and requested additional materials during the Class Period.[21]  Finally, the Committee also generally devoted more time to discuss items put on "Watch"  -- Boston College submits testimonial evidence that the Committee devoted more time to discuss and ask questions about items put on "Watch".[22]  The Participants dispute this, CSOF ¶ 125, however, pointing to testimony from Committee members stating that they did not know or could not state whether the Committee did anything differently when a fund was placed on "Watch[,]" id. ¶ 123, including testimony from Smith that "[he] [doesn't] know that [the Committee] would do anything differently" "when a fund is listed as being on watch."  Ex. H (Smith Tr.) 163:13-24.  The fact that some Committee members or Smith did not know whether

---

[19] Ex. 64 (Q4 2016 QIR, BC-SELLERS002155, at 2155, 2184-85, 2193-94), ECF No. 63-19; Ex. 52 (Minutes, February 12, 2020, BC-SELLERS001442, at 1442-43), ECF No. 63-7.

[20] SOF ¶ 61, 146; Ex. 12 (Gissiner Report) ¶ 98; Ex. 1 (Martens Tr.) 66:5-67:23; Ex. 8 (Zona Tr.) 117:8-21, 204:20-205:1, ECF No. 62-8; Ex. H (Smith Tr.) 137:14-138:2; id. 151:19-152:8.

[21] Ex. 9 (Pontiff Tr.) 208:1-8, ECF No. 62-9; Ex. H (Smith Tr.) 94:2-7; Ex. 8 (Zona Tr.) 66:19:67-9.

[22] Ex. F (Pontiff Tr.) 96:11-97:9, 98:18-99:2; see also Ex. 1 (Martens Tr.) 122:24-123:7; Ex. 8 (Zona Tr.) 129:18-20; Ex. A (Jack Burke Tr.) 166:7-24.

the Committee treated items on Watch differently does not contradict the testimony from other Committee members that they did devote more time to items on Watch.  Thus, this is not genuinely disputed.  Lastly, the Committee did make changes to its investment lineups during the Class Period, CSOF ¶¶ 127-34, which may provide some evidence that the Committee did engage in prudent monitoring.  See Coyer v. Univar Sols. USA Inc., No. 1:22CV-0362, 2022 WL 4534791, at *6 (N.D. Ill. Sept. 28, 2022) (suggesting that a fiduciary's switching of investments shows prudence because it "shows that defendants assessed their investment options and made appropriate changes").

Thus, there is evidence that the Committee generally had a process in place to review and monitor investments.  While evidence of these procedures serves as some evidence of prudence, it is not dispositive, as this Court must inquire more specifically into the decision-making process behind retaining the challenged investments.  Davis v. Magna Int'l of Am., Inc., No. 20-11060, 2023 WL 3821807, at *4 (E.D. Mich. June 5, 2023) (the Committee reviewing investments several times per year, maintaining a Watch list, and getting investment updates alone does not demonstrate prudence).

### 2.  The CREF Stock Account

This Court next assesses whether there is a genuine dispute of material fact as to whether the Committee engaged in a

prudent and reasoned decision-making process in deciding to retain the CREF Stock Account.

> ### a. There Is a Factual Dispute as to Whether the CREF Stock Account Experienced Sustained Underperformance.

This Court concludes that factual disputes exist regarding whether CREF experienced underperformance relative to its benchmarks during the Class Period.

The Participants first point to evidence of the CREF Stock Account's underperformance in 2016. They provide evidence that the CREF Stock showed "consistent . . . blocks of orange," in a 2016 QIR when compared against one of its peer groups (Large Cap Core), with "orange" indicating that the investment is in the 76th-100th percentile compared to peers (i.e., the worst ranking). RSOF ¶ 216; CSOF ¶ 216; Ex. 62 (Q2 2016 QIR, BC-SELLERS001446, at 1468), ECF No. 63-17; Ex. 60 (Q4 2015 QIR, BC-SELLERS002003, at 2033), ECF No. 63-15. Moreover, it is undisputed that, in a June 2016 QIR, the CREF Stock "satisfied all [five] performance criteria" related to being put on "Watch[,]" according to the investment matrix.[23] The same report also shows that the CREF Stock "trailed its custom index for every [year] period." CSOF

---

[23] RSOF ¶ 216; Ex. 62 at 1468, 1474 (showing that the only factors on the Watch matrix that CREF Stock did not meet were related to expense ratios and significant changes to the fund's managers, organization, and fund philosophy). But see Ex. 1 (Martens Tr.) 67:4-9 (explaining that the investment matrix is not descriptive enough to understand truly whether to remove an investment).

¶ 216; Ex. 62 at 1468; <u>see also</u> Ex. 1 (Martens Tr.) 140:3-6.
Despite this, the fund had a "Maintain" ranking in 2016.  Ex. 62
at 1474.  Boston College points to evidence that that the CREF
Stock was "green" (performed favorably) when compared to the
Global Multi-Cap Peer Group -- one of its newly added
benchmarks.  RSOF ¶ 216; CSOF ¶ 216; Ex. 62 at 1468.

　　　The Participants demonstrate a factual dispute as to
whether CREF Stock was put on Watch in 2020-21 for sustained
underperformance.  Participants submit several QIRs (from 2020
and 2021) that stated the CREF Stock Account was on "Watch" (in
part) for "sustained underperformance."  RSOF ¶ 215.  Boston
College admits that these QIRs state that the CREF Stock Account
was placed on "Watch" due to "[a portfolio manager's departure]
and sustained underperformance."  <u>Id.</u>  The minutes for these
meetings only say that the CREF Stock Account was placed on
"Watch" due to "departure of one of the fund's portfolio
managers" and omits language referring to "sustained
underperformance."  <u>Id.</u>  Boston College provides Committee
member Martens' testimony, explaining that he believed
performance was "subjective[,]" Ex. 1 (Martens Tr.) 132:17-
133:12.  Boston College argues this accounts for this
discrepancy, as one of Fiducient's analysts prepared the QIR and
Smith prepared the minutes, Ex. H (Smith Tr.) 169:18-170:9.
Smith explains that these inconsistencies between the QIRs and

the meeting minutes could have been an oversight but otherwise cannot explain the omission.  Id. at 172:18-174:15.  Although meeting minutes are intended to be high-level summaries of important topics discussed, see id. at 56:1-8, it does not make sense for only one of the two reasons for the CREF Stock Account's "Watch" designation to be listed in the minutes. While this could have been an oversight, as speculated by Smith, or could have been because performance is subjective, as speculated by Martens, a reasonable factfinder is not required to believe these guesses as to these inconsistencies.  See Reeves, 530 U.S. at 151.  Thus, the Participants demonstrate a factual dispute as to whether the CREF Stock was placed on "Watch" for underperformance.

The Participants state that a 2022 QIR showed that the "CREF Stock Account's calendar year performance exceeded the CREF Stock Composite Index in only one year -- 2017 -- from 2016 to 2022."  RSOF ¶ 218; Ex. 89 (Q4 2022 QIR, Fiducient_004419, at 4441), ECF No. 63-49.  When compared to one of its peer groups – IM Global Multi-Cap Core Equity -- CREF Stock "exceeded" its performance every year from 2012 to 2015 and 2018 to 2022.  RSOF ¶ 218; Ex. 89 at 4458.  The CREF Stock Account also exceeded the CREF Stock Composite Index in 2015 and 2013 and performed similarly to CREF Stock Composite Index in 2020.  RSOF ¶ 218; Ex. 89 at 4441.

Beyond the parties' analysis of Fiducient's QIRs as presented to the Committee, the parties' experts dispute the CREF Stock Account's performance.  Boston College's expert Wermers opines that the "CREF Stock Account's returns were consistent with the returns of the composite index and peer groups considered by the Committee" throughout the duration of the Class Period.  SOF ¶ 173; Ex. 13 (Wermers Report) ¶ 61. Participants' expert Halpern, however, states that regardless of the benchmarks applied, the CREF Stock Account's "investment performance has proven remarkably and consistently poor over an extended time period, evaluated from many different perspectives."  CSOF ¶ 173; Ex. 15 (Halpern Report) 2-3, ECF No. 62-15.

There is a genuine dispute as to whether the CREF Stock Account underperformed relative to its benchmarks throughout the Class Period.  Disputes as to CREF's performance, however, are not enough to deny Boston College's motion for summary judgment, as "investment losses [alone] are not proof that an investor violated his duty of care."  Jenkins v. Yager, 444 F.3d 916, 926 (7th Cir. 2006); see also Bunch v. W.R. Grace & Co., 532 F. Supp. 2d 283, 290 (D. Mass. 2008) ("[T]he test is not whether [the fiduciary] got the best possible return on the investment, but whether it considered all relevant factors in deciding the

prudence of [an investment decision].”), aff'd, 555 F.3d 1 (1st Cir. 2009).

A reasonable factfinder could find that the CREF Stock Account's performance, especially after it was put on "Watch" for sustained underperformance, should have compelled the Committee to subject it to additional review and monitoring. Thus, this Court next evaluates whether Boston College engaged in a thorough and reasoned process in deciding whether to maintain the CREF Stock despite its sustained underperformance.

**b.  Whether the Committee Engaged in a Thorough and Reasoned Decisionmaking Process in Deciding to Retain the CREF Stock Account.**

Considering the CREF Stock Account demonstrated enough performance concerns for it to be placed on "Watch" (in part) due to sustained underperformance, this Court considers whether the Committee actually and thoroughly considered whether to retain the CREF Stock Account.  See Jacobs, 2023 WL 3027311, at *22.

This Court rules that Boston College fails to show, as matter of law, that the Committee engaged in a thorough and reasoned decision-making process in deciding to retain the CREF Stock Account.

**i. Relevant Facts**

The Participants generally take issue with the lack of specific and detailed record evidence as to discussions about

keeping the CREF Stock Account.[24]   Boston College provides
evidence that the Committee discussed the CREF Stock Account and
its performance at meetings throughout the Class Period.   Ex. 6
(Smith Tr.) 42:10-23, ECF No. 62-6 (CREF Stock is discussed
"quarter over quarter").

Boston College submits evidence that the Committee
discussed CREF Stock and its benchmarks in 2016 to better
understand its performance.[25]   The Participants point to
testimony from Committee member John Burke that "to [his]

---

[24] The Participants imply that the meeting minutes' lack of
detail shows a lack of discussion.   Opp'n 3, 11, 13; Ex. 15
(Halpern Report) at 15 ("[T]he minutes are routinely perfunctory
regarding the merits of nearly all investment options.").   This
Court rejects those arguments.   Falberg v. Goldman Sachs Grp.,
Inc., No. 19 CIV. 9910 (ER), 2022 WL 4280634, at *13 (S.D.N.Y.
Sept. 14, 2022) (rejecting plaintiffs' arguments that the lack
of meeting minutes shows, on a motion for summary judgment, that
the discussions did not happen); see id. at *12 (stating that
plaintiff fails to cite a single case in which a fiduciary was
held imprudent for "insufficiently descriptive" meeting
minutes).   Testimonial evidence alone could still be sufficient
to show a deliberate process.

[25] Ex. 1 (Martens Tr.) 75:7-15, 136:17-138:14 (confirming
that the Committee did discuss how to apply the CREF Stock
Account's peer groups in analyzing CREF's performance); Ex. 8
(Zona Tr.) 128:21-134:1 (recalling lengthy discussions about the
CREF Stock Account's benchmarks and explaining that the
Committee asked questions about the CREF Stock Account's peer
groups); Ex. 5 (Trainor Tr.) 134:9-15 (explaining that he is
"sure" the Committee examined the CREF Stock Account's
performance in 2016); Ex. 9 (Pontiff Tr.) 110:14-21 (explaining
that the Committee "would have discussed" the CREF Stock
Account's performance in 2016); Ex. 6 (Smith Tr.) 38:4-22
(explaining that the additional benchmark was added to help
committees review the CREF Stock Account from "difference
lenses" and in consideration of the CREF Stock Account's unique
characteristics).

knowledge[,]" the Committee did "not specifically" discuss how to apply the CREF Stock Account's benchmarks in analyzing its performance.  Ex. B (John Burke Tr.) 183:6-8.  Drawing from this, Participants' expert Halpern opines that the Committee was uninformed about the CREF Stock Account's benchmarks and did not discuss how to apply them.  Ex. 15 (Halpern Report) at 16. Halpern, however, does not appear to consider testimony from Zona and Martens who did demonstrate an understanding of the CREF Stock Account's benchmarking and stated that the Committee did discuss them, see supra note 25, as further confirmed by the associated meeting minutes, Ex. 40 (Minutes, March 7, 2016, BC-SELLERS001719, at 1719), ECF No. 62-40.  Thus, this Court does not consider Halpern's opinion as to whether the Committee was informed.  Since John Burke qualifies his response with "to his knowledge[,]" this testimony does not create a factual dispute as to whether these benchmarks were discussed in 2016, especially in light of overwhelming evidence showing that they were.

Martens indicated that sometime before June 2016, the Committee, in performing diligence, asked Fiducient to "investigate" the CREF Stock Account and show additional peer groups.  Ex. 8 (Zona Tr.) 130:10-138:1; 128:21-129:17.  The QIRs show that Fiducient added the additional peer group in late 2015, Ex. 60 at 2033, and Smith testified that Fiducient added

this additional peer group for most of its clients around this
time (and thus the change was not specific to this Committee).
RSOF ¶¶ 216, 234; Ex. H (Smith Tr.) 39:22-42:17; see also Ex. A
(Jack Burke Tr.) 184:8-11 (testifying that Fiducient selected
the peer groups).  The record shows that some Committee members
understood the CREF Stock Account's composition, Ex. 1 (Martens
Tr.) 136:17-138:1; Ex. 8 (Zona Tr.) 128:21-134, whereas one
Committee member, Trainor, did not, Ex. D (Trainor Tr.) 137:1-6.

    The record is unclear regarding whether the Committee
discussed alternatives to the CREF Stock Account.  In 2019,
Smith emailed the Committee to discuss whether to freeze "CREF
annuities[,]" in favor of index funds; however, the email does
not specify which annuities or which alternatives he was
referring to.  Ex. 103 (Email, Feb. 15, 2019, BC-SELLERS022922,
at 2922), ECF No. 64-13.  In fact, during his deposition, Smith
was unable to identify which CREF annuities he was referring to.
Ex. H (Smith Tr.) 126:19-128:13, 129:8-131:2, 132:2-134:23.
While Smith stated that he planned to discuss the possibility of
freezing CREF annuities at the next meeting and noted that many
of his other clients have frozen some CREF annuities for
indexes, Ex. 103 at 2922, there is nothing further in the record
as to the nature of these conversations -- except vague
testimony from Committee members confirming that this was
generally discussed without providing any specifics.  Ex. 5

(Trainor Tr.) 163:18-164:10; Ex. 10 (John Burke Tr.) 169:17-21;

Ex. 6 (Smith Tr.) 126:2-17.  But see Ex. 8 (Zona Tr.) 117:8-21

(stating that these conversations included whether it was better

to use "indexing versus more active management[,]" considering

the best option for participants and costs).

Several Committee members did not recall discussions as to

the CREF Stock Account's "sustained underperformance" in 2020 or

2021.[26]  Some Committee members suggest that the CREF Stock

Account's performance "would have" been discussed,[27] or was

discussed but fail to provide any details of such discussion.[28]

---

[26] Ex. 1 (Martens Tr.) 132:17-133:12 (not recalling discussion about the CREF Stock Account's sustained underperformance in 2020 but noting that performance is subjective); id. at 144:5-17 (stating that the CREF Stock Account was taken off of "Watch" because the Committee became comfortable with the new manager and not recalling any discussions about the CREF Stock Account's performance in 2021); Ex. A (Jack Burke Tr.) 182:3-17 (not recalling whether the CREF Stock Account's "sustained underperformance" was discussed); Ex. F (Pontiff Tr.) 100:5-14, 102:8-12 (not recalling discussing the CREF Stock Account's "sustained underperformance" in 2020).

[27] Ex. D (Trainor Tr.) 117:4-22, 131:14-22 (saying that the "sustained underperformance" "would have been discussed" if it was a reason for putting CREF Stock on "Watch"); Ex. 1 (Martens Tr.) 175:11-175:24, 176:16-24 (explaining that the Committee "would have discussed [the CREF Stock Account's] performance in general" and "whether to remove the CREF stock account" in light of a "[fund] manager change" in 2020).

[28] Ex. E (Martens Tr.) 126:9-128:3 (explaining that he does not remember discussions as to the CREF Stock Account's performance in "that much detail"); Ex. B (John Burke Tr.) 140:7-16 (not recalling exactly when CREF's performance was discussed but stating that it was).

The Committee did offer some reasons as to why it generally kept the CREF Stock over the Class Period, such as its organization, stability of its asset base, its broad market exposure, and its reasonable performance.  Ex. 8 (Zona Tr.) 203:5-12, 127:18-128:16; Ex. 6 (Smith Tr.) 38:8-22, 182:23-183:21.  There is no evidence in the record that Fiducient ever specifically recommended to terminate the CREF Stock Account at any point during the Class Period.  CSOF ¶¶ 149, 159.

### ii. Analysis

Participants primarily rely on Cates, Garthwait, and Tracey in arguing that there are "significant factual disputes . . . [that ought] preclude summary judgment" in favor of Boston College.  Opp'n 2 n.2, 10.  Participants' best case seems to be Cates.  In Cates, the court denied the fiduciary's motion for summary judgment when there was evidence that the challenged investment performed poorly relative to its benchmarks, the investment's performance failed multiple performance criteria on an independent consultant's investment scorecard, the challenged investment was placed on "Watch", there was a "sell rating" for the investment, and another independent consultant recommended termination of the investment from the plan's investment lineup. 2019 WL 8955333, at *13-14.  Similar to Cates, the CREF Stock Account failed multiple performance criteria on the consultant's "scorecard" (in this case, Fiducient's watch list matrix, see

[66]

Section II.D.2.a).  Jacobs, 2023 WL 3027311, at *21 (discussing Cates, 2019 WL 8955333, at *13-14).  Further, the challenged investments were placed on "Watch" in Cates for "historical underperformance", Cates, 2019 WL 8955333, at *13, whereas here, the CREF Stock Account was placed on "Watch" for a manager departure and "sustained underperformance."  RSOF ¶ 215.  Unlike Cates, however, Fiducient never recommended to terminate the CREF Stock Account, and there is no indication of a "sell rating" attached to the challenged investment, as there was in Cates.  Cates, 2019 WL 8955333, at *13-14.  Moreover, although the Participants cite Cates for their breach claim, Opp'n 10, 12, Boston College observes that the fiduciary in Cates moved for summary judgment on the ground of "objective prudence," not breach.  Reply 8 n.16.  Thus, Cates is not exactly analogous to the case at bar.

Tracey, cited by the Participants, is clearly inapposite, as the fiduciaries in Tracey had no process whatsoever for evaluating funds, despite their consultant's recommendations to have a process in place.  Tracey, 404 F. Supp. 3d at 362; Ex. 135 (Tracey SOF), ¶¶ 155-56; see Sacerdote, 9 F.4th at 111 (lack of deliberative process "may be enough to demonstrate imprudence").  Here, the Committee did have a process in place to monitor investments.

Boston College's best case is Cunningham, which was recently affirmed by the Second Circuit.[29]  There are some similarities between Cunningham and the present case.  First, both committees reviewed and discussed the imprudent investment. Cunningham, 2019 WL 4735876, at *14.  Both decided to retain the CREF Stock Account despite performance concerns after assessing its benchmarks.  Id. at *13-14 (retaining CREF Stock and noting that its benchmarks are imperfect).  The Cunningham court found that the committee asked questions and did not "passively" accept its consultants' recommendations as to the CREF Stock Account specifically.  Cunningham, 2019 WL 4735876, at *14. Similarly, the Committee here did generally ask Fiducient questions in performing its diligence with respect to CREF Stock in 2016 -- in fact, according to Zona, the Committee told Fiducient to investigate the CREF Stock Account's performance earlier (or right before) the Class Period after seeing "blocks of orange" on the QIRs.  Ex. G (Zona Tr.) 132:11-133:8, 158:19-160:7.  Thus, there are some general similarities between Cunningham and the case at bar.

The record in Cunningham does appear more detailed as to the discussions about retaining the challenged fund.  The

---

[29] The Second Circuit affirmed Cunningham shortly before Boston College's motion for summary judgment went to oral argument on November 14, 2023.  Cunningham v. Cornell Univ., 86 F.4th 961 (2d Cir. 2023).

fiduciary asked questions about disruption (if alternatives were chosen to CREF Stock), expressed concern about the CREF Stock Account's performance (here, it is not clear if the Committee expressed concern in 2020 or asked Fiducient questions), recognized a legacy concern because many participants remained in the funds, and observed that the funds performed favorably, were diverse, and popular among plan participants. Cunningham, 2019 WL 4735876, at *14.

Here, there is evidence that performance was reviewed and discussed each quarter and, when reviewing investments, the Committee generally considered performance, market conditions, diversification, risk, strategy, and management. The record is unclear, however, as to specific discussions about the CREF Stock Account's performance and the pros and cons of keeping it -- especially in 2020, when it was put on "Watch" for sustained underperformance. Cf. id. at *14 (some indication that the investment was underperforming but not that it was placed on "Watch"). A reasonable factfinder could find that the Committee did not follow a prudent process given the lack of specific discussions about the CREF Stock Account's performance after being placed on Watch (in part) for sustained underperformance in 2020. While there is evidence of the Committee discussing alternatives to CREF annuities generally in 2019, there is no evidence in the record that the Committee considered

[69]

alternatives specifically to the CREF Stock Account in 2020, after it was placed on "Watch."  Cf. id. (explaining that the fiduciary considered alternatives to the imprudent fund and this consideration was fatal to plaintiffs' claims).  Further, Halpern opines that, considering the CREF Stock Account's performance, the Committee "should have considered some 'alternative' to maintaining" CREF Stock."  Ex. 16 (Halpern Report) 13, ECF No. 62-16; Ex. 15 (Halpern Report) at 17.

Drawing all reasonable inferences in favor of the Participants, and recognizing that questions of "reasonableness" are typically resolved by the finder of fact at trial, this Court rules that there is a genuine dispute of material fact as to whether the Committee thoroughly discussed and analyzed whether to retain the CREF Stock Account in 2020 and whether the Committee actually considered alternatives to the CREF Stock Account.

### 3.  TIAA Real Estate Account

The Court applies similar principles in evaluating whether the Committee engaged in a prudent process in deciding to retain the TIAA Real Estate Account.

#### a. The Parties Genuinely Dispute Whether TIAA Real Estate Account Experienced Underperformance During the Class Period.

The parties' experts limn a factual dispute as to whether it is more appropriate (in evaluating the TIAA Real Estate

Account's performance) to compare the Real Estate Fund's adjusted or unadjusted returns against its benchmark, and similarly, whether the TIAA Real Estate Account underperformed during the Class Period.

The Committee's QIRs benchmarked the Real Estate Fund to the NCREIF ODCE Index on both an absolute basis and on an "adjusted" basis since 2018.  CSOF ¶ 163; Ex. 13 (Wermers Report) ¶¶ 75-77; see, e.g., Ex. 92 (Q1 2018 QIR, Fiducient_003028, at 3058), ECF No. 64-2; see also Ex. 1 (Martens Tr.) 165:7-24.  Fiducient added the adjusted basis to account for the TIAA Real Estate Account's liquidity restriction -- TIAA holds 15-25% of its holdings in non-real estate liquid investments as a part of its fund strategy.  Ex. 13 (Wermers Report) ¶¶ 73-77; Ex. 1 (Martens Tr.) 165:7-14.  Boston College and its expert, Wermers,[30] state that comparing the TIAA Real Estate Account to its adjusted returns is more appropriate than its unadjusted returns, because the former "allows an investor to assess the TIAA Real Estate Account's performance relative to

---

[30] Wermers criticizes Halpern for "compar[ing] the TIAA Real Estate Account's unadjusted returns[,]" -- "which have exposure to non-real estate liquid investments to meet participant redemption requests, and thus do not fully reflect fund managers' skill in selecting direct real estate investments" -- "to the returns of the prospectus benchmark[,]" which have no exposure to "non-real estate liquid investments[.]" Ex. 13 (Wermers Report) ¶ 78.  Wermers states that Halpern fails to account for the Real Estate Account's liquidity.  Id.

its real estate investment strategy."  RSOF ¶ 219-20; SOF ¶ 177; Ex. 13 (Wermers Report) ¶¶ 78-79.  The Participants and expert Halpern state that the more appropriate benchmark is the NCREIF Index with unadjusted returns, because comparing it to its "adjusted returns" is inappropriate as it "strips out the real-world impact of [TIAA Real Estate's] burdensome cash exposure and the cost to participants of its liquidity guarantee."  Ex. 16 (Halpern Report) at 9, 11.  Halpern further states that, regardless -- even after accounting for adjusted returns -- the TIAA Real Estate Account still lags its benchmark.  Id. at 11.

The Participants point to a June 2016 QIR for the TIAA Real Estate Account, "show[ing] that [it] performed below its benchmark index, the [NCREIF Index], for every period in the report" and "[t]he Watch List Matrix showed that the Fund scored 'yes' or 'N/A' for every performance element."  RSOF ¶ 219; Ex. 62 at 1468-74.  Boston College states that this June 2016 QIR failed to account for liquidity (meaning it was unadjusted). RSOF ¶ 219.  The Participants also point to a 2022 QIR showing that the TIAA Real Estate Account's calendar year performance did not exceed the unadjusted NCREIF index in any year from 2012 to 2022, RSOF ¶ 220 -- although the Court notes that there were not dramatic deviations in returns, Ex. 89 (Q4 2022 QIR, Fiducient_004419 at 4459).  As provided by Boston College, the same QIR "show[ed] that the TIAA Real Estate Account's **adjusted**

[72]

calendar year performance exceeded [NCREIF in four years from 2012 and 2022] and [nearly] matched it once." See RSOF ¶ 220 (emphasis added); Ex. 89 (Q4 2022 QIR, Fiducient_004419 at 4441, 4459). Beyond the QIRs, the experts also dispute the TIAA Real Estate Account's performance based on their own calculations.[31]

Lastly, it is undisputed that Fiducient consistently designated TIAA Real Estate as "Maintain" before September 2022, and that, in September 2022, the account was placed on "Discuss" only due to a manager change with the fund. CSOF ¶¶ 168-69. There is no indication in the record that Fiducient ever recommended to specifically terminate the TIAA Real Estate Account. Id. ¶ 171; see also Ex. 1 (Martens Tr.) 177:7-23 (stating that TIAA was never designated as "Terminate" or put on "Watch").

There are factual disputes as to the TIAA Real Estate Account's performance and whether the TIAA Real Estate Account's returns should be adjusted when comparing it to its index.

---

[31] Wermers opines that "TIAA Real Estate Account's five-year and ten-year adjusted returns exceeded the returns of its prospectus benchmark as of year-end 2015." Ex. 13 (Wermers Report) ¶ 79. He also claims that TIAA's "ten-year adjusted returns" for the TIAA Real Estate Account "continued to exceed the returns of its prospectus benchmark" each year until 2018, and "[i]ts one-year adjusted returns exceeded the returns of its prospectus benchmark" twice between 2019 and 2022. Id. Halpern opines that the Real Estate Fund's returns lagged its primary benchmark (NCREIF) in every time frame throughout the Class Period. Ex. 15 (Halpern Report) at 20.

Although the TIAA Real Estate Account's performance is relevant for the Committee to consider in deciding whether to keep it as an investment, it is not dispositive, because investment losses alone are not enough to demonstrate imprudence.  Jenkins, 444 F.3d at 926; see also Bunch, 532 F. Supp. 2d at 290.

Boston College provides some evidence that the Committee generally discussed TIAA Real Estate throughout the Class Period but does not provide specifics.[32]  Martens and Smith testified that the TIAA Real Estate Account has a unique investment strategy, provides direct exposure to real estate, and allows for liquidity when needed.[33]  Moreover, as discussed, there is general evidence that the Committee reviewed all investments regularly and generally considered numerous factors in evaluating all investments, including the performance, market

---

[32] Ex. 8 (Zona Tr.) 195:6-20 (not recalling whether the Committee "singled out" TIAA for its performance and just generally remembering the Committee's review of TIAA Real Estate's performance in fall 2022); Ex. 1 (Martens Tr.) 177:7-18 (when asked whether the Committee discussed removal of TIAA in 2022 when there was a manager change, he explains that the Committee "would have discussed the merits of keeping it").

[33] Martens explained that the Real Estate Fund is unique because it "offer[s] a differentiating set of returns relative to equities or fixed income," and that its "strategy [] is hard to access elsewhere."  Ex. 1 (Martens Tr.) 166:18-167:1, 177:7-18.  Smith similarly explained that TIAA is unique, offers "direct exposure real estate exposure to participant[s,]" is "less correlated to traditional stock and bond markets[,]" is a diversified investment, and allows for liquidity (cash when you need it).  Ex. 6 (Smith Tr.) 215:20-216:16.

conditions, diversification, risk, strategy, expenses, and management.  See supra Section II.D.1.b.

Halpern opines that, considering the TIAA Real Estate Account's performance and cash drag, the Committee should have considered alternatives to the TIAA Real Estate Account.[34] Halpern asserts that the Committee was not equipped to evaluate the TIAA Real Estate Account and that the Committee did not notice or discuss the Account's cash drag.  Ex. 15 (Halpern Report) at 22.  While Committee member John Burke did not know what the TIAA Real Estate Account's "adjusted returns" meant, id. at 23; Ex. B (John Burke Tr.) 167:2-7, Martens and Smith demonstrated an understanding of the difference between the Account's adjusted and non-adjusted returns, Ex. 1 (Martens Tr.) 165:2-24; Ex. 6 (Smith Tr.) 215:11–217:14.  There does not seem to be any indication in the record that the Committee specifically discussed this "cash drag" -- meaning the burden of the TIAA Real Estate Account's liquidity restriction, nor is there evidence that the Committee specifically considered alternatives to TIAA Real Estate at any point.

---

[34] Halpern originally stated in his report that "the Committee could have and should have terminated the [Real Estate Fund]."  Ex. 15 (Halpern Tr.) at 24.  Halpern testified, however, and later corrected in his second report, that he was not necessarily opining that TIAA Real Estate Account should have been replaced, but that the Committee failed to explore alternatives and should have.  Ex. 11 (Halpern Tr.) 117:18-119:25, ECF No. 62-11; Ex. 16 (Halpern Report) at 13.

The Participants' evidence that the Committee engaged in an imprudent process in retaining the TIAA Real Estate Account is thin -- especially because there is much less clear evidence, compared to the CREF Stock, that its performance should have signaled to the Committee to conduct additional review. Cf. supra Section II.D.2 (CREF Stock was placed on "Watch" for sustained underperformance, which should have signaled additional review by the Committee). Despite this, with all reasonable inferences in favor of the Participants, Halpern's opinion that the Committee should have considered alternatives to the TIAA Real Estate Account given its performance,[35] the lack of evidence showing that the Committee considered any alternatives to TIAA Real Estate, and the lack of discussions about TIAA Real Estate "cash drag" could lead a reasonable factfinder to believe that the Committee engaged in an imprudent process in deciding to retain the TIAA Real Estate Account. Thus, this Court holds that Participants adduce sufficient evidence to survive summary judgment on breach for the TIAA Real Estate Account.

---

[35] Halpern's opinion that the Committee should have considered alternatives is also generally supported by Wermers' data on college and university plans with at least $1,000,000,000 in assets (total of 52) showing that 27 of these universities either terminated or froze contributions to TIAA Real Estate from 2016 to 2023.  Ex. 13 (Wermers Report) at Exhibit 6.B.1.

### 4.    The Committee's Good Faith

The Participants argue that Boston College "worked with Fiducient to create a paper trail to justify their decisions, and they cited litigation challenging the same investments and issues in other college and university plans in doing so." Opp'n 18.  Boston College deems these "spurious accusations" to be "[b]aseless."  Reply 9.  The Participants also argue that Boston College added benchmarks "against which the CREF Stock Account would always look better" and manufactured the record in light of lawsuits and to show good process.  Opp'n 3 n.4, 19; CSOF ¶ 227.  This Court rules that no reasonable factfinder could find that the Committee acted in bad faith, but instead was monitoring litigation and adding additional benchmarks as a part of its diligence efforts.

The Participants cite to evidence that the CREF Stock Account performed poorly relative to its peer group in **2016**, RSOF ¶ 216, and argue that an additional peer group was added to make the CREF Stock Account look like it was performing better than it was.[36]  Opp'n 3 n.4, 19; RSOF ¶ 216.  Boston College

---

[36] Participants are referring to the Committee's inclusion of the Global Multi-Cap benchmark to evaluate the CREF Stock Account.  The CREF Stock Account has a 70% in domestic stock and 30% in foreign stock.  Ex. 60 at 2033.  Fiducient recognized that this unique mix "create[s] some challenges when selecting an appropriate peer universe for comparison" to the CREF Stock Account.  Id.  The existing peer group "Large Core Cap" had an 88% in domestic stock and 12% in international stock.  Id.

provides evidence that Fiducient added the additional peer group
in the last quarter of 2015, nearly two years before any of the
emails referencing ERISA litigations cited by the Participants
as evidence of bad faith and before the Class Period had begun.
RSOF ¶¶ 216, 226; Ex. 40 at 1719; CSOF ¶ 9 n.2.  This argument
has merit, as the first email the Participants cite as evidence
of bad faith occurred in May 2017, Opp'n 19.  The Participants
do not point to evidence that litigation was on the Committee's
radar when Fiducient added these benchmarks.  Moreover, Smith
testified that Fiducient added this additional peer group for
most of its clients around the same time to help them better
understand CREF Stock, RSOF ¶¶ 216, 234; Ex. H (Smith Tr.)
39:22-42:17; Ex. G (Zona Tr.) 158:19-160:7, which further
supports Boston College's argument that the Committee and
Fiducient added these benchmarks to better evaluate the CREF
Stock Account -- i.e., they did not add these additional
benchmarks in bad faith.  Finally, the Committee and Fiducient
did not even remove the benchmark that the CREF Stock Account
performed poorly against -- they just added additional

---

Fiducient, moving forward, added Global Multi-Cap peer group as
an additional benchmark to evaluate CREF Stock, and this new
benchmark has a mix of 53% in domestic stock and 47% in
international stock.  Id.; Ex. 1 (Martens Tr.) 72:22-75:15
(explaining that CREF Stock fell between these two peer groups).

benchmarks.  See Sacerdote, 328 F. Supp. 3d at 311 (explaining that shifting benchmarks demonstrates prudence).

The Participants also point to emails from Smith to the Committee in **2017** about other ERISA litigation involving the CREF Stock Account.  In the email exchange, Committee members asked Smith whether the Committee is required to keep the CREF Stock Account, considering litigation liability.  Ex. 99 (May 2017 email, BC-SELLERS012410, at 2411), ECF No. 64-9.  Smith stated that were Boston College liable for offering CREF Stock, so would many other universities, id. at 2410, and that Fiducient's reporting to the Committee "solves for [the] issue" of being liable for not properly evaluating the CREF Stock Account's performance by adding multiple comparison categories to "provide the Committee with a fuller understanding of the results [of the CREF Stock Account] versus [its] peers." Id. at 2410, 2413.  No reasonable juror could find that this email shows that Boston College acted in bad faith –- it is reasonable for a fiduciary to keep up on litigation related to its duties as part of its diligence and Smith's email essentially states that they are not risking litigation liability because they comprehensively evaluate the CREF Stock Account's performance using multiple benchmarks.

The Participants point to another email from October **2018**, in which Smith stated, in reference to litigation surrounding

[79]

the CREF Stock Account and the TIAA Real Estate Account, that
the Committee is "thoughtful in regards to how unique investment
options be evaluated and how the evaluation process is
documented in the performance reports [by] . . . . includ[ing]
alternate data points in the reporting to demonstrate an
understanding of particular investment strategies . . . ."  Ex.
102 (October 2018 email, BC-SELLERS024741, at 4741), ECF No. 64-
12 (emphasis added).  Again, similar to the previous email,
Smith is simply stating that they are not at risk of litigation
because they comprehensively evaluate the CREF Stock Account and
document their process -- both of which serve as evidence of
diligence not bad faith.

The Participants also point to the **2019** email from Smith,
in which he stated that he would bring up freezing CREF
annuities in favor of index funds at the next meeting, Ex. 103
at 2922; however, the next meeting's minutes listed all
investments as "Maintain" and stated that all investments were
competitive, RSOF ¶ 222; Opp'n 19.  Despite Participants'
arguments that the Committee purposely "omitted negative
information from the formal record" to avoid future litigation,
Opp'n 19, the lack of detail in the meeting minutes does not
demonstrate bad faith.  The record shows that meeting minutes
were intended to be high-level summaries of important topics
discussed.  Ex. H (Smith Tr.) 56:1-8.  Moreover, insufficiently

descriptive meeting minutes, alone, are not enough to demonstrate imprudence.  See supra note 24.  Lastly, the governing IPS only requires the Committee to document changes to investment lineups, see infra Section II.E. -- here, the Participants complain of not documenting discussions about possibly freezing CREF annuities.

In **2020**, Smith wrote to the Committee that "[i]n light of changes to TIAA product, lawsuit and to **show good process** we are going to again show an active versus passive target date fund comparison at this quarter's meeting."  Ex. T (Smith Email, BC-SELLERS023239, at 3240), ECF No. 71-20 (emphasis added).  Again, while the Participants argue that this reference to showing "good process" demonstrates bad faith, Smith is essentially saying that they are going to perform more diligence in light of potential litigation risks associated with its investments.

Lastly, the Participants suggest that the Committee's tracking of ERISA litigations show the Committee's motives for creating a paper trail for litigation.  CSOF ¶ 80; Opp'n 18-20. In reference to the litigation tracking, Boston College offers testimony from Committee member Zona that he keeps apprised of litigation as a part of "due diligence" in improving the Committee's process and in order to keep apprised on what was happening in the industry.  Ex. G (Zona Tr.) 298:1-20, 300:24-301:17.  Moreover, Zona specifically said that ERISA litigations

[81]

were not discussed when the CREF Stock Account's additional peer group was added, id. at 158:14-18, and that he could not recall a single instance in which the Committee suggested a change to its process due to litigation, id. at 301:21-302:22.  Lastly, Boston College points out that the Participants alleged in their Complaint that the Committee acted imprudently by ignoring these lawsuits, Reply 9 n.18; Compl. ¶ 83 ("Defendants breached their duties because they ignored multiple red flags about TIAA and Fidelity, including court decisions concluding that specific investments in the Plans were imprudent."), and now they argue that considering these lawsuits shows bad faith.  Again, and as the Participants indirectly recognize in their Complaint, it is not nefarious for the Committee to track litigation as part of the diligence efforts -- if anything, this demonstrates that the Committee performed additional diligence by learning from the potential imprudence of other similarly-situated fiduciaries.

Even with all reasonable inferences in favor of the Participants, the Committee's bad faith is not genuinely disputed.  No reasonable juror could find that adding additional benchmarks to better understand the CREF Stock Account, documenting its evaluation process, and tracking litigation relevant to the Committee's duties under ERISA demonstrate bad faith -- to the contrary, this all shows the Committee and

Fiducient's diligence.  Thus, this Court holds no reasonable juror could find that Boston College acted in bad faith.

**E.  Boston College Did Not Violate the Plans' Documents.**

ERISA Section 404(a)(1)(D) provides: "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -- in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III."  29 U.S.C. § 1104.

The IPS states that "the Committee . . . **may** establish a probationary period [for any investment] during which any area of concern will be assessed, and if necessary, corrected."  CSOF ¶ 69 (emphasis added).  It also states that "[c]hanges to the investment options available to participants will be **made at the sole discretion of the Committee**, which shall document its analysis and decisions in the Committee minutes."  Ex. 22 (Investment Policy Statement, BC-SELLERS005481, at 5483), ECF No. 62-22 (emphasis added).

The Participants allege that Boston College's conduct constitutes a breach of their duty to act in accordance with the documents and instruments governing the plan, in violation of ERISA Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Compl. ¶¶ 119-21.  Specifically, the Participants argue that the

[83]

Committee failed to follow the "investments' performance objectives and to document [its] conclusions."  Opp'n 14.  The Participants contest Boston College's argument that the Committee was only required "to document items in the minutes if an investment were changed[,]" arguing that the Committee was obligated to document decisions even when it considered alternatives but did not make changes to the investment lineup.  Id. at 14 n.13.  The Participants posit that Investment Policy Statement should not be treated like a "dead letter."  Id. at 13.[37]

Boston College argues that there is no genuine issue of disputed material fact regarding whether it complied with the Plan documents and that it is entitled to a finding of prudence on Count III as matter of law.  Mem. 13.  Specifically, Boston

---

[37] The Participants submit Halpern's opinion that the Committee's actions with respect to the TIAA Real Estate Account "appear[] contrary to" the Investment Policy Statement, and the Committee's alleged "failure to carefully scrutinize the [CREF Stock Account]" "departed from" the Investment Policy Statement. Ex. 15 (Halpern Report) at 14, 23; CSOF ¶ 189.  The Court does not consider Halpern's opinion on the Investment Policy Statement as creating an issue of material fact, as it is conclusory.  Further, Halpern fails to outright state that the Investment Policy Statement was violated, instead using words like "appears contrary to" and "departed from."  Ex. 15 (Halpern Report) at 14, 23; CSOF ¶ 189.  Lastly, the Participants themselves admit that the IPS' requirements pose questions of law.  CSOF ¶ 69 (identifying Boston College's statement that "the [Investment Policy Statement] does not require the Committee to put investments on a watch list or consider them for termination" as a legal conclusion).

College argues that the Investment Policy Statement gave the Committee discretion in whether it should establish a probationary period, does not require particular monitoring, and does not require any particular monitoring criteria.  Id.; see Ex. 22 at 5483 (stating that "general criteria **may** include" before listing criteria (emphasis added)).

This Court agrees with Boston College.  The plain language of the IPS does not require the Committee to use certain monitoring criteria and gives the Committee significant discretion in whether to change investments.  See Ex. 22 at 5483.  With respect to Participants' claims about documentation, this Court rules that the IPS only mandates documentation, as per the term "shall," when investment changes are made.  Id. Participants do not point to any record evidence showing that a change was made to the investments and went undocumented.  Thus, this Court **GRANTS** Boston College's motion for summary judgment on the alleged failure to comply with plan documents.

> **F.  Although Participants Show Loss on the Recordkeeping Fees Claim from 2019 to Present, They Fail to Show Loss from 2016 to 2018.  Although Participants Show Loss for the CREF Stock Account, They Fail to Show Loss for the TIAA Real Estate Account.  Boston College Fails to Meet its Burden in Establishing that the Committee's Decisions Were Objectively Prudent.**

Boston College also moves for summary judgment on the ground that the Participants did not "establish loss" by failing to offer any "evidence purporting to quantify a loss or any

supposed damages." Mem. 1.  Boston College also argues that the Plans' fees and the challenged investments "were objectively prudent as a matter of law[,]" because these investments were "widely used by comparable plans[,]" and that its fees were "objectively reasonable" compared to comparable plans offering similar services.  Id. at 1, 14.[38]

The Participants admit that neither of their experts "attempted to calculate whether the Plans suffered any loss associated with conduct alleged in the complaint."  CSOF ¶ 180. The Participants instead rebut that their experts "provided data that suffice to show [Boston College's] conduct caused the Plans and their participant losses, even if they did not calculate [those] losses."  Id.

---

[38] In their post-hearing response on the issue of loss, the Participants argue that Boston College never moved for summary judgment on the issue of causation (i.e., objective prudence). Supp. Response Loss 1-2 (arguing that, because the headings, opening sentence, and closing sentence of Boston College's motion for summary judgment refer only to the Participants' failure to establish loss, Boston College never moved for summary judgment on causation).  This Court disagrees with the Participants' characterization of Boston College's motion. Although both parties did lump their analyses of loss and loss causation together in their initial briefs, Boston College did -- in addition to loss -- move for summary judgment on the ground of "objective[e] prudenc[e][,]" citing Brotherston and adopting its terminology for loss causation.  Mem. 1, 13-14; Brotherston, 907 F.3d at 39 ("[O]nce an ERISA plaintiff has shown a breach of fiduciary duty and loss to the plan, the burden shifts to the fiduciary to prove that such loss was not caused by its breach, that is, to prove that **the resulting investment decision was objectively prudent.**" (emphasis added)).

This Court rules that although the Participants show loss on the Recordkeeping Fees Claim from 2019 to present, they fail to show loss from 2016 to 2018.  Boston College fails to show that its decision with respect to the Recordkeeping Fees is objectively prudent as matter of law.  This Court also holds that although the Participants show loss for the CREF Stock Account, they fail to show loss for the TIAA Real Estate Account.  Boston College fails to show that the Committee's decision to retain CREF Stock was objectively prudent as matter of law.

### 1.   General Principles Relevant to Loss or Objective Prudence

#### a. Loss

Fiduciaries acting in violation of ERISA's duty of prudence standards must "make good to [the] plan any losses to the plan resulting from [the] breach."  29 U.S.C. §§ 1109(a).  Courts may also award "other equitable or remedial relief as the court may deem appropriate" for ERISA violations.  Id.

The burden is on the plaintiff to show "a loss associated with the fiduciary's breach." Brotherston, 907 F.3d at 36, 39.  "Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." Evans v. Akers, 534 F.3d 65, 74 (1st Cir. 2008); see also Cunningham, 86 F.4th at 961

("Losses are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been [operated] like other funds being [properly operated] during the same period." (quoting Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt., 843 F.3d 561, 567 (2d Cir. 2016))).

### b.   Objective Prudence

Once plaintiffs show both breach and loss, the fiduciary has the burden to disprove causation by showing that the "resulting investment decision was objectively prudent." Brotherston, 907 F.3d at 39; see id. at 34 ("Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability **if a hypothetical prudent fiduciary would have made the same decision anyway**." (quoting Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994) (emphasis added))); id. at 39 (framing causation as "whether [defendants] can meet its burden of showing that the loss most likely would have occurred even if [defendants] [acted] prudent[ly] in [their] selection and monitoring procedures"); see Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 366 (4th Cir. 2014) ("When a plaintiff has established a fiduciary breach and a loss, courts tend to conclude that the breaching fiduciary was liable."). A fiduciary shows objective prudence when it provides evidence that a prudent fiduciary "would" have rather

than "could" have made the same decision.  Tatum, 761 F.3d at

365 (emphasizing that this distinction is legally significant,

as "'could' describes what is merely possible, while 'would'

describes what is probable" (citing Knight v. Commissioner, 552

U.S. 181, 187-88, 192, (2008))); see also Brotherston, 907 F.3d

at 35-36 (adopting the same ERISA burden-shifting approach as

the Fourth Circuit).

This Court emphasizes that Boston College has a heavy

burden in disproving loss causation on summary judgment.  When

the moving party also bears the burden at trial, as is the case

here with respect to objective prudence, its burden of proof

includes "producing incontrovertible prima facie evidence of its

claims."  Atlantic Specialty Ins. Co., 480 F. Supp. 3d at 329

(citing Celotex Corp., 477 U.S. at 331).  If the movant does so,

then the nonmovant must set forth specific facts sufficient to

establish a genuine issue for trial.  Matsushita Elec. Indus.

Co., 475 U.S. at 586-87.

> **2.  Participants Fail to Show Loss from 2016 to 2018 for the Recordkeeping Fees Claim but Do Show Loss for the Fees from 2019 to 2023.  Boston College Fails to Show the Fees Were Objectively Prudent as Matter of Law.**

### a. Loss

Boston College asserts that the Participants failed to

prove loss and thus moves for summary judgment on the

Participants' recordkeeping claims.  Mem. 14.  It is undisputed

that Minnich did not specifically calculate loss based on the
allegedly excessive fees, CSOF ¶ 180; however, as discussed
infra Section II.F.3.a.i, the Participants do not need to
calculate loss to show loss.  Boston College argues that Minnich
failed to show that the Plans' fees were unreasonable "relative
to similar services provided to similarly situated plans."  Mem.
14.  Further, Boston College argues that the Participants fail
to "identif[y] any other plan—much less a range of similarly-
situated university plans—with similar participation levels or
comparable services to the Plans that paid Minnich's
'reasonable' fee during the Class Period."  Id.  The
Participants argue that Minnich showed that a reasonable fee
would have been $50 (from 2016-2018) and $31 (2019 to present),
which is lower than the Plans' fees during that time and
sufficiently establishes loss.  Opp'n 15.

     The Participants need to show "there was a 'prudent
alternative' to the allegedly imprudent fees paid" to survive on
summary judgment.  Cunningham, 86 F.4th at 982.  The
Participants do not need to show that its alternative fee ranges
"were the only plausible or prudent ones," because that would
improperly place the burden of loss causation on the
Participants.  Sacerdote, 9 F.4th at 113 (internal quotation
marks and citations omitted).  In Cunningham, the court excluded
Minnich's opinion regarding loss for the recordkeeper fees claim

[90]

because of deficiencies in Minnich's methodology -- Minnich
appeared to base his reasonable fee on his "experience" without
explaining why his reasonable fee was "reasonable in light of
any features of the Plans."[39] Cunningham, 86 F.4th at 982;
Cunningham, 2019 WL 4735876, at *9.  Similarly, the court in
Huang adopted the reasoning in Cunningham, finding unreliable an
expert opinion who relied on "his experience" to determine a
reasonable fee, did not identify a single plan with his
reasonable fee, and did not explain why he picked certain
comparator plans (which were "not comparable in size or type to
the [p]lan").  Huang, 2023 WL 3092626, at *8-10.  To the extent
the expert just "considered" these comparator plans, the Huang
court held that was "insufficient to constitute a reliable
methodology."  Id. at 10.

Similarly here, as Boston College notes, Minnich does not
appear to give any indication (aside from "experience")[40] as to

---

[39] The Cunningham court found that Minnich failed to explain
how he reached his "reasonable fee[,]" because Minnich "simply
referenc[ed] [his] knowledge of the relevant industry" and
provided "a few examples of other university plans that paid
lower fees" but failed to "explain[] how these putative
comparators were selected."  Cunningham, 86 F.4th at 982.  This
is similar to Minnich's methodology here for the period before
the 2018 RFP.

[40] Minnich writes in his report for this case that he
establishes the $50 fee based on his "30 years of experience,
including significant experience providing pricing information
in response to RFP for 403(b)/402(k) plans . . . . ."  Ex. 17
(Minnich Report) at 22.  Gissiner shows that this $50 could not
be based on Minnich's experience, as Minnich charged higher fees

how he came up with a reasonable fee of $50 from 2016 to 2018.
Minnich references several comparator plans (with much larger
participant counts) and a survey from 2021 in his report, and
Minnich also states that he considers ancillary revenue,
participant count, and enhanced services in determining what is
a reasonable fee.  See generally Ex. 17 (Minnich Report); Ex. 18
(Minnich Report); CSOF ¶ 204.  There is no indication as to how
he applies any methodology to calculate a reasonable fee of $50
from 2016 to 2018, and Minnich was unable to identify any plan
with a $50 recordkeeping fee during the same time period, Ex. 4
(Minnich Tr.) 271:23-272:3.  Thus, this Court finds and rules
**inadmissible** Minnich's opinion that $50 is a prudent fee from
2016 and 2018, because he fails to show how his "experience" led
to his calculation of the reasonable fee.  Accordingly, this
Court holds, as matter of law, that the Participants fail to
show loss from 2016 to 2018 and thus their duty-of-prudence
claim fails for that time period.  See Troudt, 2019 WL 1006019,
at *9 (finding plaintiffs provided no evidence of loss when
plaintiffs' only evidence was its expert opining on what a
reasonable fee would be, which was struck by the court).

   Minnich identifies $31 (a number that comes directly from
the 2018 RFP) as a reasonable fee for both Plans, which, the

---

when working at Transamerica.  Ex. 12 (Gissiner Report) ¶ 210,
fig.4.

Participants observe, establishes the "market baseline for the Plans." Supp. Loss 5; Opp'n 15. To the extent that Boston College argues that Minnich fails to show that the fees paid were excessive relative to the services rendered,[41] the Court notes that the $31 bid was tailored to the Plan and came from Fidelity, an incumbent recordkeeper, CSOF ¶ 212.[42] To the extent that Boston College attacks the $31 fee by pointing out that Minnich did not compare the Plans' fees to those plans that choose to not consolidate to a single recordkeeper, id. ¶ 213, this Court rejects those arguments -- the Participants need only to identify a prudent alternative -- they do not need to prove

---

[41] Boston College cites case law supporting that the Participants must show that the fees were excessive relative to the services offered by the Plans' recordkeepers. See Young, 325 F. App'x at 33 (2d Cir. 2009); see also Wehner v. Genentech, Inc., 2021 WL 507599, at *5 (N.D. Cal. Feb. 9, 2021) (stating on a motion to dismiss that "a plaintiff must plead [fees] that are excessive in relation to the **specific** services the recordkeeper provided to the **specific plan** at issue").

[42] See CSOF ¶ 105 (parties agreeing that TIAA and Fidelity's bids included "non-core recordkeeping services for which the other candidates would charge additional fees, including the provision of a consolidated fee disclosure services"); id. ¶ 106 (explaining that TIAA and Fidelity "waived contract termination fees, while Empower did not, and they provided five-year fee guarantees, while Vanguard and Empower only offered three-year fee guarantees"). Boston College provides evidence that the Committee considered services (among other factors) in deciding to stick with its incumbent recordkeepers. Ex. 48 (2018 Meeting Minutes).

that its fee is the only prudent alternative.  Sacerdote, 9
F.4th at 113.[43]

     Thus, the Participants successfully identify a prudent
alternative and, with all reasonable inferences in favor of the
Participants, this Court holds that they meet their burden of
showing loss for the fees after the 2018 RFP.

### b.    Objective Prudence

     Although the Participants survive on breach and loss for
the fees after 2019, Boston College can still succeed on its
motion for summary judgment if it can meet its high burden in
showing incontrovertible evidence that the fees were objectively
prudent as matter of law.  This is because the burden of
persuasion now shifts to Boston College.  Brotherston, 907 F.3d
at 39 ("[O]nce an ERISA plaintiff has shown a breach of
fiduciary duty and loss to the plan, the burden shifts to the
fiduciary to prove that such loss was not caused by its breach,
that is, to prove that the resulting investment decision was
objectively prudent.").

     Boston College has the burden of proving that the loss
would most likely have occurred even if it had acted prudently;

_____

     [43] For example, if the Participants prove that it was
imprudent to pay $100 in fees, but prudent to pay $10, they
would not have to prove that it would also be imprudent to pay
$11 to $99 to show its burden on loss.  Sacerdote, 9 F.4th at
113-14.  The burden to show that a fee between $11 to $99 would
also be prudent would rest with Boston College in disproving
loss causation.  Id.

[94]

in other words, that a hypothetical prudent fiduciary would have, rather than could have, made the same decision regarding fees.  Boston College fails to clear this high hurdle.

Boston College submits evidence that some similarly situated fiduciaries use multiple recordkeepers.  Gissiner explained that university plans commonly have multiple recordkeepers -- one recordkeeper for annuities and another for mutual funds.  Ex. 12 (Gissiner Report) ¶¶ 23, 29.  Gissiner sets forth data demonstrating that of the top 40 universities with assets over $500,000,000 (a total of 28 universities), 12 have a single recordkeeper (without "frozen" providers) and 14 use multiple recordkeepers for their active investments.  Id. ¶ 32.  The remaining 2 selected a single recordkeeper for future contributions, but still have legacy assets retained by TIAA.  Id.  Thus, 14 opted to use a single recordkeeper and 14 opted to use multiple recordkeepers.  While this data shows that a hypothetically prudent fiduciary **could** have opted not to consolidate the plans, it does not serve as incontrovertible evidence that a hypothetically prudent fiduciary **would** have chosen not to consolidate the plans.

There is additional evidence in the record that casts doubt on whether a hypothetically prudent fiduciary would have made such a decision.  Minnich opines that it is best practice to consolidate plans, Ex. 17 (Minnich Report) at 10-12, although he

does concede that it is not always unreasonable or a less than best practice to maintain multiple recordkeepers, Ex. 4 (Minnich Tr.) 151:13-152:1.  A consulting group in 2016 reported to the Committee that "[m]aintaining two [] [p]lans is a more complex design than plans offered at most colleges and universities[,]" Ex. M (Sibson Summary Response, BC-SELLERS021214, at 1221), ECF No. 71-13, and Fiducient advised the Committee to consider consolidation as early as 2016. Ex. Q at 1151.

Fiducient's benchmarking showed that the Plans' fees were competitive and comparable to similarly sized plans with similar assets and participation.  Mem. 17; Ex. 12 (Gissiner Report) at Exhibit 7A; id. at Exhibit 7B.  The Participants do not rebut Fiducient's benchmarking.  Minnich, however, does both opine that moving to a single recordkeeper is a best fiduciary practice, as it allows the plan to maximize its bargaining power, and points out the inefficiencies in multi-recordkeeper plans.  Ex. 17 (Minnich Report) at 10.  Thus, if the plans had consolidated, it is possible that the Committee could have secured even further reductions in fees for its participants throughout the Class Period.

Boston College submits evidence that TIAA and Fidelity were popular among university clients.  Ex. 71 at 1099 (showing that TIAA had 5,745 clients, Transamerica had 238, Vanguard had 31, Empower had 382, and Fidelity had 762).  Of the top 40

universities with assets over $500,000,000 (a total of 28 plans
and looking at plans with both single and multiple
recordkeepers), 26 plans[44] list TIAA as a recordkeeper and 15
list Fidelity as a recordkeeper.  Ex. 12 (Gissiner Report) at
Exhibit 1; Ex. 4 (Minnich Tr.) 202:3-10, 194:8-196:2 (conceding
that TIAA dominates the higher-education market); see also Ex.
18 (Minnich Report) at 5 (confirming popularity of TIAA among
university clients).  Among these 28 plans, 13 retained both
Fidelity and TIAA as recordkeepers.  Again, while this may show
that the hypothetical prudent fiduciary **could** have made the same
decision (to keep both TIAA and Fidelity), it does not show that
a hypothetical prudent fiduciary **would** have as matter of law.

Gissiner compares Plan I's fees to those "charged by TIAA
to other college or university plans with counts of participants
between 2,600 and 5,000 in single-vendor arrangements each year
between 2017 and 2023."  CSOF ¶ 30; Ex. 12 (Gissiner Report) ¶¶
146-49, Ex. 8A.  Gissiner shows that Plan I's fees were lower
than the average fees of these plans.  Ex. 12 (Gissiner Report)
¶¶ 146-49.  The Participants point out, however, that Gissiner

---

[44] Although Gissiner's report does say that all of these
universities had TIAA as a recordkeeper, Ex. 12 (Gissiner
Report) at Exhibit 1, the Court does not include the University
of Notre Dame and Vanderbilt University because -- although they
have "legacy assets" with TIAA -- they both selected a single
recordkeeper for future contributions.  Id. ¶ 32.  Both
universities consolidated under Fidelity.  Id. ¶¶ 24 n.31, 44
n.82.

relies on too few comparators in making this assessment.[45]  For Plan II, Gissiner similarly provides evidence that Plan II's fees "were either below or consistent with the median fees charged to all university plans of between 1,000 and 10,000 participants every year between 2016 and 2023," including both single and multi-recordkeeping plans.  CSOF ¶ 42; Ex. 12 (Gissiner Report) ¶¶ 146-49, Ex. 8A.  The Participants, however, similarly point out that these calculations rely on too few comparators.  CSOF ¶ 42.[46]  A reasonable factfinder would not be required to rely on this data given the minimal comparators provided.

While Boston College does provide compelling evidence that a hypothetically prudent fiduciary would have made the same choice -- to retain both TIAA and Fidelity as recordkeepers -- , drawing all reasonable inferences in favor of the Participants, and because Boston College has the burden of persuasion on this issue, this Court rules that Boston College fails to meet its heavy burden of proof under ERISA on disproving causation.

---

[45] From 2017 to 2023, the number of TIAA comparator plans is as follows: 1, 2, 4, 6, 2, 7, and 13.  Ex. 12 (Gissiner Report) at Exhibit 8A.

[46] From 2017 to 2023, the number of Fidelity comparator plans are as follows: 5, 13, 20, 18, 12, 11, 6, and 4.  Ex. 12 (Gissiner Report) at Exhibit 8C.

3.    **While Participants Show Loss for the CREF Stock Account, Participants Fail to Show Loss for the TIAA Real Estate Account.  Boston College Fails to Show that Retaining the CREF Stock Account Was Objectively Prudent as Matter of Law.**

### a. Loss

Boston College asserts that the Participants' expert Halpern did not "attempt[] to calculate a loss and that he is not offering any damages calculations."  Mem. 17.  The Participants concede that Halpern does not calculate loss, CSOF ¶ 180, but argue that Halpern's "ample discussion of better-performing alternatives" is sufficient in showing a genuine dispute of material fact on loss.  Supp. Loss 4 n.1.

This Court holds that while the Participants fail to show loss with respect to the TIAA Real Estate Account, Participants do show sufficient loss to survive on summary judgment for the CREF Stock Account.

### i. Participants Were Not Required to Calculate Loss to Show Loss.

As set forth in Brotherston, the Participants have the burden of showing loss, and Boston College has the burden of disproving loss causation.  Brotherston, 907 F.3d at 39.  Other courts have cautioned against conflating loss and damages.  See, e.g., Sacerdote, 9 F.4th at 112.  The parties disagree on whether the Participants needed to calculate loss to show loss. This question is not directly addressed by Brotherston.  In Brotherston, the court ruled that the plaintiffs' expert's

approach for showing loss was not "inadequate as a matter of

law" when the expert "calculated which funds generated a loss

relative to a benchmark." Brotherston, 907 F.3d at 33-34

(emphasis added).  The court further stated:

> [T]o determine whether there was a loss, it is
> reasonable to compare the actual returns on that
> portfolio to the returns that would have been
> generated by a portfolio of benchmark funds or indexes
> comparable but for the fact that they do not claim to
> be able to pick winners and losers, or charge for
> doing so. Restatement (Third) of Trusts, § 100 cmt.
> b(1) (loss determinations can be based on returns of
> suitable index mutual funds or market
> indexes); cf. Evans v. Akers, 534 F.3d 65, 74 (1st
> Cir. 2008) ("Losses to a plan from breaches of the
> duty of prudence may be ascertained, with the help of
> expert analysis, by comparing the performance of the
> imprudent investments with the performance of a
> prudently invested portfolio.").

Id. at 34.  While the expert in Brotherston did provide

calculations of loss and explained his methodology for

calculating loss, Brotherston does not appear to foreclose the

possibility of showing loss without providing calculations (for

instance, it allows for comparing return rates).  Id. at 32-33.

Moreover, Brotherston recognized that the text of ERISA is

broad, expressing "Congress's clear intent 'to provide the

courts with broad remedies for redressing the interests of

participants and beneficiaries when they have been adversely

affected by breaches of fiduciary duty.'"  Id. at 31 (quoting

Eaves v. Penn, 587 F.2d 453, 462 (10th Cir. 1978)).  Thus,

Brotherston supports Participants' method of showing loss.

This Court has previously stated that, while defendants have the burden on proving causation under Brotherston, "[t]he plaintiff still bears the burden of showing the existence and extent of the alleged loss."  Moitoso, 451 F. Supp. 3d at 210; see id. at 220 (reiterating that the plaintiffs must prove the "exact extent of losses" at trial).  Here, the Participants can still show the extent and existence of loss through comparing return rates -- the greater the difference in returns rates, the greater the extent of the loss.  Moreover, this Court observes that several courts have discussed ascertaining more precise "calculations" or "amounts" of harm in the context of calculating damages (as to which defendants have the burden under Brotherston), in contrast to terms like "compare" or "show" in the context of loss.[47]

---

[47] See, e.g., Ramos v. Banner Health, 461 F. Supp. 3d 1067 (D. Colo. 2020), aff'd, 1 F.4th 769 (10th Cir. 2021) ("If a plaintiff proves both a breach of a fiduciary duty, as well as loss causation, but fails to present a viable calculation of loss, a prevailing plaintiff may still recover losses to the Plan."); Sacerdote, 9 F.4th at 112 ("The question of **how much money** should be awarded to the plaintiffs in damages is distinct from, and subsequent to, whether they have **shown a loss**." (emphasis added)); Tatum, 761 F.3d at 362-63 (ruling the lower court erred when it placed the burden on plaintiffs to show "what, if any, damages were attributable to that breach"); Secretary of U.S. Dept. of Labor v. Gilley, 290 F.3d 827, 830 (6th Cir. 2002) (holding that "ambiguity in determining the amount of loss in an ERISA action . . . should be resolved against the breaching fiduciary" and seemingly using the phrase loss and damages interchangeably); Evans, 534 F.3d at 74 (explaining that plaintiff can "ascertain[]" losses by "comparing the performance[s]").  Brotherston itself refers to

This Court holds that "comparing" return rates of the allegedly imprudent fund to a prudent alternative is sufficient for the Participants to survive summary judgment and that the Participants did not need specifically to calculate loss.

> ### ii. A Reasonable Factfinder Could Find that an Alternative Decision Should Have Been Made with Respect to the CREF Stock Account in 2020, but that Participants Fail to Adduce Evidence of When an Alternative Decision Should Have Been Made with Respect to the TIAA Real Estate Account.

Boston College states that the Participants failed to show loss because their expert Halpern did not opine on when the breach occurred, what prudent action the Committee ought have taken (freeze, terminate, or replace), and what alternative investment the Committee should have chosen.  Supp. Loss 3-4.  The Participants admit that Halpern did not opine on when the Committee should have terminated or frozen the challenged investments, as Halpern opines only that the Committee should have considered alternatives to maintaining the challenged investments.  CSOF ¶¶ 188-90.  While Halpern's opinion that the Committee should have considered alternatives relates to breach (process failure) rather than loss, Halpern shows loss by including the difference in performance between the challenged

---

"loss calculation[,]" but also uses the phrases "show loss" and that "to determine whether there was a loss, it is reasonable to compare the actual returns."  Brotherston, 907 F.2d at 34.

funds and alternatives.  Tr. Mot. Hearing 10:3-14, 12:1-8, ECF
No. 100.  Still, the record must allow a reasonable factfinder
to identify when an alternative decision ought have been made
for purposes of showing loss.  See Ellis, 257 F. Supp. 3d at 130
(finding for the fiduciary when plaintiffs entirely failed to
"point to a specific moment when [the fiduciary] should have
made a different decision" and instead "vaguely challenge the
Portfolio's overall structure without reference to any specific
events").

With respect to the CREF Stock Account, the Court can only
identify one instance in which a reasonable factfinder could
have concluded that an alternative decision ought have been
made: when Fiducient placed the CREF Stock Account on "Watch"
for sustained underperformance in 2020.[48]  A reasonable
factfinder could find that the CREF Stock Account ought have
been terminated or frozen in 2020.  Although Halpern shows loss

_____

[48] While the Participants posit that the blocks of orange in
2016 indicate that the CREF Stock Account was underperforming,
Fiducient explained –– and the Committee discussed -- that the
CREF Stock Account's benchmark was imperfect: the CREF Stock
Account's unique composition makes it difficult to "select[] an
appropriate peer universe for comparison."  Ex. 60 at 2033; see
also Ex. 40 at 1719 (meeting minutes explaining that the
Committee "discussed the nuances with assigning benchmarks and
peer groups for some of the Plan's more unique options[,]" such
as the CREF Stock Account).  The relevant QIR shows that CREF
Stock was only performing poorly relative to one benchmark,
performed well relative to its two other benchmarks, and that
the Committee kept it on "Maintain" status.  Ex. 62 at 1468.

by assuming that the CREF Stock Account was terminated in 2016 or 2017, Ex. 15 (Halpern Report) at 18 (comparing the CREF Stock Account's average annual returns over 5 years ending in 2022 and terminating in 2016 or 2017), a reasonable factfinder could still find that the Participants suffered losses by the Committee's failure to terminate or freeze the fund in 2020. According to Halpern's report, the CREF Stock Account's return rates show that it performed worse than its alternative.[49]

With respect to the TIAA Real Estate Account, Halpern similarly opines that the Committee ought have considered alternatives, but does not opine that TIAA Real Estate should have been terminated.  Ex. 11 (Halpern Tr.) 117:18-119:25; Ex. 16 (Halpern Report) at 13.  Halpern also does not identify when an alternative decision with respect to the TIAA Real Estate Account ought have been made.  CSOF ¶¶ 188-90.  Unlike the CREF Stock Account, there is no specific event (like Fiducient's placement of the CREF Stock Account on "Watch" for "sustained underperformance") from which a reasonable factfinder could conclude that an alternative decision ought have been made.  Thus, this Court holds that the Participants fail to show loss for the TIAA Real Estate Account as matter of law.

---

[49] The Court must also determine whether this alternative was unsuitable as matter of law, discussed _infra_.

### iii. CREF Index Fund Was a Suitable Alternative to the CREF Stock Account for Purposes of Showing Loss on Summary Judgment.

The parties further dispute whether the Participants had to, under <u>Brotherston</u>, identify a "suitable" alternative to the CREF Stock Account to show loss, and whether Boston College showed, as matter of law, that the Participants failed to identify a "suitable" alternative to the CREF Stock Account.[50]

Boston College argues that the CREF Index Fund is an "inapt comparator[]" to the CREF Stock Account because they differ in terms of "risk, investment strategy, and financial characteristics[.]"  Mot. Exclude Halpern 2.  The Participants state that Halpern shows loss by pointing to "specific benchmarks and pricing data" which shows the "specific returns for those funds for those periods[.]"  Supp. Loss 3.  The Participants further argue that Halpern need not point to specific investment alternatives or calculate damages, and that regardless, as per <u>Brotherston</u>, "whether or not Mr. Halpern

---

[50] This issue is more fully explored in the parties' <u>Daubert</u> motion briefing.  The parties refer to these <u>Daubert</u> briefs in their summary judgment materials.  Mem. Supp. Defs.' Mot. Exclude Opinions of Pls.' Expert Samuel Halpern ("Mot. Exclude Halpern") 10, ECF No. 55; Pls.' Opp'n Defs.' Mot. Exclude Pls.' Expert Samuel Halpern ("Opp'n Mot. Exclude Halpern") 13, ECF No. 67; Reply Mem. Law Supp. Defs.' Mot. Exclude Opinions of Pls.' Expert Samuel Halpern ("Reply Mot. Exclude Halpern") 8, ECF No. 78.

sufficiently identified alternatives, are questions of fact."
Id. at 4.

Boston College asserts that Brotherston requires a
"suitable" index to calculate loss. Brotherston, 907 F.3d at 32
("[T]he Restatement specifically identifies as an appropriate
comparator for loss calculation purposes return rates of one or
more . . . **suitable** index mutual funds or market indexes (with
such adjustments as may be appropriate)." (emphasis added)
(internal quotation marks omitted)). After ruling the
plaintiffs' experts' loss calculations were not "inadequate as a
matter of law[,]" the Brotherston court further stated that it
was not saying the expert "necessarily picked suitable
benchmarks, or calculated the returns correctly, or focused on
the correct time period," and while the defendants raised these
issues on appeal, "these are questions of fact." Id. at 33-34.[51]
Participants argue that forcing Halpern to pick suitable
alternatives violates principles in Brotherston. In discussing
why defendants bear the burden as to loss causation (distinct
from loss), Brotherston states:

---

[51] The court in Brotherston further rejected defendants'
arguments that plaintiffs failed to provide evidence to support
their expert's selection of comparators and thus "challenge his
comparators as a matter of law" because "there is legal support
for the use of index funds and other benchmarks as comparators
for loss calculation purposes." Brotherston, 907 F.3d at 34
n.14.

An ERISA fiduciary often -- as in this case --
has available many options from which to build a
portfolio of investments available to beneficiaries.
In such circumstances, it makes little sense to have
the plaintiff hazard a guess as to what the fiduciary
would have done had it not breached its duty in
selecting investment vehicles, only to be told "guess
again." It makes much more sense for the fiduciary to
say what it claims it would have done and for the
plaintiff to then respond to that.

Id. at 38.  This reasoning in Brotherston, however, pertains to

loss causation, not loss.

The Second Circuit in Cunningham recently stated that

plaintiffs, in proving loss for fees, must show that there was a

"'prudent alternative' to the allegedly imprudent fees paid" --

"[t]hat is, [p]laintiffs must provide evidence of a 'suitable

benchmark[ ]' against which loss could be measured."

Cunningham, 86 F.4th at 982 (citing Brotherston, 907 F.3d at

34).  This Court agrees with Boston College, and the Second

Circuit's interpretation of Brotherston, which requires the

Participants to show a "prudent alternative" or "suitable

benchmark" for which to compare the challenged investments

against for purposes of calculating loss.  To hold otherwise

would eliminate the Participant's burden to show loss[52] -- the

---

[52] While the Participants point out that the issue of
whether there is a suitable benchmark was an issue of fact that
Brotherston left for the court to decide, Boston College can
still show that the Participants failed to identify a prudent
alternative.  If the record evidence fails to show that a
reasonable factfinder could find that the Participants have
identified a "suitable" alternative, Boston College is entitled

Participants could pick any alternative fund to "show" loss.
See Evans, 534 F.3d at 74 (explaining that losses may be
"ascertained" "by comparing the performance of the **imprudent
investments** with the **performance of a prudently invested
portfolio**" (emphasis added)).  "[N]othing in Brotherston
supports that a loss may be shown by comparing alleged imprudent
investments to funds that cannot be said to be prudent."
Wildman v. American Century Servs., LLC, 362 F. Supp. 3d 685
(W.D. Mo. 2019) (deciding that the experts' comparator indexes
were "so dissimilar" to the "Plan's philosophy and investment
strategy" that plaintiffs failed to show loss at trial).

To survive summary judgment, the Participants need only
rebut Boston College's showing, if any, that there is no genuine
dispute of material fact as to whether the Participants
identified a suitable or prudent alternative.  Boston College
points to Halpern's testimony, in which he stated that he was

---

to summary judgment on the issue of loss.  This Court agrees
with Boston College as to the scope of Brotherston's holding:
that the district court erred in finding that a comparison of
the challenged investments to index funds could not show loss as
matter of law, where there was legal support for using index
funds as prudent comparators.  See Supp. Opp'n Loss 3.  This
does not mean that index funds will always be a "suitable
benchmark" in every case -- as this is a fact-intensive inquiry,
just as whether there was a breach of fiduciary duty to begin
with.  While perhaps the fact that it is a fact-intensive
inquiry ought caution courts against finding alternatives
unsuitable as matter of law on summary judgment, this does not
mean that the Participants can escape showing, as part of their
loss burden, a prudent or suitable alternative.

not opining on the suitability of the alternatives to the
challenged investments and did not identify a "comparator" for
the purposes of calculating loss.[53]  Halpern did, however,
identify the CREF Index Fund as an alternative to the CREF Stock
Account.  See generally Ex. 15 (Halpern Report).  This Court
agrees with the Participants that Halpern's failure to opine on
the CREF Index Fund's suitability does not make the CREF Stock
Index unsuitable as matter of law.  Pls.' Opp'n Defs.' Mot.
Exclude Pls.' Expert Samuel Halpern 15.

Boston College cites case law suggesting that it may be
inappropriate to compare CREF Stock to domestic indices.[54]
Halpern has admitted that CREF Stock has a 30-35% international
mix, whereas the CREF Equity Index Fund is a purely domestic
investment.  Ex. 15 (Halpern Report) at 17.  Regardless, the
Court is not persuaded by these cases to hold -- as matter of

---

[53] Ex. 11 (Halpern Tr.) 128:16-25 (not calculating loss
because it "would require a comparator"); id. 153:23-155:8
(declining to opine on the "suitability" of the CREF Index Fund
and the TIAA Global Equity Fund, i.e., whether they were
"appropriate investment option[s] for the [P]lan"); see id.
(confirming that he did not conduct any "due diligence" on the
alternative investment options).

[54] In Sacerdote, the court found, after trial, that it was
inappropriate to compare the CREF Stock Account to funds that do
not "account for the foreign stock market's performance or the
performance of the relevant segments of the U.S. and foreign
markets[.]" 328 F. Supp. 3d 273 at 315; see also Wilcox v.
Georgetown Univ., 2019 WL 132281, at *11 (D.D.C. Jan. 8, 2019)
(dismissing complaint because "domestic indices . . . are
comparators to only part of [the CREF Stock Account's]
holdings").

law -- that CREF Stock cannot be compared to domestic indexes,
especially because Brotherston stated that the use of index
funds as comparators has legal support and adequate comparators
are "questions of fact." Brotherston, 907 F.3d at 34; see also
Fuller v. SunTrust Banks, Inc., No. 1:11-CV-784-ODE, 2019 WL
5448206, at *28 (N.D. Ga. Oct. 3, 2019) (suggesting that
Brotherston indicated "the determination of the appropriateness
of the comparator funds used is a question for trial, not
summary judgment").

Moreover, as the Participants point out, the CREF Index
Fund was already offered in the Plan and thus Boston College had
arguably already found it to be a suitable alternative to the
CREF Stock Account. Opp'n Mot. Exclude Halpern 13; Ex. 11
(Halpern Tr.) 154:3-24. Further, the Participants explain that
the CREF Stock Account's international stock is what caused the
loss to the Plans. Opp'n Mot. Exclude Halpern 14; Ex. 15
(Halpern Report) at 18 ("illustrat[ing] the depressive impact of
international stock exposure on the CREF Stock Fund"). Thus,
the Court is reluctant to require that the Participants set
forth a prudent alternative with the same -- or similar --
exposure to international stock as the sine qua non of
Participants' survival on this aspect of summary judgment,
especially considering it is this exposure to foreign stock that
allegedly resulted in losses. Moreover, Morningstar, a third-

party research investment firm which assigns ratings to funds, compared the CREF Stock Account against a purely domestic index -- which further suggests that the CREF Index Fund, a domestic index, is an appropriate comparator for the CREF Stock Account. CSOF ¶ 174.  Lastly, Boston College argues that the CREF Stock Account is unique and hard to "pigeonhole into a single category[.]"  Id. ¶¶ 148, 156.  Unique investments ought not be insulated from duty-of-prudence claims simply because they are unique.  See Opp'n 17.

Thus, this Court holds that Boston College fails to show, as matter of law, that the Participants failed to identify a suitable alternative to the CREF Stock Account.!

### b.    Objective Prudence

Objective prudence is established if it is more likely than not that a hypothetically prudent fiduciary would, i.e., probably (rather than could, i.e., possibly) have made the same decision.  Tatum, 761 F.3d at 365.  Boston College has a heavy burden in disproving loss causation on summary judgment.  ERISA is designed to benefit participants, not protect fiduciaries, and therefore this burden shifting escape valve is, not surprisingly, usually reserved for trial.

Boston College's expert Wermers provides evidence that every year from 2015 to 2021,[55] the vast majority (at least 49 out of 51) of the largest university and college ERISA retirement plans with over $1,000,000,000 in assets under management invested had significant assets[56] in CREF Stock.  Ex. 13 (Wermers Report) ¶ 54, Exhibit 6.A.1, A.2.  Wermers' chart shows that 20 of the 51 largest college and university plan sponsors "discontinued offering the investment or frozen it against new investments" at some point over the Class Period. Ex. 16 (Halpern Report) at 14; Ex. 13 (Wermers Report) ¶ 54, Exhibit 6.A.1.  A reasonable factfinder could find that because many other plan sponsors were freezing contributions to CREF Stock, it was not objectively prudent for this Committee to continue retaining CREF Stock.  Moreover, Smith did state that "many" of Fiducient's university and college clients opted to freeze CREF annuities in favor of index funds, Ex. 103 at 22922;

---

[55] The Participants object on the ground that these data are from 2016, Opp'n 18; however, the Participants ignore that the data are only partially from 2016, as Boston College points out. Reply 3.  Wermers provides data up to year-end 2021 showing the same trends.  Ex. 13 (Wermers Report) ¶ 54, Exhibit 6.A.1, A.2.

[56] According to Wermers' report, the average amount of assets invested in CREF Stock across the top 52 universities is as follows: 15.78% (year-end 2015), 15.01% (year-end 2016), 14.58% (year-end 2017), 12.62% (year-end 2018), 12.16% (year-end 2019), 12.17% (year-end 2020), and 11.54% (year-end 2021).  Ex. 13 (Wermers Report), Exhibit 6.A.2.

however, as noted previously, the record is unclear as to which annuities Smith was referring to.

Boston College asserts that retaining the CREF Stock Account was objectively prudent based on qualitative[57] and quantitative factors, providing evidence that a third-party research investment firm -- Morningstar -- assigned CREF Stock a 4/5-star rating between 2018 and 2021, which indicates that the fund is "above average."  CSOF ¶ 174.  Fiducient's placement of CREF Stock on "Watch" for sustained underperformance, however, casts some doubt as to its objective prudence.

Boston College also argues that there is no evidence that the Participants would have moved investments out of the CREF Stock Account even had the Committee frozen contributions to it.[58]  The Committee was unable to "map" (transfer or redirect) assets in CREF Stock because the decision to transfer these

---

[57] The CREF Stock Account is an annuity that seeks long-term returns through investment income and capital appreciation.  It invests assets in four categories of common stocks; it "invests in companies of any size and includes allocations to foreign securities," and its managers have 10-20 years of experience.  CSOF ¶¶ 135-37, 178.  The Participants do not dispute these attributes of the CREF Stock Account.

[58] The parties agree that issues as to the Participants' investment behavior relate to loss causation.  See Tr. Mot. Hearing 11:16-22; Supp. Opp'n Loss 5.  Indeed, courts have held that, once an ERISA plaintiff established breach and loss, "the risk of uncertainty as to the amount of the loss fails on the [fiduciary]."  Ramos, 461 F. Supp. 3d at 1067, aff'd, 1 F.4th at 769 (quoting Confederated Tribes of Warm Springs Reservation of Ore. v. United States, 248 F.3d 1365, 1371 (Fed. Cir. 2001)).

assets was left to the individual participant -- the Committee could only prevent new contributions to CREF Stock.  Mem. 18; CSOF ¶¶ 20, 23.  Thus, even had Boston College frozen CREF Stock, it is possible that the Participants would not have moved their investments.  The Participants invested 20-25% of their assets in the CREF Stock Account each year during the Class Period, which -- as Boston College argues -- suggests that it was a popular choice among the Participants.  CSOF ¶ 175; see Ex. 15 (Halpern Report) at 15.  While it is possible that the freezing of contributions would have signaled to the Participants to move their investments, it is difficult to ascertain whether the Participants would have moved their assets had the Committee frozen contributions to CREF Stock.  Freezing contributions and redirecting them could have prevented additional losses, however, regardless of whether the Participants would have moved out their existing investments.

Boston College argues that the Participants fail to provide evidence to rebut Boston College's evidence showing that "individual participants in plans that froze [CREF Stock] did not move their assets to new investments."  Supp. Opp'n Loss at 6.  Upon review of other university plans that froze these investments, it is unclear to what extent participants kept their assets in the CREF Stock Account, although the data does show that participants in frozen or terminated funds did not

[114]

significantly reduce their investments in the CREF Stock Account.[59] See Ex. 13 (Wermers Report) ¶ 23, Exhibit 6.A. Looking generally at all 20 plans that eventually froze or terminated the CREF Stock Account at some time over the Class Period, only two had their overall assets in CREF Stock decrease. Ex. 13 (Wermers Report), Exhibit 6.A.1. The percentage of total plan assets in the CREF Stock Account, however, did decrease for 18 of them -- thus, it is plausible that at least some participants were removing investments, even if there is no evidence of mass relocation of investments away from the CREF Stock Account. Id. at Exhibit 6.A.2.

Halpern does not opine on what Participants would have done had the Committee frozen contributions to CREF Stock because doing so would be, admittedly, "speculative." CSOF ¶ 198. Despite this, Halpern observes that the Participants "tended to

---

[59] Yale University froze its contributions to the CREF Stock Account in 2019, and its assets in the CREF Stock Account increased from $676,500,000 (year-end 2018) to $934,100,000 (2021). Ex. 13 (Wermers Report), Exhibit 6.A.1 n.12. The percentage of Yale participants' assets in the CREF Stock Account, however, declined: 12.01% in year-end 2018 to 10.99% in 2021. Id. at Exhibit 6.A.2. Vanderbilt University, after freezing the CREF Stock Account in 2015, increased from $312,700,000 in 2015 to $358,800,000 in 2021. Id. at Exhibit 6.A.1 n.13. The percentage of assets in the CREF Stock Account, however, declined: 9.48% in 2015 and 5.68% in 2021. Id. at Exhibit 6.A.2 n.13. Finally, the University of Rochester froze the CREF Stock Account in 2017, with assets decreasing from $437,300,000 in year-end 2017 to $377,000,000 in 2021. Id. at Exhibit 6.A.1 n.4.

invest far less in international stocks than in domestic stocks[,]" Ex. 11 (Halpern Tr.) 126:18-127:5,[60] which the Participants cite as evidence that they, after the Committee froze contributions to CREF Stock, would have moved their assets from the CREF Stock Account (which has a 65%/35% domestic to foreign equity mix) to investments with an even heavier domestic equity mix.  Opp'n Mot. Exclude Halpern 16.  Boston College points out a deficiency in Halpern's observation: Halpern completely "set aside participants' choice to invest in the CREF Stock Account" -- in other words, Halpern did not at all consider the percentage of Participants that invested in the CREF Stock Account in making these observations about the Participants' preference for domestic equity.  Reply Mot. Exclude Halpern 10; Ex. 15 (Halpern Report) at 18 n.55.  The CREF Stock Account was included as a "domestic equity" fund in

---

[60] In his report, Halpern states that the Participants tend to invest more in domestic than foreign stock, citing evidence from September 2022 showing:

> [P]articipants in Plan I invested 32.5% of their assets in domestic equity and only 7.3% in international equity.  Relative to all equity investments by those participants, that meant nearly 82% domestic exposure, versus CREF Stock Fund's domestic exposure as low as 65%.  At that same date, participants in Plan II invested 43.9% in domestic equity and only 4.2% internationally.  That's over 92% in domestic stocks and only 8% international.

Ex. 15 (Halpern Report) at 18 n.55 (referencing Ex. 88 (Q3 2022 QIR, BC-SELLERS022361 at 2388-2389), ECF No. 63-48).

the calculations Halpern relies upon to make these observations. Ex. 88 at 2388-2389; supra note 60.  While this certainly diminishes the credibility of Halpern's observation, the Court cannot make credibility determinations on a motion for summary judgment.  Reeves, 530 U.S. at 150.

In arguing that the Participants provide no evidence to rebut Boston College's evidence on loss causation, Boston College cites Tussey, in which the Eighth Circuit deemed the district court's damages award overly speculative because there was no evidence in the record as to how participants would have invested their funds, and the district court ignored evidence about both participant choice and the popularity of investment funds.  Tussey v. ABB, Inc., 746 F.3d 327, 339 (8th Cir. 2014). The Participants distinguish Tussey by stating that Halpern did in fact opine, as discussed above, that "[P]articipants likely would have reduced their exposure to international stocks if the Stock Fund were removed."  Opp'n Mot. Exclude Halpern 16.

Boston College cites compelling evidence that the CREF Stock Account was objectively prudent; however, Boston College still fails to meet its heavy burden of showing objective prudence on summary judgment, considering many fiduciaries were freezing or terminating contributions to the CREF Stock Account and Halpern's observations that the Participants showed a

preference for domestic equity.  Thus, Boston College fails to
show as matter of law objective prudence as to CREF Stock.

### G.   This Court GRANTS Summary Judgment on Whether the Trustees Prudently Monitored Their Fiduciaries.

This Court **GRANTS** Boston College's motion for summary
judgment on Count II's failure to monitor other fiduciaries.

ERISA Sections 409 and 502 require monitoring fiduciaries
to ensure that fiduciaries are complying with their ERISA
obligations.  29 U.S.C. § 1109(a); 29 U.S.C. §§ 1132(a)(2),
1132(a)(3).  These obligations include those related to making
prudent investment decisions, monitoring those providing
services to the Plans, and ensuring that their actions are
compliant with Plan documents.  29 U.S.C. § 1109(a); 29 U.S.C.
§§ 1132(a)(2), 1132(a)(3).  If the monitored fiduciaries breach
any obligations, the monitoring fiduciaries must promptly act to
protect participants, the plans, and beneficiaries to those
plans.  See Compl. ¶ 131.

Boston College argues that Count II fails on summary
judgment "because (1) the underlying claims as to the Committee
fail; and (2) Plaintiffs adduced no evidence rebutting the
record evidence showing that the Board of Trustees regularly
monitored the Committee, including through annual meetings."
Mem. 20.  The Committee prepared annual reports and presented
these reports to the Board of Trustees.  CSOF ¶ 79.  These

reports contained checklists, confirming that the Committee met
regularly and performed a list of tasks related to monitoring.
Id. ¶¶ 79-81 (describing items on check list).  The Committee
also reported that it conducted a 2018 RFP.  Id. ¶ 81.

The Participants argue that this Court ought deny Boston
College's motion for summary judgment as to these claims because
(1) Boston College fails on the underlying prudence claim and
(2) "Trustees were kept apprised at every step about what the
Committee and Fiducient were doing and not doing, likely
including their efforts to create an incomplete, misleading
record."  Opp'n 20.  The Participants do not cite to any case or
evidence suggesting that this monitoring was deficient, and
their allegations that the Trustees were kept apprised of the
Committee's actions to create an incomplete record is without
any record support.  Thus, even though the underlying duty of
prudence claim survives summary judgment, this Court **GRANTS**
summary judgment to Trustees on the duty to monitor claim.  See
Shirk v. Fifth Third Bancorp, 2009 WL 692124, at *20 (S.D. Ohio
Jan. 29, 2009) (granting summary judgment on duty to monitor
claim where "Plaintiffs fail[ed] to submit evidence that [the]
monitoring was deficient"); Hunter v. Shield, 550 F. Supp. 3d
500, 525 (S.D. Ohio 2021), aff'd, No. 21-3748, 2022 WL 2952583
(6th Cir. July 26, 2022) (stating that speculation, unsupported

by evidence in the record, cannot defeat a motion for summary judgment).

## III. CONCLUSION

This Court **DENIES** Boston College's motion for summary judgment as it relates to the Recordkeeping Fees Claim.  This Court also **DENIES** Boston College's motion for summary judgment on the Challenged Investment Claim.  This Court **GRANTS** Boston College's summary judgment motion on the claims that it violated the Plans' documents and that it failed prudently to monitor its fiduciaries.

## IV.  EPILOGUE – A BRIEF REFLECTION ON SUMMARY JUDGMENT

In some cases, a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure may be a powerful tool for the "determination" of a civil action pursuant to Rule 1.[61] This case is not one of them.  Consider this comparison:

In March 2023, the United States commenced a jury waived antitrust civil action -- as complex as this jury-waived, civil action under ERISA -- seeking to enjoin the merger of Jet Blue and Spirit Airlines.  United States v. JetBlue Airways Corp.,

---

[61] The magnificent 1938 original version of the Federal Rules of Civil Procedure came on the scene when trials were in their heyday.  See Nora Freeman Engstrom, The Diminished Trial, 86 Fordham L. Rev. 2131, 2131 (2018) (stating that trials resolved close to 20% of federal civil cases in 1938, 4.3% in 1990, 2.2% in 2000, and close to 1% in 2016).  Trials having now fallen into desuetude in the wake of "managerial judging," more pallid "determinations" are the norm.

No. CV 23-10511-WGY, ECF No. 1 (complaint filed Mar. 7, 2023).
The parties eschewed summary judgment and drove straight to
trial.  Ten months after the case was filed, the Court entered a
113-page opinion and an appealable judgment that "determined"
that case.  Here, in contrast, over twenty-one months after this
case was filed, the Court enters its 126-page memorandum and
order that, while slightly trimming the case, now must be tried
in full in order for an appealable "determination" to be
reached.

In short, this entire summary judgment exercise has been a
monumental waste of time.  And no one ought be surprised.[62]
Here, where there are qualified experts on both sides and
granting summary judgment to a party who bears the burden of

---

[62] Perhaps, if it's so obvious, the fault is mine.  One
district judge -- the Honorable Davis Folsom in the Eastern
District of Texas -- required parties to request judicial
permission before filing a motion for summary judgment.  Hon.
Diane P. Wood, Summary Judgment and the Law of Unintended
Consequences, 36 Okla. City U. L. Rev. 231, 250 n.60 (2011).
I've never favored such a rule, fearing that it could be misused
as a means of docket control to satisfy the requirement of the
Civil Justice Reform Act.  See Miguel F. P. de Figueiredo,
Alexandra D. Lahav, & Peter Siegelman, The Six-Month List and
the Unintended Consequences of Judicial Accountability, 105
Cornell L. Rev. 363 (2020) (explaining how the Civil Justice
Reform Act has incentivized judges to act more quickly and may
be causing judicial errors).  But see Wood, supra note 62, at
244, 250 (suggesting judges require parties to ask permission
before filing summary judgment motions so cases that "could just
as efficiently or even more efficiently be brought to trial"
could go straight to trial).

proof[63] is well-nigh impossible, see Atlantic Specialty Ins. Co.,
480 F. Supp. 3d at 329 (explaining that a party must produce
"incontrovertible [] evidence" when it moves on an issue it has
the burden of proof on (citing Reeves, 530 U.S. 133 at 151)),
counsel should understand that a summary judgment motion
displays what one of my colleagues calls "an instinct for the
capillaries" -- a money waster -- not the true trial lawyer's
"instinct for the jugular."

    Summary judgment is **not** fact finding -- it is most closely
akin to a declaratory judgment and is, of course, properly
subject to de novo review.  Hardy v. Loon Mountain Recreation
Corp., 276 F.3d 18, 20 (1st Cir. 2002) (reviewing a grant of
summary judgment de novo).  In the summary judgment analysis,
the trial judge must lean **against** the movant and draw all
reasonable inferences **against** that party.  Fact finding is
entirely different and requires an utterly distinct mind set.
It is fact finding that requires the utmost fairness and
impartiality:

---

[63] The Court is here referring to granting summary judgment
in favor of Boston College on loss causation (objective
prudence).  As per Brotherston, the Participants have the burden
in showing breach and loss.  907 F.3d at 39.  Although this
Court recognizes that Boston College has set forth strong
evidence tending to disprove causation, Boston College faces a
high hurdle in winning on summary judgment on an element in
which it has the burden of proof, as this Court must take all
reasonable inferences in favor of the Participants.  Reeves, 530
U.S. 133 at 150-51.

> [F]act-finding is difficult.  Exacting and time
> consuming, it inevitably falls short of absolute
> certainty.  More than any society in history, the
> United States entrusts fact-finding to the collective
> wisdom of the community.  Our insistence on procedural
> safeguards, application of evidence rules, and our
> willingness to innovate are all designed to enhance
> impartial fact-finding.
>
> Judicial fact-finding is equally rigorous.
> Necessarily detailed, judicial fact-finding must draw
> logical inferences from the record, and, after lucidly
> presenting the subsidiary facts, must apply the legal
> framework in a transparent written or oral analysis
> that leads to a relevant conclusion.  Such fact-
> finding is among the most difficult of judicial tasks.
> It is tedious and demanding, requiring the entirety of
> the judge's attention, all her powers of observation,
> organization, and recall, and every ounce of analytic
> common sense he possesses.  Moreover, fact-finding is
> the one judicial duty that may never be delegated to
> law clerks or court staff.  Indeed, unlike legal
> analysis, many judges will not even discuss fact-
> finding with staff, lest the resulting conclusions
> morph into judgment by committee rather than the
> personal judgment of the duly constituted judicial
> officer.

Hon. William G. Young, A Lament for What Was Once and Yet Can Be, 32 B.C. Int'l & Comp. L. Rev. 305, 312-13 (2009).  The path to fact finding leads through trial.  See In re One Star Class Sloop Sailboat Built in 1930 with Hull No. 721, Named "Flash II", 517 F. Supp. 2d 546, 556 (D. Mass. 2007) ("As is always the case, issues yield readily to fact finding."), aff'd sub nom. United States v. One Star Class Sloop Sailboat built in 1930 with hull no. 721, named "Flash II", 546 F.3d 26 (1st Cir. 2008).

It's useless, of course, to rail against the overuse of summary judgment, though every summary judgment motion denied exacts a toll on the entire district court caseload and contributes to the endemic delay and excessive cost of federal civil litigation.  Lawyers resort to summary judgment for the best of all possible reasons.  It works.  Over three times as many federal civil actions are "determined" by summary judgment as are resolved by trial.  See Robert P. Burns, What Will We Lose If the Trial Vanishes?, 37 Ohio N.U. L. Rev. 575, 577 (2011); see also Table C-4A, U.S. District Courts – Civil Cases Terminated, by District and Action Taken, During the 12-Month Period Ending in September 30, 2022, United States Courts (2022), https://www.uscourts.gov/sites/default/files/data_tables/jb_c4a_0930.2022.pdf (data showing that close to 8.5% of civil cases in 2022 were disposed of by motion before trial, including summary judgment, and close to 0.5% of cases are resolved by trial); Judiciary Data and Analysis Office, Civil Statistical Reporting Guide 26-27 (3d ed. 2023) (on file with the Administrative Office of the United States Courts) (providing disposition codes for data); D. Brock Hornby, The Business of the U.S. District Courts, 10 Green Bag 2d 453, 454, 468 (2007) (explaining that while trials have been declining markedly, filings have not, and a federal judge's primary role is no longer "umpiring trials").

Here, however, is a case that would have benefitted everyone from a direct march to trial.  The Court will hold a status conference to set a prompt trial date.

Ultimately, of course, I am responsible for the mismanagement of this case and the added costs and delay such management has imposed on these litigants.  I have puzzled how to do better.  Restrictions on the filing of summary judgment motions are not the answer.

Rather, it seems better simply to prioritize trial as the more apt means of dispute resolution.  Already, I usually require that summary judgment motions be filed three months before the expected trial date.[64]  In the future, I shall make plain that filing a motion for summary judgment does **not** suspend the trial date or the time of filing a joint pre-trial memorandum (one month earlier).  While I shall continue to make every effort to resolve all or part of any such motion, if the motion remains unresolved by the time of the final pre-trial conference, notwithstanding the precatory language of Rule 56 of the Federal Rules of Civil Procedure, I shall simply deny it.[65]

---

[64] The month when trial will be held is established in this Session at the initial case management scheduling conference held pursuant to Local Rule 16.1 (D. Mass).  Usually, that's no more than 13 months after that conference.  This Court strongly disfavors any continuance of that date.

[65] This approach has the further beneficent effect of rewarding the earlier filing of summary judgment motions and speeding up discovery -- litigation's greatest cost driver.

Fed. R. Civ. P. 56(a) ("The court should state on the record the reasons for granting or denying the motion.").  After all, "the fact that summary judgment denials are not appealable makes it far easier to draft very brief opinions denying summary judgment -- or even simply to deny summary judgment on the oral record without any written opinion."  Jonathan Remy Nash & D. Daniel Sokol, The Summary Judgment Revolution That Wasn't, 65 Wm. & Mary L. Rev. 389, 432 (2023).  A full trial will follow promptly.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[66]

---

[66] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.